# EXHIBIT

# A

UNITED STATES DEPARTMENT OF COMMERCE
UNITED STATES PATENT AND TRADEMARK OFFICE
EQUAL EMPLOYMENT OPPORTUNITY CASE
IN THE MATTER OF:

| | | |
|---|---|---|
| GREGORY ROYAL,<br>    Complainant, | ) | |
| | ) | |
| | ) | |
| | ) | Agency Case No. 14-56-22 |
| v. | ) | EEOC No. 570-2015-00842X |
| | ) | |
| MICHELLE K. LEE, DIRECTOR, | ) | |
| U.S. PATENT AND TRADEMARK OFFICE | ) | |
|     Agency. | ) | |
| ———————————————————— | ) | |

## FINAL AGENCY DECISION

This is the Final Agency Decision of the United States Patent and Trademark Office (Agency or USPTO) regarding the complaint of discrimination identified above. Complainant, Gregory Royal, former Agency employee, has alleged that he was discriminated against in the form of a hostile work environment on the bases of sex (male), race (African American/Black), and reprisal (prior EEO activity)[1] since:

1. On or about December 13, 2013, complainant alleges his complaints of hostile work environment were not taken seriously because he is a "six-foot, medium built black man" and the alleged harasser is a white woman ("Alleged Harasser");

2. On or about November 7, 2013, he was physically assaulted by the Alleged Harasser;

3. On or about December 13, 2013, and continuing Complainant alleges that the Alleged Harasser has been allowed to continue to violate USPTO policies on workplace safety and conduct by bringing several knives to the workplace and threatening Complainant;

4. On or about July 10, 2014, he alleges he was physically assaulted in the workplace by another Agency employee whereby other examiners see him as a "punching bag" to be slapped, and nothing will happen to them for doing so.

5. On or about August 14, 2014, during the Patent Examiner Efficiency Exam (Exam), Complainant was further subjected to a hostile work environment because the Agency failed to take sufficient action[2] to prevent him from being subject to a hostile work environment when:

---

[1] Reprisal applies to Claims 6 and 7 only.
[2] Complainant alleges that due to the lack of a functioning keyboard at his cubicle, he did take the Exam in a room separate from the Alleged Harasser.

    a.   the Alleged Harasser was to be allowed to take the Exam in the same room and the same time as Complainant was, despite the fact that she was moved to a different "Lab" than he was on or about December 13, 2013;

    b.   the Alleged Harasser failed to follow the Exam Proctor's instructions to remain silent by approaching the cubicle in front of the one where Complainant was seated and began a "loud conversation" with another employee, and she "did so solely to annoy [sic] Complainant's focus" and "under the cloak of being social," the Alleged Harasser sought to disturb Complainant's focus for the Exam; and

    c.   When the Exam Proctor spelled the name of an employee Complainant believes to be "Islamic" due to his name being "Mohammed," another employee was allowed to mock, not for the first time, those of the Islamic faith.

6.   On or about September 4, 2014, Complainant was removed from federal service during his probationary period, including being publicly escorted from the Agency's Alexandria, Virginia headquarters by Agency security guards.

7.   On or about September 2014, the Agency withheld timely payment of his vacation benefits.

*See* Report of Investigation (ROI), Exhibit [Ex]. C-10, pp. 157-61.

## PROCEDURAL HISTORY

Complainant initially contacted the Agency's EEO Office on January 27, 2014, and an initial interview occurred February 27, 2014 (ROI, Ex. B, p. 91). After Complainant's allegations were not resolved through the informal counseling process, the Agency provided Complainant with his Notice of Right to File a formal complaint of discrimination, which he received on April 25, 2014. (ROI, Ex. C, p. 104). Complainant filed the formal complaint of discrimination on May 12, 2014, which the Agency acknowledged by correspondence dated May 26, 2015 (ROI, Ex. A, pp. 49-66; Ex. C-2, pp. 107-108). On May 27, 2014, the Agency issued its Notice of Investigation (NOI). (ROI, C-3, pp. 110-12).

Subsequently, Complainant requested to amend his complaint on July 23, 2014 and the Agency issued its Amended NOI on July 23, 2014, which is clarified on July 25, 2014. (ROI, Ex. C-4, pp. 114-120). On August 15, 2014, Complainant again requested to amend his complaint, and the Agency issued its Second Amended NOI on August 14, 2014. (ROI, Ex. C-5, pp. 122-24). On August 24, 2014, Complainant again requested to amend his complaint, and on August 29, 2014, the Agency issued its Third Amended NOI and Partial Dismissal (NOI & PD).[3] (ROI, C-6, pp. 126-30). On September 11, 2014, Complainant again requested to amend his complaint, and on September 12, 2014, the Agency issued its Fourth Amended NOI & PD. (ROI, C-7, pp. 132-39). On October 3, 2014, Complainant again requested to amend his complaint, and on October 7, 2014, the Agency

---

[3]This Final Agency Decision hereby incorporates by reference as if fully stated herein its dismissal of claims in the 3rd Amended NOI & PD, 4th Amended NOI & PD, 5th Amended NOI & PD, 6th Amended NOI & PD, and 7th Amended NOI & PD.

issued its Fifth Amended NOI & PD. (ROI, Ex. C-8, pp. 141-47). On October 8, 2014, Complainant again requested to amend his complaint, and on October 10, 2014, the Agency issued its Sixth Amended NOI & PD. (ROI, Ex. C-9, pp. 149-55). On December 22, 2014, Complainant requested to amend his complaint a final time, and on January 7, 2015, the Agency issued its Seventh Amended NOI & PD. (ROI, Ex. C-10, pp. 157-61).

On March 25, 2015, the Agency timely issued its Report of Investigation (ROI) and Complainant's notice of rights under 29 C.F.R. § 1614.108(f). On May 22, 2015, Complainant elected a hearing before an administrative judge (AJ) of the Equal Employment Opportunity Commission (EEOC). On May 28, 2015, the Agency electronically transmitted the ROI and complaint file to the EEOC. On October 5, 2016, as "an appropriate sanction" for Complainant's "failure to comply with orders and respond to requests for information in discovery," Administrative Judge Alexander of the EEOC dismissed Complainant's request for a hearing and remanded the case to the Agency for issuance of final agency decision (FAD). (Copy attached hereto as Exhibit A.) This FAD issues pursuant to the AJ's order.

## MATERIAL FACTS

*Background*

1.  Complainant identifies himself as an African-American male. (ROI, Ex. F-1a, p. 1284). Complainant has a bachelor's of science in electrical engineering, a juris doctor, and master of laws in intellectual property. (ROI, Ex. F-1a, p. 1286; Ex. G-4, p. 1975).

2.  Complainant began employment with the Agency as a patent examiner, GS-1222-09, on September 9, 2013. (ROI, Ex. F-1a, p. 1284; Ex. G-3, p. 1951). Once Complainant completed his introductory training in the Patent Training Academy (PTA), he was assigned to Art Unit 2856 in Technology Center (TC) 2800.[4] (ROI, Ex. F-1a, p. 1284). Complainant reported to a Supervisory Patent Examiner (SPE). (ROI, Ex. F-1a, p. 1284). Complainant's second-line supervisor was a Group Director in TC 2800 (TC 2800 Group Director). (ROI, Ex. F-8, p. 1823).

3.  As a patent examiner, Complainant reviewed patent applications from inventors determining whether the invention could be issued a patent based on prior art (*i.e.*, inventions) and other legal requirements. (ROI, Ex. F-1a, p. 1285).

4.  Patent examiners must meet certain quality and quantity standards by each GS level, which are set out in the performance appraisal plan (PAP). (ROI, Ex. F-1a, pp. 1435-57). The quantity standards are known as production. (ROI, Ex. F-1d, p. 1489).

*Complainant's Tenure in the Patent Training Academy (PTA)*

5.  As a new patent examiner, Complainant spent his first four (4) months of employment at the PTA, learning the technical aspects of the job, as well as Agency policies and procedures. (ROI, Ex. F-1a, p. 1285; Ex. F-6, p. 1808). In the PTA, Complainant was first in

---

[4]Patent examiners work in groups, or art units, of approximately 15-20 examiners, all focused on the same or similar technology. Art units are part of the nine (9) TCs, each focused on a broader field, such as biology or mechanical engineering.

Training Lab 9 and then in Training Lab 11; the September 9th starting class had twelve (12) labs of approximately fourteen (14) to sixteen (16) new examiners each.  (ROI, Ex. F-1a, p. 1285; Ex. F-6, p. 1808).  In the PTA, Complainant reported to the Training SPE and his second-line supervisor was the Class Manager.  (ROI, Ex. F-1a, p. 1285; Ex. F-3, p. 1722; Ex. F-4, p. 1765-66).

6.      In the PTA, from on or around September 9, 2013 through October 17, 2013, Complainant and another examiner (Examiner A) had several conversations about the meaning of certain acronyms associated with patent examining and researching prior art, which Complainant found to be "demean[ing] and slander[ous]," and culminated in Complainant issuing Examiner A a "Cease and Desist" letter on October 17, 2013.  (ROI, Ex. F-1a, p. 1286, pp. 1419).  Complainant and Examiner A continued to have verbal conflicts about work and other matters.  (ROI, Ex. F-1a, pp. 1286-87, 1295-99, 1348, 1422).

7.      On or about October 17, 2013, Complainant met with Training SPE to discuss his concerns about Examiner A; however, Complainant did not raise any issues of harassment based on his sex or race.  (ROI, Ex. F-1a, p. 1289; Ex. F-3, 1723).  This was the first time the Training SPE became aware of issues involving Complainant and Examiner A.  (ROI, Ex. F-2, 1723).  The Training SPE met separately with both Examiner A and Complainant and both agreed there was a conflict related to prior art; the Training SPE then met with both men together and counseled them that they needed to work together in the PTA and thought the matter was resolved.  (ROI, Ex. F-3, pp. 1723-24).

8.      On or about October 18, 2013 another examiner, Examiner B, a non-African-American female, told Complainant to "shut up" during a lecture in the PTA; Examiner B told another examiner, a non-African-American female to "shut up" during lectures on at least two other occasions.  (ROI, Ex. F-1a, p. 1289).  Complainant asked the Training SPE to remind everyone to be polite and not to say "shut up," and the Training SPE agreed.  (ROI, Ex. F-1a, p. 1420; Ex. F-3, p. 1725).

9.      On or about November 7, 2013, Complainant sent the Training SPE an email complaining that Examiner B was interrupting him and disturbing him during PTA lectures.  (ROI, Ex. F-1a, p. 1293; Ex. F-3, p. 1724).  That same day, Examiner B confronted Complainant about the email, stating that Complainant was trying to get her in trouble, and Complainant told the Training SPE.  (ROI, Ex. F-1a, p. 1293).  The Training SPE spoke with Examiner B and counseled her that she could not tell Complainant or others to "shut up," and he also reminded Complainant to let the lecturer fully answer questions from the class.[5]  (ROI, Ex. F-3, p. 1725).

10.      Also on November 7, 2013, Complainant contacted his second-line supervisor at the time, the PTA Class Manager.  (ROI, Ex. F-1a, p. 1294; Ex. F-4, p. 1766).  At that time, the Class Manager did not know Complainant's race and had not met him in person.  (Ex. F-4, p. 1767).  Complainant chose not to follow up with the PTA Class Manager because he perceived her not to be understanding of his situation.  (ROI, Ex. F-1a, p. 1294).

---

[5]The Training SPE acknowledged Complainant had a deeper knowledge of patent law (not patent examining) than many of his PTA classmates, which sometimes led to Complainant asking more advanced questions and going off topic during lectures.  (ROI, Ex. F-3, p. 1725).

11.     On or about November 14, 2013, Lab 11 took a quiz in the PTA.  Complainant accused Examiner B of disrupting the quiz and Examiner B accused Complainant of disrupting the quiz.  (ROI, Ex. F-1a, pp. 1295-96).

12.     Between November 2013 and December 13, 2013, Complainant and Examiner B had multiple verbal confrontations, each accusing the other of being the instigator.  (ROI, Ex. F-1a, pp. 1295-1305, 1348 "[Examiner B] and [Complainant] are getting into constant confrontations").  Complainant alleges that at one point during this period Examiner B came so close to him that a pen was knocked from Complainant's hands and spilled ink on Examiner B, she denied doing so to the Training SPE.[6]  (ROI, Ex. F-1a; Ex. F-3, p. 1725).

*The December 13, 2013 Incident*

13.     On Friday, December 13, 2013, the Training SPE and the Class Manager were both teleworking and thus not on campus.  (ROI, Ex. F-3, p. 1726; Ex. F-4, p. 1768).  Around 8:30 am, the Training SPE received an email from Complainant complaining that Examiner B had "knives on her desk," was pulling her hair out of her head, eating loudly at her desk, and otherwise being contentious.  (ROI, Ex. F-3, pp. 1726, 1740).  The Training SPE forwarded the email to the Class Manager and called her, and he also tried to call Complainant to discuss the situation.  (ROI, Ex. F-3, p. 1726).  The Class Manager contacted the Director of the PTA to discuss separating Complainant and Examiner B.  (ROI, Ex. F-3, p. 1726; Ex. F-4, p. 1768).

14.     On December 13, 2013, as soon as the PTA Director received the Class Manager's email, he walked over to the labs.  (ROI, Ex. F-5, p. 1809).  When the PTA Director arrived, neither Examiner B nor Complainant was at her/his desk; the PTA Director and Deputy Director observed a paring knife on Examiner B's desk, with fruit, and a plastic knife, like you would get from the cafeteria.  (ROI, Ex. F-5, p. 1809; Ex. F-7, p. 1817).  Given the lack of conflict and the small blade, the PTA Director did not see anything amiss in the situation.  (ROI, Ex. F-5, p. 1809).  When the PTA Director returned to his office, he had an email stating that Security had been called, and he returned to the lab, which was a 3-block walk away.  (ROI, Ex. F-5, p. 1809).

15.     On December 13, 2013, around 10:00 am, Complainant called Security from the PTA because he feared Examiner B and her "knives."[7]  (ROI, Ex. F-1a, pp. 1305, 1403).  Complainant told Security Complainant had been verbally abusive and had knives on her desk.  (ROI, Ex. F-1a, p. 1349).  Security contacted the Federal Protective Service (FPS) to respond because the initial report involved potential criminal activity.  (ROI, Ex. F-1a, p. 1403; Ex. F-13, pp. 1873-74).

16.     FPS responded to Complainant's call and spoke with both Complainant and Examiner B about the situation, who continued to bicker and argue, in a way that "appalled" the PTA Deputy Director.  (ROI, Ex. F-1a, pp. 1305-10; Ex. F-4, p. 1768; Ex. F-7, p. 1817).  FPS

---

[6]There was no contemporaneous reporting of this incident so there are no Agency records of when this alleged incident occurred or the facts of the alleged incident.  Examiner B testified that she never knocked a pen out of Complainant's hand.  (ROI, Ex. F-11, p. 1861).

[7]Complainant states that he had informed Training SPE of Examiner B's knives prior to December 13, 2013, which Training SPE denies.  It is un-contradicted that Training SPE learned of the knives on December 13, 2013.  (ROI, Ex. F-3, p. 1726).

escorted Examiner B to the lobby of the Agency and had her take the knives to her car, although it did not appear Examiner B had violated any Agency rules or regulations. (ROI, Ex. F-1a, p. 1403; Ex. F-7, p. 1817). Classmates of Complainant told FPS that Examiner B had "been singling out Complainant and bullying him." (ROI, Ex. F-1a, p. 1403). The FPS inspectors "concluded it was a non-violent disagreement and called [Complainant] and [Examiner B] to the same office and informed them they would have to find a way to get along with each other." (ROI, Ex. F-1a, p. 1403; Ex. F-3, p. 1727). FPS asked the PTA Director why both new employees were not on better behavior. (ROI, Ex. F-5, p. 1809).

17.     Based on the call to Security, both the Training SPE and the Class Manager came to campus; the Director and Deputy Director of the PTA were already at the training lab. (ROI, Ex. F-3, p. 1727). Management concluded that Examiner B's knives did not violate Agency policy, as they appeared to be for use as personal eating utensils. (ROI, Ex. F-3, pp. 1726-27; Ex. F-7, p. 1817). The Class Manager agreed that the knives were "paring knives, used to cut up fruit." (ROI, F-4, p. 1768). Examiner B was not cited. (ROI, Ex. F-4, p. 1768; Ex. F-5, p. 1783). The Agency does prohibit workplace violence. (ROI, Ex. G-9, pp. 2129-30).

18.     The Training SPE, Class Manager, and Director of the PTA decided to immediately move Examiner B to her Technology Center to separate her from Complainant because she had been the one with the knives.[8] (ROI, Ex. F-3, p. 1727; Ex. F-5, p. 1787; Ex. F-5, p. 1810; Ex. F-6, p. 1815; Ex. F-7, p. 1817). Management concluded both Examiner B and Complainant were unprofessional in their dealings with one and other and that neither was blameless. (ROI, Ex. F-4, p. 1769). At the time PTA management decided to separate Examiner B and Complainant, they believed it to be a personality conflict and no one had alleged race and/or sex discrimination. (ROI, Ex. F-6, p. 1817).

19.     On December 13, 2013, after contacting Security, Complainant contacted an employee relations specialist (ERS) in OHR to discuss his complaint about Examiner B. (ROI, Ex. F-1a, p. 1310; Ex. F-5, pp. 1779, 1786-87). Complainant relayed his version of events in the PTA, including all the ways in which Examiner B was allegedly harassing him (e.g., interrupted him, was rude, pulled out her hair, did noxious things, and had the knives at work) and about Examiner A. (ROI, Ex. F-1a, pp. 1312-14; Ex. F-5, pp. 1780, 1786-87). During Complainant's meeting with the ERS, he stated that Examiner B had waved her hands around and knocked a pen out of his hand, which Complainant described as a physical assault. (ROI, Ex. F-1a, p. 1314; Ex. F-5, p. 1780). Complainant also raised his concern that Examiner A was "mocking Muslims by asking about their religion. (ROI, Ex. F-1a, p. 1409; Ex. F-5, pp. 1786-87). Complainant did state that he believed Examiner B's actions were because Examiner B "was not used to a polite, educated black man." (ROI, Ex. F-5, p. 1784). In conducting her inquiry into the situation, the ERS did not find any facts showing that race and/or sex were a factor in how the Agency treated Complainant. (ROI, Ex. F-5, p. 1784). The ERS kept this information separate from Complainant's personnel file and from the later ER conduct file. (ROI, Ex. F-5, p. 1781). At no time during Complainant's employment did OHR conclude that facts supported Complainant's allegations that he was subject to harassment. (ROI, Ex. F-9, p. 1836).

---

[8]At this time, Complainant and Examiner B were scheduled to finish the PTA and join their art units in approximately a week, so Examiner B moved early. (ROI, Ex. F-4, p. 1769).

20.    On or about December 16, 2013, Complainant requested that he be moved early from the PTA and into his Art Unit, which had already been discussed.[9]  (ROI, Ex. F-1a, p. 1350; Ex. F-3, pp. 1726-27).  The Agency agreed and moved Complainant to his Art Unit (and thus away from Examiner B) on December 20, 2013.  (ROI, Ex. F-1a, p. 1350; Ex. F-5, p. 1810).

21.    On or about December 18, 2013, Examiner B came to the ERS' office to file a complaint about Complainant and that she had been moved, not Complainant.  (ROI, Ex. F-5, pp. 1781, 1788).  Examiner B alleged that Complainant interrupted her, tried to dominate classroom discussions, and that he humiliated her when he called Security about the knives she uses to cut fruit.  (ROI, Ex. F-5, p. 1782; Ex. F-11, p. 1863).

22.    Based on the on-going issues between Examiner B and Complainant and its disruption of the PTA class, the ERS advised the Director of the PTA to discharge both employees.  (ROI, Ex. F-5, p. 1783).  The Director of the PTA determined that moving both employees to their separate art units was sufficient action to end the situation and did not follow the ERS' recommendation.  (ROI, Ex. F-5, p. 1783; Ex. F-6, p. 1810).

*Complainant's Tenure in the Art Unit*

23.    On December 19, 2013, as Complainant transitioned to his Art Unit, he received his first interim evaluation.  (ROI, Ex. F-1a, p. 1327-28; Ex. F-3, p. 1751; Ex. G-4, pp. 1967-68).  Complainant received a "1" for "needs improvement" in the area of "ability to interact with co-workers," along with the comment "the examiner should be mindful of his interactions with coworkers in order to avoid further instances of contentious interactions from occurring."  (Ex. F-1a, p. 1328; Ex. G-4, pp. 1967-68).  Complainant also received "1s," which were "needs improvement" in productivity consistency and work habits.[10]  (Ex. F-3, p. 1751; Ex. G-4, pp. 1967-68).

24.    In or around March 2014, Complainant received his six month evaluation from his SPE and his second line supervisor, TC 2800 Group Director.  (ROI, Ex. F-1d, p. 1489; Ex. G-4, pp. 1961-69).  Complainant received a "2" for "meeting expectations" in getting along with others but he received a "1" for "needs improvement" on production.  (ROI, Ex. F-1d, p. 1489; Ex. G-4, pp. 1961-69).  Complainant recalls his production being around 40% at his six-month evaluation, with 95% being considered fully successful.  (ROI, Ex. F-1d, p. 1489).

25.    Around the time of Complainant's six-month evaluation in March 2014, Complainant informed his SPE that his background was not well suited to his art classes (thermal measurement and measurement and testing); however, he did not request a transfer and the SPE did offer him assistance with searching (for prior art).  (ROI, Ex. F-1d, pp. 1490-91).

26.    On or about April 29, 2014, Complainant complained to Security about an alleged incident on April 23, 2014, in which Examiner B had allegedly waited for Complainant in a

---

[9]There is some dispute in the record whether Complainant or the PTA management initiated the request to move early, but it is not disputed Examiner B moved on December 13, 2013 and Complainant to his Art Unit the following week.
[10]Probationary patent examiners receive 1s for "needs improvement," 2 for "meets expectations," and 3 for "exceeds expectations."  For retention purposes, examiners should not be receiving 1s and their scores should be improving.  Ex. G-4, pp. 1967-68.

concourse outside one of the lecture halls and attempted to force physical contact. (ROI, Ex. F-1a, pp. 1330, 1401-1402). Security reviewed video footage of the alleged incident but it did not show anything relevant or support of Complainant's allegations. (ROI, Ex. F-13, p. 1875).

27.     In or around May 2014, the TC 2800 Group Director met with Complainant because he was concerned with Complainant's low productivity and low level of work product. (ROI, Ex. F-8, p. 1823). TC 2800 Group Director and SPE asked Complainant if he needed assistance or resources to help him perform his job. (ROI, Ex. F-8, p. 1824).

28.     On or about July 10, 2014, Complainant alleged to his SPE that another examiner, Examiner C, had "smacked [him] on the back of the head; however, at the time he declined to make any statement and did not do so until July 23, 2014. (ROI, Ex. F-1a, pp. 1358-59; Ex. F-1b, pp. 1461-62; Ex. F-10, p. 1843). Complainant's SPE followed up with Complainant for him to contact Security to file a complaint against Examiner C. (ROI, Ex. F-1a, p. 1387). Complainant's SPE called Complainant into her office and called Security to ensure Complainant gave a statement about the July 10, 2014 incident. (ROI, Ex. F-1b, p. 1463). When OHR investigated the incident, it found while Examiner C may have touched Complainant, it was just to get Complainant's attention and in no way constituted a smack on the head or an assault. (ROI, Ex. F-9, p. 1833).

29.     Complainant's SPE never witnessed other examiners treating Complainant differently, or engaging in any workplace harassment or bullying. (ROI, Ex. F-10, p. 1844). Complainant only complained to his SPE about Examiners A, B, and C from his time in the PTA. (ROI, Ex. F-10, p. 1844).

30.     On August 14, 2014, Complainant and others were scheduled to take a patent examining exam. (ROI, Ex. F-1c, p. 1481). Complainant believed Examiner A was disrupting the testing atmosphere by asking about which examiners had to have their exams rescheduled. (ROI, Ex. F-1c, p. 1481). Complainant thought he would have to take the exam in the same room as Examiner B; however, he did take the test in a separate room. (ROI, Ex. F-1c, p. 1482).

31.     In or around August 2014, Complainant received his eight-month evaluation from his SPE.[11] (ROI, Ex. F-1d, p. 1493 Ex. G-4, pp. 1961-69). At this time, Complainant received a "1" for ability to work with others as well as "1" in production. (ROI, Ex. F-1d, p. 1493 Ex. G-4, pp. 1961-69). Approximately a week later, Complainant met with his TC 2800 Group Director to discuss the rating, and his second-line supervisor affirmed the evaluation. (ROI, Ex. F-1d, p. 1494).

32.     Complainant's SPE found that Complainant's work product numbers were not improving, despite weekly meetings. (ROI, Ex. F-10, p. 1853). While Complainant was not ultimately rated on his production, they are expected to demonstrate that they will succeed on the production metrics. (ROI, Ex. F-10, p. 1853). Complainant's production at 8 months was around 44%, when management expects it to be around 80% (fully successful for a non-probationary examiner is 95%). (ROI, Ex. F-10, p. 1853). The SPE and the TC 2800 Group Director informed Complainant on multiple occasions that failure to consistently improve his production would have a negative impact on whether the Agency would retain Complainant. (ROI, Ex. F-10, p. 1853).

---

[11]This was 8 months after Complainant began in his Art Unit, but in his 11th month of employment with the Agency.

*Complainant's Discharge During His Probationary Period*

33.     On September 4, 2014, the TC 2800 Group Director called Complainant in for a meeting, along with two OHR employees, an employee from the Security Office and a uniformed security guard.  (ROI, Ex. F-1d, p. 1495).  The TC 2800 Group Director informed Complainant he was being discharged during his probationary period because Complainant had not demonstrated he could successfully do the job of a patent examiner as required by the PAP.  (ROI, Ex. F-1d, p. 1495; Ex. F-8, p. 1823; Ex. G-4, pp. 1954-56).  The TC 2800 Group Director considered Complainant's lack of progress with productivity and his work product output, as well as Complainant's continued inability to get along with a number of different people.[12]  (ROI, Ex. F-8, p. 1824).

34.     After the September 4, 2014 termination meeting, Security and OHR gave Complainant approximately ten (10) minutes to gather his things and escorted him from the Agency premises.  (ROI, Ex. F-1d, p. 1496).  The TC 2800 Group Director stated it was typical protocol to have OHR at a termination and that it is not uncommon to have Security present at any termination where it is thought that the employee might have a hostile reaction to the discharge decision.  (ROI, Ex. F-8, p. 1825).  The TC 2800 Group Director stated that Complainant's prior call to Security and the number of confrontations he had warranted the decision to call Security to the meeting and was consistent with his prior practice and OHR concurred.  (ROI, Ex. F-8, p. 1825; Ex. F-9, p. 1834).

35.     In TC 2800, in the three (3) years prior to Complainant's discharge, nine (9) other patent examiners were discharged during their probationary period.  (ROI, Ex. G-15, pp. 2215-18).  Seven (7) were male, two (2) were female, and six (6) of them were not African-American; one (1) of them, who was not African-American, also engaged in protected EEO activity.  (ROI, Ex. G-15, pp. 2215-18).

36.     Complainant received his wages through September 4, 2014; however, it took another two (2) weeks approximately to receive his outstanding vacation (*i.e.*, annual leave) pay out.  (ROI, Ex. F-1d, p. 1499).

37.     The Agency prohibits discrimination on the basis of disability and also prohibits harassment; it also prohibits retaliation from engaging in protected EEO activity.  (ROI, Ex. G-8, pp. 2121-27; G-10, pp. 2132-34).  All Agency management denied that Complainant's race, sex, or participation in the EEO process had anything to do with their actions.  *See generally* ROI, Ex. F-3, F-4, F-5, F-6, F-7, F-8, F-9.

## ANALYSIS

Complainant alleges that the Agency subjected him to a hostile work environment based on his race and sex when it failed to take appropriate action to remedy the alleged harassment Examiners A, B, and C subjected him too, and that his discharge during his probationary period was discriminatory and retaliatory.

---

[12]This included not only Complainant's incidents with Examiners A, B, and C, but also Complainant's failure to cooperate with the Office of Personnel Management (OPM), a separate federal agency, when it re-opened Complainant's background investigation of its own volition.  (ROI, Ex. F-8, p. 1825).

## I.    APPLICABLE LEGAL STANDARDS

### A.  *Relevant Statute*

Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, makes it unlawful for employers, including the federal government, to discriminate against employees on the bases of their race, color, sex, national origin, or, religion.  Title VII also protects employees from reprisal for participating in any Title VII proceeding or otherwise opposing conduct made unlawful by Title VII. Complainants may prove a violation of Title VII with evidence of disparate treatment discrimination or evidence of hostile work environment harassment.

### B.  *Burden of Proof in Hostile Work Environment and Harassment Cases*

To establish a claim of HWE harassment, the EEOC has held that the complainant must prove the following:

> (1) he belongs to a statutorily protected class; (2) he was subjected to harassment in for the form of unwelcome verbal or physical conduct related to his membership in her protected bases; (3) the harassment complained of was based on his protected bases; (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability.

*\*\*\*1 v. Dep't of Defense (Defense Intelligence Agency)*, EEOC DOC 0120084008 \*10 (June 6, 2014), 2014 WL 2647178 (E.E.O.C.). [13]

### C.  Prima Facie *Case – Disparate Treatment Discrimination*

The classic formulation of a *prima facie* disparate treatment case under Title VII and the ADEA is the establishment a 1) membership in a protected class, 2) an adverse action, and 3) evidence supporting an inference that there is a nexus between the protected class and the adverse action (*e.g.*, that a similarly situated individual not in the complainant's protected group was treated more favorably. *See \*\*\*2 v. U.S. Postal Service*, EEOC DOC 0720130009 at \* 3 (May 14, 2014), 2014 WL 2206534 (E.E.O.C); *\*\*\*3 v. USPS*, EEOC DOC 0120140084 \*2 (February 3, 2014), 2014 WL 586707 (E.E.O.C.) (citing *McCreavy v. Dep't of Defense*, EEOC Appeal No. 0120070257 (April 14, 2008) (same *prima facie* case for ADEA)  For two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, a complainant must show that all of the relevant aspects of his or her employment situation are virtually identical to those of the other employees who he or she alleges were treated more favorably.  *See Knapp-Huffman v. Department of Justice*, EEOC Appeal No. 01991026 (January 16, 2002), 2002 WL 110453 (E.E.O.C)

---

[13]From 2013 – 2015, the EEOC did not use complainants' names or pseudonyms to identify cases.  For ease of reference, these cases are designated *\*\*\*1 v. Agency, \*\*\*2 v. Agency, etc.*

D. Prima Facie *Case – Retaliation*

To establish a *prima facie* case based on retaliation, a complainant must show that: (1) he engaged in prior protected activity; (2) the agency official was aware of the protected activity; (3) he was subsequently disadvantaged by a materially adverse action; and (4) there is a causal link between the protected activity and adverse action. *See Tulloch v. USPS*, EEOC DOC 0120102353 at *3 (September 10, 2010), 2010 WL 3698970 (E.E.O.C.); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Complainant can show a nexus with evidence that adverse treatment "followed the protected activity within such a period of time and in such a manner that a reprisal motive is inferred." *Tulloch*, EEOC Appeal 0120102353 at *3.

E. Burden of Proof in Title VII Disparate Treatment and Retaliation Cases

The Supreme Court and the EEOC have held that complainants may prove their case of discrimination using circumstantial or direct evidence. *See ***4 v. Dep't of Commerce (Bureau of the Census)*, EEOC DOC 0120112930 *6 (February 19, 2015), 2015 WL 1399390 (E.E.O.C.) (applying the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny). That is, because there is no allegation by Complainant or material facts on the record to indicate any direct evidence of discrimination on the basis of her sex and/or race *McDonnell Douglas*, as further explained in *Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993), and refined in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), applies to this case.

Under the *McDonnell Douglas* and progeny scheme, to prove her claim the complainant must make out a *prima facie* case of discrimination. The burden of production then shifts to the employer to present a legitimate, nondiscriminatory reason for its action. This is a burden of production only, and not of persuasion. *See ***4*, EEOC DOC 0120112930 at *5. However, if the agency offers no adequate explanation for its treatment of the complainant, the agency does not carry its burden of production and the complainant prevails on the basis of inference of discrimination created by the *prima facie* case. *See Frady v. United States Postal Service (USPS)*, EEOC App. No. 01A05317 (January 10, 2003), 2003 WL 137914 (E.E.O.C.). If the employer meets this burden, any presumption of discrimination created by the prima facie case disappears; it simply "drops from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 507.

Then, to prevail, the complainant must prove by a preponderance of the evidence that the agency's stated nondiscriminatory reason is mere pretext and that the real reason for the employment action was discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *see also St. Mary's Honor Ctr.*, 509 U.S. at 510-11, 515-16. The complainant cannot create a factual issue of pretext based merely on personal speculation that there was discriminatory intent. *See Lyles v. USPS*, EEOC Appeal No. 01A11110 (May 22, 2002), 2002 WL 1211570 (E.E.OC.); and *Nathan v. USPS*, EEOC Appeal No. 01995788 (August 29, 2001), 2001 WL 1097337 (E.E.O.C.). "Complainant can do this by showing that the proffered explanations are unworthy of credence. A showing that the employer's articulated reasons are not credible permits, but does not compel, a finding of discrimination." *** 5 v. Dep't of Commerce (Nat'l. Oceanic and Atmospheric Administration)*, EEOC DOC 0120113373 at *9 (March 9, 2015), 2015 WL 1635876 (E.E.O.C.) (citing *Burdine* and *Hicks*). "Bald statements and speculation…without corresponding probative evidence do not suffice to demonstrate pretext." *** 6 v. USPS*, EEOC DOC 0120121258 at *4 (July 11, 2014), 2014 WL 3571444 (E.E.O.C.) (internal citations omitted).

The complainant always has the "ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 254.

## II.    COMPLAINANT'S CLAIM FOR HARASSMENT

The record evidence does not support a claim for harassment. Complainant establishes the first requirement in that he is an African-American male. Taking the record evidence in the light most favorable to Complainant, he did suffer unwelcome verbal conduct from both Examiner A and Examiner B; however, the record does not establish Complainant suffered unwelcome physical conduct from Examiner B. Not only does Examiner B deny any physical touching of Complainant, Complainant is not credible on this issue as his version of events shifted over time. He did not originally report the incident when it originally occurred in November 2013. When he first described the incident to OHR and PTA management in December 2013 he stated only that Examiner B had knocked a pen from his hand. However, over the course of the instant investigation, Complainant changed his story to allege that he had been "backhand slapped me hands knocking a red ink pen out of my hand" which constituted "criminal assault and battery" and "incessant criminal violence." (ROI, Ex. G-6, pp. 2045, 2052). It does appear that Complainant was touched by Examiner C in a way he found unwelcome, although the record does not support Complainant's allegation of a serious and vicious attack.

Most importantly, on this record, Complainant does not have evidence that the unwelcome conduct related to either his race or sex. There is no evidence of racial or sexual animus between Complainant and Examiners A, B, or C. Indeed, Examiners B and C are also men. Similarly, there is no evidence that the unwelcome conduct was based on Complainant's race. At most, the record evidence supports that Examiners A and B considered Complainant rude, loud, and over-bearing during lectures and that Complainant felt the same way about them. There is no evidence on this record to support anything more than a mutual personality conflict between Examiners A and B and Complainant.

Further, the complained-of conduct did not create a hostile work environment (HWE). The Supreme Court has established a high threshold for establishing a HWE. Complainant must prove the HWE from "the objective viewpoint of a reasonable person in the [alleged] victim's circumstances." *Henry v. Dep't of Interior (Bureau of Indian Affairs)*, EEOC DOC 0120112176 * 3 (Feb. 3, 2012), 2012 WL 424271 (E.E.O.C.) (citing EEOC Enforcement Guidance); *see also Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1993) ("objectively hostile or abusive work environment [is created when] a reasonable person would find [it] hostile or abusive" and the Complainant subjectively perceives it as such."). Both the courts and the EEOC have held that "the incidents must have been 'sufficiently severe and pervasive'" to be of the nature of altering the work environment before they are actionable under the law. *Polk v. US Postal Service*, EEOC DOC 0120071381 (July 11, 2008), 2008 WL 2788271 (E.E.O.C.) at *2 (citing *Harris* and *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998). In determining that a working environment is hostile, "factors to consider are the frequency of the alleged discriminatory conduct, its severity, whether it is physically threatening or humiliating, and if it unreasonably interferes with an employee's work performance." *Henry*, 2012 WL 424271 at *3 (citing *Harris*, 510 U.S. at 23). Thus, a single incident or group of isolated incidents will generally not be regarded as discriminatory harassment unless the conduct is severe. *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1358 (11th Cir. 1982).

Consistent with the Supreme Court's requirement of "severe and pervasive" conduct, Title VII "does not set forth a general civility code for the American workplace." *See Oncale*, 523 U.S. at 80. Therefore, actionable harassment does not include "complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). All of Complainant's allegations, taken in the light most favorable to Complainant that is consistent with the record, do not amount to anything more than the "ordinary tribulations of the workplace," and while potentially uncivil, are not unlawful. Complainant alleged that Examiner A disagreed with him about how to research prior art and at least once singled out Complainant based on this disagreement. Complainant responded by issuing Examiner A a "cease and desist" letter. This work-related verbal dispute over a period of several days, which was then mediated by the Training SPE, does not rise to a sufficiently severe and pervasive level. Complainant's on-going conflict with Examiner B, in which both parties acted rudely and unprofessionally toward one and other, likewise does not rise to the level of one-sided humiliation or interference with work. Lastly, with respect to Examiner B's knives and Complainant's call to Security, it was not objectively reasonable for Complainant to be threatened by Examiner B, as all other witnesses concluded they were for Examiner B to eat her food, did not violate Agency policy, and she had taken no action to threaten Complainant. Complainant's April 2014 complaint against Examiner B cannot be substantiated any more that they were in the same hallway and Examiner C's actions, a one-time tap to get Complainant's attention are not sufficient evidence of a hostile work environment.[14]

Lastly, there is no basis for imputing liability to the Agency. In *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that agencies may avoid liability for claims of harassment in certain situations, but only if they take action to reasonably prevent and correct any harassment. *Faragher and Ellerth* apply to the instant case. In October and November 2013, the Training SPE, based on the information he had available, counseled both Complainant and Examiners A and B to stop their rude and unprofessional behavior, which was a reasonable step given the mutual conflict and misconduct. In December 2013, as soon as PTA management learned of the conflict between Examiner B and Complainant, it took steps to separate them, which was reasonable given the mutual responsibility for the situation and that there was no evidence of unlawful harassment. Additionally, the Agency did not permit Examiner B to violate Agency policies in that her possession of small knives used to eat food was not impermissible (and FPS had her remove them to her car in any event). At all times, the Agency responded promptly and appropriately to all of Complainant's harassment complaints against his co-workers. Thus, even assuming *arguendo* he had established HWE in violation of Title VII, there is no basis for imputing liability.

In sum, Complainant has not established evidence in this record that he was subjected to unwelcome conduct based on his race or sex, that any such unwelcome conduct rose to the legal standard necessary to prove an actionable hostile work environment, or that the Agency should be liable in any event. Thus, Complainant has not proven his case of harassment.

---

[14]Complainant's allegations of HWE regarding the August 2014 exam and that it took two (2) weeks to receive his annual leave pay are unavailing given that he acknowledges he did not have to take the text in the same room as Examiner B and that it takes the Agency 2 weeks to manually process all such leave payouts.

## III. COMPLAINANT'S CLAIMS OF DISCRIMINATION AND RETALIATION

Complainant has established that he was African-American and male, that he engaged in protected activity as early as December 2013 (when he informed the ERS that he believed Examiner B could not handle a polite, educated Black man), and that the TC 2800 Group Director was aware of his EEO activity when he discharged Complainant during his probationary period. Therefore, Complainant has established those elements of his *prima facie* cases of discrimination and retaliation.

Complainant cannot establish that similarly situated non-males and non-African-Americans were treated more favorably. The record evidence shows that TC 2800 discharged nine (9) other probationary patent examiners and that most of them were not African-American and at least two were female. Further, given Complainant's long history of not meeting the performance metrics for retention, no inference of discrimination attaches. Similarly, there is no inference of retaliation, despite Complainant's termination occurring while he was engaged in protected activity because the record shows the Agency discharged others without protected activity, particularly in light of Complainant's poor performance. Thus, Complainant cannot establish the necessary nexus between his protected bases and the adverse action.

## IV. AGENCY'S ARTICULATED, NON-DISCRIMINATORY REASON

As noted above, Complainant failed to satisfy the required elements of his *prima facie* case of discrimination and retaliation. However, for the purpose of a fair and full evaluation of his claims, and assuming Complainant had even stated a *prima facie* case, for purposes of this Final Agency Decision only, it will be assumed that Complainant established a *prima facie* case of discrimination and retaliation under Title VII by proving each element of his *prima facie* case. Therefore, the Agency's articulated legitimate, non-discriminatory reason will be examined.

The Agency has consistently stated that Complainant's achieve an acceptable level of performance, along with his inability to work with others, resulted in his discharge during his probationary period. Unacceptable performance has long been held to be a legitimate, non-discriminatory reason for severing the employment relationship. *See Green v. Dep't of the Air Force*, EEOC DOC 0320110021 at *3 (June 9, 2011), 2011 WL 2433101 (E.E.O.C.) (poor performance merited removal when complainant could not prove animus or that similarly situated person outside of his protected class was treated more favorably). Therefore, the Agency has articulated legitimate reasons for terminating Complainant; and the Agency has met its burden of persuasion and any presumption of discrimination has been rebutted under *McDonnell Douglas* and its progeny. The burden remains on Complainant to prove the articulated reasons are pretext for unlawful discrimination.

## V. FAILURE TO ESTABLISH PRETEXT

Complainant has failed to provide evidence of pretext; that is "the proffered reason was not the true reason for the employment decision, and that [discrimination] was." *St. Mary's Honor Ctr.*, 509 U.S. at 508 (internal citations omitted). A complainant may meet her burden of creating a disputed issue of fact with respect to pretext by either (1) presenting evidence that defendant's proffered reason is not worthy of belief, thereby enabling the jury to infer discrimination was the employer's real reason, or (2) presenting evidence that discrimination was, in fact, the employer's real reason. *See Reeves*, 530 U.S. 133 (2000). However, in his attempts to show pretext, Complainant may not recast an

employer's legitimate, non-discriminatory reason or substitute his business judgment for that of the employer, but instead must meet each reason head on and rebut it. *See Camden v. Dep't of Justice (Federal Bureau of Investigation),* EEOC DOC 0520120603 at *2 (January 31, 2013), 2013 WL 486715 (E.E.O.C.) ("….Commission has made identical or similar statements in previous decisions to emphasize the fact finder must focus on the employer's motivation, not its business judgment, when analyzing personnel decisions.")(citing *Glass v. U.S. Postal Service,* EEOC Appeal No. 07A50068 (June 15, 2006); *Thomas v. Dep't. of Transportation,* EEOC Appeal No. 01945798 (Dec. 12, 1996)).

The crux of Complainant's argument appears that the Agency took his complaints against Examiner B less seriously than if the situation were reversed (*i.e.,* if Examiner B, a white female, had complained about "workplace violence," against Complainant, a black male, the Agency would have taken more forceful action). However, Complainant lacks evidence to support his conclusory allegations. The Agency took Complainant's allegations against Examiner B very seriously and immediately took steps to remove her from Complainant's training lab. Complainant's disagreement is with how the Agency assessed and judged the situation, but this disagreement is one of business judgment, not pretext of racial or sex-based animus. *See Glass,* 2006 WL 1725434 ("The trier of fact must understand that the focus is to be on the employer's motivation, not its business judgment.") (Internal citations omitted.)

The Agency's actions regarding Complainant do not support Complainant's claims of pretext for discrimination or retaliation. The PTA Director's actions also do not support Complainant's contention that he was treated poorly, or differently, because of his race and sex. The ERS recommended terminating both Examiner B and Complainant based on their conduct at the PTA; however, the PTA Director rejected OHR's recommendation and retained both employees. The Agency also continued to take seriously Complainant's allegations, despite their inconsistencies, such as the April 2014 and July 2014 incidents involving Examiners B and C. At no time did the Agency fail to respond to Complainant's allegations or fail to investigate. Rather, Complainant found the Agency's conclusions as to allegations wanting, which, without more, is not evidence of pretext. There is nothing incredible about the Agency's determinations with respect to the "workplace violence" allegations, none of which were substantiated.

Complainant also contends that the temporal connection between his complaints and his discharge support his claims that the Agency's actions were pretext for retaliation. However, on this record, Complainant has no evidence of pretext regarding his discharge. Throughout Complainant's tenure at the Agency, he had difficulties meeting the production standards or showing he was making progress to meet those standards. Complainant acknowledged that his production was no better than 44%, when it needed to be near 80%. While Complainant blames his poor performance on the alleged harassment, where this harassment is not substantiated by evidence, it cannot be used to excuse his unacceptable performance. It is undisputed Complainant was not performing at the necessary level and that Complainant had long been put on notice of that fact. The SPE and TC 2800 Group Director worked with Complainant to improve his performance, which further undermines Complainant's claim of pretext. It is also undisputed that Complainant engaged in contumacious conduct with Examiner A and Examiner B; he was not blameless and thus it was not pretext for discrimination for the Agency to rate Complainant as needing improvement in his ability to get along with others and ultimately considering his conduct as a factor in deciding not to retain Complainant past his probationary period.

Lastly, the record evidence shows that the TC 2800 Group Director had discharged others who were not of Complainant's protected groups, which refutes Complainant's claims of pretext. There is also no evidence on the record that the Agency retained probationary patent examiners who were at Complaint's production levels and/or who had similar conduct problems. Thus, there is no evidence on this record of pretext in the Agency's decision to terminate Complainant's employment.

Therefore, for all the foregoing reasons, I find Complainant has not established a case of disparate treatment discrimination or retaliation under Title VII with respect to decision to terminate his employment.

## CONCLUSION

After carefully considering the entire record, and applying the legal standards outlined in detail above, I find that Complainant failed to prove that he was subjected to discrimination or retaliation with respect to his discharge or that he was subject to any harassment. As a result, this case is now closed with a finding of <u>no discrimination, no retaliation, and no harassment</u>.

## ATTORNEY'S FEES

As I have rendered a finding of no discrimination an award of attorney's fees is not appropriate.

## APPEAL TO THE EEOC

You have the right to appeal the Agency's final decision to the **Director, Office of Federal Operations, Equal Employment Opportunity Commission (EEOC), P.O. Box 77960, Washington, D.C. 20013,** within 30 calendar days of your receipt of this decision. You must use Form 573, a copy of which is enclosed, in connection with your appeal. You may also deliver your appeal in person or by facsimile provided that briefs filed by facsimile are ten or fewer pages in length. Any supporting statement or brief must be submitted to the EEOC within 30 calendar days of filing the appeal. Along with your appeal, you must submit proof to the EEOC that a copy of the appeal and any supporting documentation or brief was also submitted to the **U.S. Patent and Trademark Office, Office of EEO and Diversity, P.O. Box 1450, Alexandria, VA 22313-1450.** You are advised that if you file your appeal beyond the 30-day period set forth in the Commission's regulations, you should provide an explanation as to why your appeal should be accepted despite its untimeliness. If you cannot explain why your untimeliness should be excused in accordance with 29 C.F.R. §1614.604, the Commission may dismiss the appeal as untimely.

## RIGHT TO FILE A CIVIL ACTION

Alternatively, if you are dissatisfied with the Agency's final decision in this case, you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the final decision, within 90 calendar days of the EEOC's final decision on any appeal, or after 180 days from the date of filing an appeal with the EEOC if no final decision has been rendered. If a civil action is filed, the Director of the United States Patent and Trademark Office must be named as the defendant. The Acting Director of the United States Patent and Trademark Office is Michelle K. Lee. The official title of the head of the Agency must also be stated. Ms. Lee's official title for this purpose is **Director, United States Patent and Trademark Office.** Failure to provide the name

and official title of the head of the Department may result in dismissal of the case.  If a civil action is filed, we request that a copy of the civil complaint be mailed on the date of its filing to:

> **U.S. Patent and Trademark Office**
> **Office of EEO and Diversity**
> **P. O. Box 1450**
> **Alexandria, VA  22313-1450**

If a civil action is filed under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal); or under the Rehabilitation Act of 1973, as amended (discrimination due to disability), and if a complainant does not have, or cannot afford the services of an attorney, the court may, upon a complainant's request, appoint an attorney to represent the complainant and permit the filing of the action without payment of fees, costs, or other security.  **The grant or denial of the request is within the sole discretion of the Court.**  Filing a request for an attorney does not extend the time in which to file a civil action.  Both the request and the civil action <u>MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS</u> of the date of receipt of this final agency decision.


Bismarck Myrick
Director, Office of EEO and Diversity
U.S. Patent and Trademark Office

12/2/2016
Date

Enclosure:        EEOC Form 573

 *U.S. Equal Employment Opportunity Commission*

**Management Directive 110**

# NOTICE OF APPEAL/PETITION - COMPLAINANT

TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS
P.O. Box 77960
Washington, DC 20013

| **Complainant Information: (Please Print or Type)** | |
| --- | --- |
| Complainant's name (Last, First, M.I.): | |
| Home/mailing address: | |
| City, State, ZIP Code: | |
| Daytime Telephone # (with area code) | |
| E-mail address (if any): | |
| **Attorney/Representative Information (if any):** | |
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |
| **General Information:** | |
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a final action been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | □ Yes Date Received _____ (Remember to attach a copy) <br> □ No <br> □ This appeal alleges a breach of a settlement agreement |
| Has a complaint been filed on this same matter with the Commission, another agency, or through any other administrative or collective bargaining procedures? | □ No <br> □ Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | □ No <br> □ Yes (Attach a copy of the civil action filed) |

**NOTICE:** Please **attach a copy of the final decision or order** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the Commission Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the Commission and with the agency **within 30 days** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, submitted, or faxed to the Commission at the address above.

Please specify any reasonable accommodations you will require to participate in the appeal process:

| | |
|---|---|
| Signature of complainant or complainant's representative: | |
| Date: | |
| Method of Service on Agency: | |
| Date of Service: | |

**PRIVACY ACT STATEMENT ON REVERSE SIDE.**

**EEOC Form 573 REV 2/09**

**PRIVACY ACT STATEMENT**

(This form is covered by the Privacy Act of 1974. Public Law 93-597. Authority for requesting the personal data and the use thereof are given below)

1. **FORM NUMBER/TITLE/DATE:** EEOC Form 573, Notice of Appeal/Petition, February 2009
2. **AUTHORITY:** 42 U.S.C. § 2000e-16
3. **PRINCIPAL PURPOSE:** The purpose of this questionnaire is to solicit information to enable the Commission to properly and effectively adjudicate appeals filed by federal employees, former federal employees, and applicants for federal employment.
4. **ROUTINE USES:** Information provided on this form may be disclosed to: (a) appropriate federal, state, or local agencies when relevant to civil, criminal, or regulatory investigations or proceedings; (b) a Congressional office in response to an inquiry from that office at your request; and (c) a bar association or disciplinary board investigating complaints against attorneys representing parties before the Commission. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a database for statistical purposes.
5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION:** Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

You may send your appeal to:

**The Equal Employment Opportunity Commission**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

**Fax it to (202) 663-7022 or submit it through the Commission's electronic submission portal.**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

131 M Street, N.E.
Suite 4NW02F
Washington, DC 20507
(202) 419-0713
TTY (202) 419-0702
FAX (202) 653-6053
1-800-669-4000

| | |
|---|---|
| Gregory A. Royal,<br>    Complainant,<br><br>    v.<br><br>Michelle K. Lee,<br>Under Secretary of Commerce and Director,<br>U.S. Patent and Trademark Office,<br>    Agency. | ) EEOC No.  570-2015-00842X<br>) Agency No. 14-56-22<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Date:      October 5, 2016 |

## ORDER OF DISMISSAL

### Background

On November 9, 2015, Administrative Judge Frances del Toro issued an Order of Acknowledgement and Scheduling of Initial Conference, setting an Initial Conference for January 14, 2016.  Administrative Judge del Toro re-served the Order on January 5, 2016, in response to Complainant's December 28, 2015 email stating he had never received the Order, and reminded Complainant of his obligation to keep a current address on file with the Washington Field Office.

On January 14, 2016, the parties met for an Initial Conference.  Pursuant to the Initial Conference, Administrative Judge del Toro issued a Case Management Order authorizing discovery and setting deadlines for the conduct of discovery. On January 20, 2016, I issued a Notice of Reassignment for this case.

On April 8, 2015, the Agency filed its Motion to Dismiss and Remand, Or In the Alternative, Compel Complainant's Discovery and Extend the Time Period for Discovery.  In its Motion, the Agency argued that Complainant neither initiated nor responded to discovery.  The Agency contended Complainant moved and did not provide a forwarding address, therefore he received the Agency's discovery requests late.  The same day, Complainant filed his Motion for Summary Judgment in Favor of Gregory Royal and Motion for Sanctions Against the Agency,

1

along with a series of emails and attachments.  On April 13, 2016, I convened a status conference to discuss the pending motions.  At the end of the conference I issued an Order extending the period for discovery in light of service issues.  I granted a further extension for Complainant to serve portions of his written discovery on April 22, 2016.

July 6, 2016, the Agency filed its Motion to Compel Complainant's Discovery Requests and Extend Deadlines.  The Agency averred that Complainant had failed to respond to written discovery, denying Agency the opportunity to appropriately prepare for a deposition.  On July 27, 2016, Complainant responded to the Motion to Compel, saying he had indeed responded to written discovery and referencing attached proof of service.  However, no proof of service was attached to Complainant's submissions.[1]

On July 13, 2016, in a status conference with Complainant and Agency Representative Taron Murakami, I granted the Agency's request to file a second motion to dismiss.  I told the parties that the Agency's submission must be made no later than July 20, 2016, and that Complainant could respond no later than August 1, 2016.  On July 15, 2016, Complainant telephoned my office to ask that I reiterate the due dates for these submissions, as he had failed to write them down during the status conference.  I reminded Complainant that his response to any Motion to Dismiss must be postmarked by August 1, 2016.

On July 20, 2016, the Agency filed its Second Motion to Dismiss and Remand, citing a litany of instances in which Complainant has failed to cooperate with discovery and to comply with the orders issued in this case, notwithstanding several extensions.  The Agency noted that it has canceled depositions due to Complainant's non-compliance with written discovery requests and failure to keep the parties apprised of his current postal address, which has changed at least three times in the last nine months.  The Agency contended that to date, Complainant has failed to respond to written discovery at all, notwithstanding the unusual number of extensions I have granted in this case.  The Agency also argues that Complainant's non-compliance unprofessional conduct throughout the case should also be grounds for dismissal.   Specifically, the Agency cited to instances of Complainant raising his voice and "engaging in lengthy rants" during status conferences, repeatedly accusing Agency Representatives of malicious and unethical conduct, and sending one Agency Representative a photograph of himself with an inappropriate message, denying that he sent the message, then accusing the FBI of breaking into his email account and sending the email.

Having received no response from Complainant to the Agency's Motion to Dismiss, and in response to a series of voicemails from Complainant and the Agency Representatives while I was out of the office between August 18 and August 29, 2016, I scheduled a status conference for September 8, 2016 at 11:00.

---

[1] On August 1, 2016 the parties left me a voicemail wherein Complainant said he inadvertently left of his attachments and requested leave to file his attachments late.  On August 2, 2016, I granted Complainant leave to do so, and conveyed this information telephonically in a phone call to the Agency Representative and in a voicemail to Complainant when he did not answer his telephone.  To date, I have received no attachment or proof of service of response to the Agency's discovery.

On the morning of September 8, 2016, Complainant sent an email stating that he was going to the hospital for ongoing health issues, and requesting a continuance of the status conference. In response, I vacated the order for the status conference and ordered the parties to provide a copy of the submission and proof of timely service for any response to the Agency's Second Motion to Dismiss Complainant may have submitted, no later than September 15, 2016. The same day, the Agency responded that it had not received any response from Complainant to the Agency's Second Motion to Dismiss.

On September 15, 2016, Complainant sent an email stating that he had not received the Agency's Second Motion to Dismiss, and requesting a copy of the Motion and an opportunity to respond. Complainant further requested permission to have a friend hand-deliver his discovery responses to the Agency.

On September 19, 2016, the Agency responded to Complainant's email stating that it served the Second Motion to Dismiss to Complainant *via* first class mail, rather than by certified mail, per Complainant's request. The Agency attached an August 9, 2016 email to Complainant informing him that they had not received any response to the Second Motion to Dismiss, and stated that Complainant did not respond. The Agency stated that it is willing to send another copy of the Second Motion to Dismiss, but argued that Complainant has been given ample opportunity to respond and has failed to do so. The Agency reiterated its request that the Second Motion to Dismiss and Remand be granted.

On September 21, 2016, I issued an Order providing Complainant another opportunity to respond to the Agency's Second Motion to Dismiss and Remand. I included a copy of the Agency's Motion in the email serving the Order. I directed Complainant to provide his response *via* certified mail or email postmarked no later than September 29, 2016. In bold print, the Order specified, "[a]bsent a showing of good cause for Complainant's continued failure to cooperate with discovery, I will grant the Agency's Second Mision [sic] to Dismiss, dismiss Complainant's hearing request, and remand the case to the Agency for a Final Decision pursuant to my authority under 29 C.F.R. § 1614.109(f)(3)(v)."

On September 28, 2016, Complainant requested an unspecified extension of the September 29, 2016 deadline, citing poor health and poor living conditions. Later the same day, Complainant sent attachments including documentation of August 18, 2016 and September 8, 2016 visits to the St. David's North Austin Medical Center, documentation of a dismissed eviction proceeding, and a picture of what Complainant alleges are bites on his body stemming from pest infestations in his current apartment.

On September 29, 2016, I denied Complainant's motion for an extension.

<u>**Legal Standard**</u>

EEOC regulations provide that where a party fails to respond to an order of an administrative judge, or requests for the investigative file, for documents, records, comparative

data, statistics, affidavits, or the attendance of witnesses, the administrative judge may, as appropriate, levy sanctions on the non-complying party pursuant to 29 C.F.R. § 1614.109(f)(3) (2015).   Specifically, an administrative judge may: (1) draw an adverse inference that the requested information would have reflected unfavorably on the non-complying party; (2) consider the requested information to be established in favor of the opposing party; (3) exclude other evidence offered by the non-complying party; (4) issue a decision fully or partially in favor of the opposing party; or (5) take other action as appropriate.

In determining an appropriate sanction, an administrative judge considers: (1) the extent and nature of the non-compliance, including the justification presented by the non-complying party; (2) the prejudicial effect of the non-compliance on the opposing party; (3) the consequences resulting from the delay in justice, if any; and (4) the effect on the integrity of the EEO process. *Gray v Dep't of Defense*, EEOC Appeal No. 07A50030 (March 1, 2007).   The Commission has held that dismissal of a hearing request with a remand to the Agency for a Final Decision is an appropriate sanction for failure to cooperate with discovery and failure to comply with orders and requests for information. *See Howard v. Dep't of Commerce*, EEOC Appeal No. 0120072499 (Aug. 9, 2007) (sustaining decision by AJ to dismiss the hearing request as a sanction for complainant's failure to respond to discovery requests); *Naugle v. United States Postal Serv.*, EEOC Appeal No. 01A60908 (July 7, 2006) (finding that AJ properly dismissed hearing request for complainant's failure to follow the orders of the AJ to provide necessary information in the case, by serving responses to the Agency's request for Production of Documents as required by the Discovery Order).

## Analysis

In this case, I find that Complainant has consistently, over a period of almost a year, failed to adhere to the orders and requests for information in this case.   Nine months after Administrative Judge del Toro authorized discovery in this case, Complainant has still not responded to discovery despite numerous extensions and opportunities to comply.   Despite Complainant's contentions that he has responded, he has never provided any proof of service of his responses to written discovery, even after having been given several opportunities to do so. Complainant has failed to keep this office and the Agency timely apprised of his changing addresses, which has contributed to the delays in this case.   Complainant has consistently engaged in argumentative, hostile and disrespectful conduct toward the Agency Representatives, compromising the decorum of the administrative proceeding.   At one point in the proceeding, Complainant's submissions became so voluminous and so hostile that I resorted to requiring the parties to obtain leave prior to filing any further submissions.   Complainant's conduct and his inability to adhere to deadlines and respond to requests for information in this case have greatly prejudiced the Agency's ability to defend itself in this proceeding, and have had a deleterious effect on my ability to adjudicate this case fairly and efficiently.

4

## <u>Conclusion</u>

Because I find that Complainant's failure to comply with orders and respond to requests for information in this discovery have had a significant prejudicial effect on this proceeding, I find that dismissal of the hearing request is an appropriate sanction. Therefore, the Agency's Second Motion to Dismiss and Remand is hereby **GRANTED**, Complainant's hearing request is **DISMISSED**, and the complaint **REMANDED** to the Agency for a final decision. The hearing record is enclosed for the Agency.

It is so ORDERED.

For the Commission:

Sharon E. Debbage Alexander
Administrative Judge
Telephone: (202) 419-0713
Facsimile: (202) 653-6053

**Via U.S. Postal Mail (With Enclosure):**
Jessica R. Hughes
EEO Manager (Formal Complaints)
Office of Equal Employment Opportunity and Diversity
U.S. Patent and Trademark Office
PO Box 1450
Alexandria, VA 22313-1450

**Via Electronic Mail:**
Gregory Royal
gregoryroyal@hotmail.com

Cheiko Clarke                     Taron Murakami
Chieko.Clarke@USPTO.gov           Taron.Murakami@USPTO.gov

5