**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

GREGORY A. ROYAL,

       *Plaintiff*,

    v.

ANDREI IANCU,

       Under Secretary of Commerce for
       Intellectual Property & Director of the
       Patent & Trademark Office,

WILBUR ROSS,

       Secretary of Commerce,

KIRSTJEN M. NIELSEN,

       Secretary of Homeland Security,

    *et al.*,

    *Defendants*.

Case No. 1:17-cv-261 (TSE/TCB)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS & FOR SUMMARY JUDGMENT**

Plaintiff Gregory Allen Royal ("Plaintiff" or "Royal") is a former probationary Patent

Examiner at the United States Patent and Trademark Office ("USPTO" or "Agency").   On

September 4, 2014, while Plaintiff was still in his probationary period with the USPTO, he was

discharged for failing to demonstrate that he would be able to meet the work product output

requirements for a Patent Examiner and for lacking sufficient professionalism in his interactions

1

with other federal employees.

In this lawsuit, pursuant to Title VIII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq., and also pursuant to 42 U.S.C. § 1983, Plaintiff alleges that his termination from his probationary position at the USPTO constituted unlawful discrimination on the basis of his race and gender and unlawful retaliation for engaging in protected activities and that during his employment at the USPTO he was subject to harassment and a hostile working environment.

Plaintiff's action is ripe for decision. Pursuant to the Equal Employment Opportunity Commission ("EEOC") process initiated at the USPTO prior to the filing of this action, a Report of Investigation of over 2000 pages was compiled by an independent investigator. Plaintiff was previously given the opportunity to participate in and conduct additional discovery during the pendency of his hearing request before the EEOC, but the presiding administrative law judge dismissed Plaintiff's EEOC hearing request and remanded the matter to the Agency for a final decision as a sanction for Plaintiff's "failure to comply with orders and respond to requests for information" over a period of almost a year. *See* Ex. 1 at 4-5.

As explained in more detail below, many of Plaintiff's allegations are nothing more than unsupported speculation that are insufficient to meet his burden to establish prima facie cases for his various discrimination and harassment claims. Further, Plaintiff has failed to provide any evidence that the Agency's proffered non-discriminatory reason for his discharge is a mere pretext for a prohibited personnel action or that there is a basis for imputing liability for the alleged harassment to the Agency.

For the reasons that follow, Defendants respectfully request that this Court grant their Motion for Summary Judgment in their favor on all claims of Plaintiff's complaint.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.      Background

**1.**  Plaintiff is an African-American male.   Ex. 2 at 1.   Plaintiff attended law school and has a J.D. and an LLM in intellectual property.   *Id.* at 3.

**2.**  Plaintiff began employment with the Agency as a probationary Patent Examiner,[1] GS-1224-09, on September 9, 2013.   Ex. 2 at 1; Ex. 2-A at 1.   Once Plaintiff completed his introductory training in the Patent Training Academy ("PTA"), he was assigned to Art Unit 2856 in Technology Center ("TC")[2] 2800.   Ex. 1 at 1; Ex. 3 at 2.   Plaintiff reported to Lisa Cauputo, a Supervisory Patent Examiner ("SPE").   *Id.*   Plaintiff's second-line supervisor was Joseph Thomas, a Group Director in TC 2800.   Ex. 4 at 2-3.

**3.**  As a probationary Patent Examiner, Plaintiff reviewed patent applications from inventors to determine whether the inventions could be issued patents in light of the relevant legal requirements.   Ex. 2 at 2; Ex. 2-A at 20, 21, 22.

**4.**  Patent examiners must meet certain quality and quantity standards by each GS level, which are set out in the performance appraisal plan ("PAP").   Ex. 2-A; Ex. 5 at 3.   The quantity standards are known as "production."   Ex. 2-A at 5.   Even though probationary patent examiners are not rated on production, they need to demonstrate an ability to meet the production requirement that will begin to apply to them (via the PAP) once they complete their one-year probationary period.   Ex. 5 at 3.

---

[1] All patent examiners are placed on a one-year probationary period.   *See, e.g.*, *Miller v. Locke*, 2009 WL 1675486, at *1 (E.D. Va. June 12, 2009).

[2] Patent examiners work in groups, or art units, of approximately 15-20 examiners, all focused on the same or similar technology.   Art units are part of the nine TCs, each focused on a broader field, such as biology or mechanical engineering.

## II.   Plaintiff's Tenure in the Patent Training Academy ("PTA")

**5.**   As a new patent examiner, Plaintiff spent his first four months of employment at the PTA, learning the technical aspects of the job, as well as Agency policies and procedures.   Ex. 2 at 2; Ex. 6 at 2.   In the PTA, the September 9, 2013, starting class had 12 training labs of approximately 14 to 16 new examiners each.   Ex. 2 at 2; Ex. 6 at 2.   In the PTA, Plaintiff reported to Matthew Such, the Training SPE, and his second-line supervisor was Jessica Rossi (née Ward), the Class Manager.   Ex. 2 at 2; Ex. 7 at 2; Ex. 8 at 1-2.

**6.**   In the PTA, from on or around September 9, 2013, through October 17, 2013, Plaintiff and another examiner, Vincent Wall, had several confrontations about the meaning of certain acronyms associated with patent examining and researching prior art, which Plaintiff found to be "demean[ing] and slander[ous]," and culminated in Plaintiff issuing Wall a "Cease and Desist" letter on October 17, 2013.   Ex. 2 at 2-3.   Plaintiff and Wall continued to have verbal conflicts about work and other matters.   Ex. 2 at 3-6, 14-16.

**7.**   On or about October 17, 2013, Plaintiff met with Such to discuss his concerns about Wall; however, Plaintiff did not raise any issues of harassment based on his sex or race.   Ex. 2 at 5-6; Ex. 7 at 3-4.   This was the first time Such became aware of issues involving Plaintiff and Wall.   Ex. 7 at 3.   Such met separately with both Wall and Plaintiff and both agreed there was a conflict related to prior art; Such then met with both men together and counseled them that they needed to work together in the PTA and thought the matter was resolved.   Ex. 7 at 3-4.

**8.**   On or about October 18, 2013, another examiner, Violeta Prieto told Plaintiff to "shut up" during a lecture in the PTA. But Prieto *also* told another examiner, a non-African-American female to "shut up" during lectures on at least two other occasions.   Ex. 2 at 6.   Plaintiff asked Such to remind everyone to be polite and not to say "shut up," and the Training SPE agreed.

Ex. 2 at 8; Ex. 7 at 5.

**9.**   On or about November 7, 2013, Plaintiff sent Such an email complaining that Prieto was interrupting him and disturbing him during PTA lectures.   Ex. 2 at 10; Ex. 7 at 4-5.   That same day, Prieto confronted Plaintiff about the email, stating that Plaintiff was trying to get her in trouble, and Plaintiff told Such.   Ex. 2 at 10.   Such spoke with Prieto and counseled her that she could not tell Plaintiff or others to "shut up," but he also suggested to Plaintiff that he should consider whether the complexity of some of his questions was beneficial to the other examiners.[3] Ex. 7 at 4-5.

**10.** Also on November 7, 2013, Plaintiff copied Rossi, his second-line supervisor at the time, on his email complaining about Prieto's behavior.   Ex. 2 at 10; Ex. 8 at 2-3.   At that time, Rossi did not know Plaintiff's race and had not met him in person.   Ex. 8 at 3.   Plaintiff chose not to follow up with Rossi, even when she called him, because he perceived her not to be understanding of his situation.   Ex. 2 at 11.

**11.** On or about November 14, 2013, Lab 11 took a quiz in the PTA during which there was further verbal conflict between Plaintiff and Prieto.   Ex. 2 at 12-13.

**12.** Between November 2013, and December 13, 2013, Plaintiff and Prieto had multiple verbal confrontations, each accusing the other of being the problem.   Ex. 2 at 12-19.   Plaintiff alleges that at one point during this period Prieto came so close to him waving her hands that a pen was knocked from Plaintiff's hands and spilled ink on her; she denied doing so to Such.   Ex. 2 at 16-17; Ex. 7 at 5.

---

[3] The Training SPE acknowledged that Plaintiff had a deeper knowledge of patent law (not patent examining) than many of his PTA classmates, which sometimes led to Plaintiff asking more advanced questions.   Ex. 7 at 5.

### III.     The December 13, 2013, Incident

**13.** On Friday, December 13, 2013, Such and Rossi were both teleworking and thus not at the

USPTO.   Ex. 7 at 6.   That morning, Such received an email from Plaintiff complaining that

Prieto had "knives on her desk," was pulling hair out of her head, eating loudly at her desk, and

otherwise being contentious.   *Id.*   Such forwarded the email to Rossi and called her, and he also

tried to call Plaintiff to discuss the situation.   *Id.*   Rossi contacted Deborah Reynolds, Deputy

Director of the PTA, and Gary Jones, the PTA Director, to inform them of the situation.   Ex. 8

at 4; Ex. 6 at 2-3.

**14.** As soon as the PTA Director received Rossi's email, he walked over to the labs.   Ex. 6 at

3.   When the PTA Director arrived, neither Prieto nor Plaintiff was at her/his desk; he observed

a paring knife on Prieto's desk, with fruit, and a plastic knife.   Ex. 6 at 3.   Given the lack of

conflict and the small blade, the PTA Director did not see anything amiss in the situation.   *Id.*

When Jones returned to his office, he had an email waiting for him stating that USPTO Security

had been called, and he returned to the lab, which was a 3-block walk away.   *Id.*

**15.** In actuality, on December 13, 2013, around 10:00 a.m., Plaintiff called Security from the

PTA, informing them that Prieto had "knives."   Ex. 2 at 22-23; Ex. 10 at 8.   Plaintiff told

Security that Prieto had been verbally abusive and had knives on her desk.   *Id.*   Security

contacted the Federal Protective Service ("FPS") to respond.   Ex. 10 at 2-3, 8.

**16.** FPS responded to Plaintiff's call and spoke with both Plaintiff and Prieto about the

situation, who continued to argue, in a way that "appalled" Jones.   Ex. 2 at 26-30; Ex. 8 at 4; Ex.

9 at 4.   FPS escorted Prieto to the lobby of the Agency and had her take the "knives" to her car,

although it did not appear Prieto had violated any Agency rules or regulations.   Ex. 10 at 8; Ex.

9 at 4; Ex. 6 at 3.   The FPS inspectors "concluded it was a non-violent disagreement and called

6

[Plaintiff] and [Prieto] to the same office and informed them they would have to find a way to get along with each other."   Ex. 10 at 8; Ex. 7 at 7.

17. Based on the call to Security, both the Training SPE and the Class Manager came to campus; the Director and Deputy Director of the PTA were already at the training lab.   Ex. 8 at 4; Ex. 7 at 6-7.   Prieto was not cited by security, and management concluded that Prieto's knives did not appear to violate Agency policy, as they appeared to be for use as personal eating utensils.   Ex. 8 at 4; Ex. 9 at 4; Ex. 6 at 3.

18. Jones, Reynolds, and Rossi decided to immediately move Prieto to another lab to separate her from Plaintiff.[4]   Ex. 7 at 7; Ex. 6 at 4; Ex. 9 at 2, 4; Ex. 8 at 5.   Prieto and Plaintiff were counseled to conduct themselves in a professional manner in the PTA.   Ex. 8 at 5.   At the time PTA management decided to separate Prieto and Plaintiff, they believed it to be a personality conflict and no one had alleged race and/or sex discrimination.   Ex. 9 at 4.

19. Nevertheless, on December 13, 2013, after contacting Security, Plaintiff contacted Jennifer Ware, an employee relations specialist ("ERS") in the Office of Human Resources ("OHR"), to discuss his complaint about Prieto.   Ex. 2 at 27; Ex. 12 at 2.   Appellant relayed his version of events in the PTA, including all the ways in which Prieto was allegedly harassing him (e.g., interrupted him, was rude, pulled out her hair, did noxious things, and had the knives at work) and about Wall.   Ex. 2 at 27-28; Ex. 12 at 3, 9-10.   During Plaintiff's meeting with Ware, he stated that Prieto had waved her hands around and knocked a pen out of his hand, which Plaintiff described as a physical assault.   *Id.*   Plaintiff also raised his concern that Wall was "mocking Muslims by asking about their religion."   Ex. 12 at 9-10.   Plaintiff did state that he

---

[4] At this time, Plaintiff and Prieto were scheduled to finish the PTA and join their art units in approximately a week.   Ex. 8 at 5.

believed Preito's actions were because Prieto "was not used to a polite, educated black man."
Ex. 12 at 7.   Ware was not aware of any facts showing that race and/or sex were a factor in how
Employee Relations treated Plaintiff.   *Id.*   Plaintiff's employee relations file was kept separate
from Plaintiff's personnel file and was not accessible to Plaintiff's supervisors.   *Id.* at 4.   At no
time during Plaintiff's employment did OHR conclude that facts supported Plaintiff's allegations
that he was subject to unlawful harassment.   Ex. 13 at 6-7.

**20.** On or about December 16, 2013, Plaintiff requested that he be moved early from the PTA
and into his Art Unit, which had already been discussed.   Ex. 7 at 6-7.   The Agency agreed and
moved Plaintiff to his Art Unit on December 20, 2013.   Ex. 6 at 4; Ex. 7 at 7.

**21.** On or about December 18, 2013, Prieto came to Ware's office to file a complaint about
Plaintiff and that she had been moved, not Plaintiff.   Ex. 12 at 4, 11.   Prieto alleged that
Plaintiff interrupted her, tried to dominate classroom discussions, and that he humiliated her
when he called Security about the knives she uses to cut fruit.   Ex. 12 at 11; Ex. 14 at 2-7.

**22.** Based on the ongoing issues between Prieto and Plaintiff, and its disruption of the PTA
class, Employee Relations recommended to the PTA Director that both employees be discharged.
Ex. 12 at 6.   But the PTA Director disagreed, and thus did not follow the Employee Relations'
recommendation; in short, the PTA Director determined that moving both employees to their
separate art units was sufficient action to end the situation.   Ex. 12 at 6; Ex. 6 at 4.

### IV.   Plaintiff's Tenure in His Art Unit

**23.** On December 19, 2013, as Plaintiff transitioned to his Art Unit, he received his first
interim evaluation.   Ex. 15.   Appellant received a "1" for "needs improvement" in the area of
"ability to interact with coworkers," along with the comment "the examiner should be mindful of
his interactions with coworkers in order to avoid further instances of contentious interactions

from occurring."   *Id.*   Indeed, Plaintiff *himself* also received "1s," which were "needs improvement," in productivity consistency and work habits.[5]   *Id.*

24. On or around March 2014, Appellant received his six-month evaluation from Caputo, his SPE, and Thomas, TC 2800 Group Director.   Ex. 15.   Plaintiff received a "2" for "meeting expectations" in getting along with others but he received a "1" for "needs improvement" on production.   *Id.*   Plaintiff recalls his production being around 40% at his sixth-month evaluation, with 95% being considered fully successful.   Ex. 16 at 3.

25. Around the time of Appellant's six-month evaluation in March 2014, Appellant informed his SPE that his background was not well suited to his art classes (thermal measurement and measurement and testing); however, he did not request a transfer and the SPE did offer him assistance.   Ex. 16 at 4-5; Ex. 5 at 4.

26. On or about April 29, 2014, Plaintiff complained to Security about an alleged incident on April 23, 2014, in which Prieto had allegedly waited for Plaintiff in a concourse outside one of the lecture halls and attempted to force physical contact.   Ex. 2 at 47.   Security reviewed video footage of the alleged incident but it did not show anything relevant to support Plaintiff's allegations.   Ex. 10 at 4.

27. In or around May 2014, Plaintiff received his eight-month evaluation from his SPE.   Ex. 15.   At this time, Plaintiff received a "1" for ability to work with others as well as a "1" in production.   *Id.*   Approximately a week later, Plaintiff met with Thomas to discuss the rating, and his second-line supervisor affirmed the evaluation.   Ex. 16 at 8.

28. Caputo found that Plaintiff's work product numbers were not improving, despite weekly

---

[5] Probationary patent examiners receive 1s for "needs improvement," 2s for "meets expectations," and 3s for "exceeds expectations."   Ex. 12.

meetings.   Ex. 5 at 3.   While Plaintiff was not ultimately rated on his production, probationary patent examiners are expected to demonstrate that they will succeed on the production metrics. *Id.*   Plaintiff's production at eight months was around 44% when management expects it to be around 80% at that time.   *Id.*   Caputo and Thomas informed Plaintiff on multiple occasions that failure to consistently improve his production would have a negative impact on whether the Agency would retain Plaintiff.   *Id.*

**29.** In or around May 2014, Thomas met with Plaintiff because he was concerned with Plaintiff's low productivity and low level of work product.   Ex. 4 at 3-4.   Thomas and Caputo asked Plaintiff if he needed assistance or resources to help him perform his job.   Ex. 4 at 4.

**30.** On or about July 10, 2014, Plaintiff alleged that another examiner, Wei "Victor" Chan, had "smacked [him] on the back of the head"; however, at the time he declined to make any statement and did not do so until August 12, 2014.   Ex. 3 at 2-3, 5; Ex. 17 at 2, 4, 6.   Caputo followed up with Plaintiff for him to contact Security to file a complaint against Chan.   Ex. 3 at 5.   When OHR investigated the incident, it found that while Chan may have touched Plaintiff, it was just to get Plaintiff's attention and in no way constituted a smack on the head or an assault. Ex. 13 at 4; Ex. 18 at 4.   Chan acknowledged touching Plaintiff to get his attention but denied it was forceful.   Ex. 19 at 3, 4.   Another examiner who witnessed the incident corroborated Chan's characterization of the amount of force applied.   Ex. 20 at 3.

**31.** Caputo never witnessed other examiners treating Plaintiff differently, or engaging in any workplace harassment or bullying during her time as his SPE.   Ex. 3 at 4.

**32.** On August 14, 2014, Plaintiff and others were scheduled to take a patent examining exam.   Ex. 21 at 5.   Plaintiff believed Wall was disrupting the testing atmosphere by asking about which examiners had to have their exams rescheduled.   *Id.*   Plaintiff thought that he

would have to take the exam in the same room as Prieto; however, he did take the test in a separate room.   *Id.* at 6.

### V.      Plaintiff's Discharge During His Probationary Period

**33.** Plaintiff's one-year probationary period was set to expire on September 9, 2014; as such, if the USPTO did not wish to retain him, as with other employee, it needed to make that decision by that date.   On September 4, 2014, Thomas called Plaintiff in for a meeting, along with two OHR employees, an employee from the Security Office and a uniformed security guard.   Ex. 16 at 9; Ex. 4 at 5-6.   Thomas informed Plaintiff he was being discharged during his probationary period because Plaintiff had not demonstrated he could successfully do the job of a patent examiner as required by the PAP.   Ex. 4 at 3, 7; Ex. 16 at 9, 10.   Thomas considered Plaintiff's lack of progress with productivity and his work product output, and, secondarily, Plaintiff's continued inability to get along with a number of different people.[6]   Ex. 4 at 3, 5.

**34.** After the September 4, 2014 termination meeting, Security and OHR gave Plaintiff approximately ten minutes to gather his things and escorted him from the Agency premises.   Ex. 16 at 10.   Thomas stated it was typical protocol to have OHR at a termination and that it is not uncommon to have Security present at any termination where it is thought that the employee might have a hostile reaction to the discharge decision.   Ex. 4 at 5.   Thomas stated that Appellant's prior call to Security and the number of confrontations he had with others warranted

---

[6] This included not only Plaintiff's incidents with other Examiners, but also Plaintiff's failure to cooperate with the Office of Personnel Management ("OPM"), a separate federal agency, when it re-opened Plaintiff's background investigation of its own volition.   Ex. 4 at 4-5.   In December 2013, OPM reopened an investigation into Plaintiff's background check.   Ex. 12 at 5.   On January 27, 2014, Plaintiff sent Ware an e-mail claiming that OPM's actions were in retaliation for his complaint about Prieto.   *Id.*   Ware informed him that the USPTO had no role in OPM's decision.   *Id.*   In April 2014, Thomas met with Plaintiff in inform him that he would not be able to continue his employment with the USPTO if Plaintiff did not cooperate in OPM's investigation.   Ex. 4 at 5.

the decision to call Security to the meeting, was consistent with his prior practice, and OHR concurred.   Ex 4 at 5; Ex. 13 at 5.

**35.** In TC 2800, in the three years prior to Plaintiff's discharge, nine other patent examiners were discharged during their probationary period.   Ex. 22.   Seven were male, two were female, and six of them were not African-American.   *Id.*

**PROCEDURAL HISTORY**

Plaintiff filed a formal administrative complaint of discrimination with the USPTO on May 26, 2014, which he amended several times thereafter; ultimately, after the USPTO dismissed many of Plaintiff's claims on appropriate threshold grounds, the USPTO accepted for investigation Plaintiff's claims of race and gender discrimination regarding his termination and allegedly-delayed leave payments, and his hostile work environment allegations.   The USPTO conducted a significantly-detailed investigation into Plaintiff's Title VII allegations, which generated an over 2,000 page report of investigation ("ROI").

Once that ROI issued (and Plaintiff obtained a copy), Plaintiff exercised his right to a hearing before an Administrative Judge ("AJ") of the Equal Employment Opportunity Commission.   On October 5, 2016, the presiding AJ ultimately dismissed Plaintiff's request for a hearing based upon Plaintiff's own misconduct and dilatory tactics.   In particular, the AJ noted that Plaintiff had "rais[ed] his voice and 'engag[ed] in lengthy rants' during status conferences, repeatedly accusing [USPTO] representatives of malicious and unethical conduct, and sen[t] one [USPTO] representative a photograph of himself with an inappropriate message."   *See* Ex. 1. As such, the AJ remanded Plaintiff's administrative complaint to the USPTO for issuance of a final agency decision ("FAD").   The USPTO issued that decision—a detailed, seventeen page decision—on December 2, 2016.   Ex. 25.   Plaintiff noticed an appeal of that FAD to the Office

of Federal Operations ("OFO") on March 7, 2017, which the OFO dismissed as untimely.

Plaintiff's complaint in this Court presents six causes of action.   First, Plaintiff maintains that USPTO officials discriminated against him on the basis of his race and gender in violation of Title VII (Counts One and Two).   Second, Plaintiff maintains that USPTO officials retailed against him on the basis of his protected activity, also in violation of Title VII (Count Three).

Third, Plaintiff maintains that USPTO officials subjected him to a hostile work environment in violation of Title VII (Count Four).   And finally, plaintiff alleges so-called "civil rights violations" against the Federal Protective Service and the USPTO's Office of Equal Employment Opportunity and Diversity pursuant to 42 U.S.C. § 1983 (Counts Five and Six).**STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56, a motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   Where the non-moving party bears the burden of proof, the moving party satisfies its obligation upon a showing that there is a lack of evidence to carry the non-moving party's burden on an essential element of a cause of action.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The Court construes the facts in the light most favorable to the non-moving party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**ARGUMENT**

Summary judgment in favor of Defendants on all of Plaintiff's Title VII claims is appropriate.   First, Plaintiff cannot establish the prima facie elements of his discrimination or retaliation claims because there is no evidence to support an inference that he was subject to an adverse personnel action on a discriminatory or retaliatory basis.   Furthermore, Plaintiff cannot

establish that the Agency's proffered non-discriminatory, non-retaliatory justification for his termination was mere pretext for a prohibited action.

Second, Plaintiff can similarly not establish the prima facie elements of his harassment claims.   There is no evidence to support an inference that the actions Plaintiff complains of were motivated by his membership in a protected class, that those actions were sufficient to constitute an objectively hostile work environment, or that, even if those requirement were met, the Agency either ignored or condoned those actions in a manner sufficient to impute liability.

Third, this Court lacks jurisdiction over Plaintiff § 1983 claims.   The statute that forms the basis of these claims applies to individuals purporting to act under state law and thus do not lie against federal employees acting in their official capacities.   Similarly, even if those claims were reinterpreted by the Court as *Bivens* claims for purporting to act under federal law, *Bivens* does not apply to federal employees acting in their official capacities.

I.      **Plaintiff cannot meet his burden for claims of race or gender discrimination (Counts One and Two)**

The first two claims found in Plaintiff's complaint seek relief under Title VII for putative race and gender discrimination during his tenure as a probationary patent examiner.   Because Plaintiff has no direct evidence of discrimination or retaliation under Title VII, the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.   *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 991 (E.D. Va. 2017) (Ellis, J.).   "To establish a *prima facie* case of discrimination under Title VII, plaintiff must show "(1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that he was performing at a level that met his employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class."   *Sadeghi*, 251 F. Supp. 3d at 991 (citing *Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 219 (4th Cir.

2016)).   At the second step, "[i]f plaintiff can establish a *prima facie* case of discrimination, then the 'burden shifts to the employer at the second step to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'"   *Id.* (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (alteration in original)).   "At the third step, the burden shifts to plaintiff 'to show that [defendant's] proffered permissible reason[s] for taking an adverse employment action [are] actually a pretext for discrimination.'"   *Id.* at 994 (quoting *Lettieri*, 478 F.3d at 646 (alterations in original)).

1.      Plaintiff cannot establish the elements of a *prima facie* case of discrimination; indeed, although Plaintiff can certainly demonstrate his membership in a protected class, he falls short on the other elements of the framework.   First, an employee is not entitled to bring a Title VII claim for anything that bothers him in the workplace; rather, "[a]n adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"   *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).   And here, the sole adverse employment action that Plaintiff can establish was his termination from employment as a probationary patent examiner.

Second, from this premise, Plaintiff cannot establish that he was performing at a level that met the USPTO's expectations.   In short, on repeated occasions, USPTO officials noted Plaintiff's difficulties in the area of production and office interactions.   In December 2013, March 2014, May 2014, and August 2014, USPTO officials noted that Plaintiff was struggling to come close to the level of production that a non-probationary patent examiner would be expected to maintain and provided Plaintiff the lowest possible marks on this score – even *Plaintiff himself*

reaclls that his production was extremely off-the-mark (40% vs. 95%).   While Plaintiff has

made much about a lack of a formal "production" requirement for probationary patent

examiners, probationary patent examiners are qualitatively evaluated (*i.e.*, with allowances for a

learning curve, demonstrated improvement over time, etc.) for their potential to produce

sufficient work product to meet such a formal production requirement that will apply to them

once they complete their probationary period.   Ex. 2-A at 3, 21; Ex. 5 at 3; Ex. 4 at 3-4.

Plaintiff demonstrated poor performance in terms of his work output and failed to demonstrate

improvement over time while also having difficulties in his interactions with coworkers.   Ex. 4

at 3-5; Ex. 5 at 3; Ex. 15.

Third, Plaintiff has not even alleged facts supporting a finding that his position was filled

by a similarly situated person outside of his protected class.   And although the Fourth Circuit

has recognized limited exceptions to that requirement, but Plaintiff has not demonstrated that he

should qualify for relief from the requirement "to eliminate this inference of non-

discrimination."   *See Miles v. Dell, Inc.*, 429 F.3d 480, 487-88 (4th Cir. 2005).   This is

especially so in light of the purpose for the *prima facie* framework – to determine whether

plaintiff can establish any inference that unlawful discriminatory animus was involved in the

adverse employment action.   And on this score, Plaintiff cannot identify any similarly-situated

comparator from outside his protected class that was treated differently than him; indeed, those

individuals who Plaintiff identified during the administrative process were in different Art Units,

and thus had different supervisors.   *See, e.g.*, *Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th

Cir. 2010).

2.   And even if Plaintiff could somehow conclude that Plaintiff has met his *prima facie*

burden, there can be little doubt that Plaintiff's claim fails on the remaining elements of the

analytical framework.   Put simply, the USPTO has come forward with a legitimate, non-discriminatory reason for Plaintiff's termination—namely, his poor performance in terms of demonstrating improvement in work product output during his probationary period coupled with his difficulties in interactions with multiple people.   Ex. 4 at 3-5; Ex. 5 at 3; Ex. 15.   Plaintiff cannot put forward any evidence to suggest that these reasons were mere pretext for terminating him on either the basis of his race or his gender.   As the record demonstrates, the same TC that made the decision to terminate Plaintiff's employment had terminated nine (9) other patent examiners in the prior three years, including those not of Plaintiff's own race and gender.   See Ex. 22.   Plaintiff's sole response to this record before the agency was to identify his disagreements with the evaluation process (e.g., due to the alleged difficulty of his assigned work).   But not only did Plaintiff's supervisory chain repeatedly offer him assistance with these difficulties – which Plaintiff often declined –but these picayune challenges do not establish that Agency's real motivation for his termination was his race or gender, rather than the conclusions reached about his performance.   As the Fourth Circuit repeatedly has held, "[w]hether the termination was 'wise, fair, or even correct' is immaterial."   *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 903 (4th Cir. 2017) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).   "Title VII is not a vehicle for substituting the judgment of the court for that of the employer."   *Jimenez v. Mary Washington College*, 57 F.3d 369, 377 (4th Cir. 1995).   And, federal courts "do[] not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination."   *DeJarnette*, 133 F.3d at 299 (internal quotations omitted).

For all these reasons, this Court should grant summary judgment in favor of Defendants on Counts One and Two of Plaintiff's complaint.

**II.      Plaintiff cannot meet his burden for a retaliation claim (Count Three)**

Plaintiff next maintains that his termination from the USPTO's employ was the result of his protected activity.   "To establish a prima facie case of retaliation, plaintiff must show that he (i) 'engaged in protected activity,' (ii) that defendant 'took adverse action against' him, and (iii) that 'a causal relationship existed between the protected activity and the adverse employment activity.' *Sadeghi*, 251 F. Supp. 3d at 997 (quoting *Guessous*, 828 F.3d at 217).   The second and third steps of the burden shifting then apply in an analogous manner as for a discrimination claim.   *See Sadeghi*, 251 F. Supp. 3d at 998.   But there is a key difference between claims for discrimination and retaliation in this regard – as the Supreme Court has recently held, in order to establish a claim for retaliation, an individual must meet a higher causation standard; *i.e.*, he must demonstrate that his protected activity was the "but for" cause of his termination.   *See Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 528 (E.D. Va. 2013) (recognizing that the causation element of retaliation is "evaluated under a 'but for' causation standard, and not under the 'motivating factor' standard used to evaluate Title VII status-based discriminatory claims").

And even assuming *arguendo* that Plaintiff could establish a *prima facie* case of retaliation, he cannot meet this advanced standard.   As Plaintiff's retaliation claim relates to the same personnel action (i.e., termination) as his discrimination claims, the Agency's legitimate, non-retaliatory reason for its action and Plaintiff's failure to demonstrate that the Agency's proffered reasons are pretext are similarly fatal to Plaintiff's retaliation claim.   Plaintiff has no more demonstrated that the Agency's proffered reason for his termination is a pretext for retaliating against him for his putative protected activity than he has shown it to be a pretext for discrimination.   Plaintiff relies only on bald assertions without even providing facts that would

give rise to a reasonable inference in his favor.

And the record provides him no greater assistance in this regard, as USPTO openly identified for Plaintiff his performance difficulties throughout his tenure – both before and after Plaintiff presented his protected activity to his supervisors.   Plaintiff was hired by the Agency as a Patent Examiner, GS-9, on September 9, 2013.   Ex. 2 at 1.   Upon hire Plaintiff was required to serve a probationary period of one year.   Ex. 5 at 3; Ex. 2-A at 23.   Caputo had meetings with Plaintiff at the 6th, 8th, and 11th month marks to discuss his Individual Development Plan ("IDP").   Ex. 5 at 3; Ex. 15.   In May 2014, at the 8-month mark, Thomas met with Plaintiff to discuss his struggling performance.   Ex. 4 at 3-4.   Plaintiff had a low level of productivity and a low amount of work product.   *Id.*   At the 8-month mark, probationary examiners are typically expected to be around 80% production and Plaintiff's cumulative production at the 8-month mark was 44%.   Ex. 5 at 3.   Thomas offered assistance, and emphasized that he would be looking at Plaintiff's performance in the next three months to determine whether Plaintiff could be a fully successful Patent Examiner.   Ex. 4 at 4.   Plaintiff indicated he was fine with the assistance he had.   Ex. 4 at 4; Ex. 5 at 3.   In the next three months, while Plaintiff's productivity rate (based upon the number of office actions prepared compared to the number of examining hours worked) increased, his number of work products remained low.   Ex. 4 at 4. "Work product" refers to the number of cases a Patent Examiner has reviewed and analyzed.   *Id.* Plaintiff's productivity had likely increased despite a low number of work products because he had taken leave, thereby reducing his examining hours worked.   *Id.*   And "temporal proximity is 'immaterial' when an employer contemplates the action before learning of the protected activity."   *Braxton v. Cook Med. Inc.*, 2013 WL 4033654, at *7 (E.D. Va. July 31, 2013) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

For these reasons, this Court should grant summary judgment in favor of Defendants on Count Three of Plaintiff's complaint.

### III.     Plaintiff cannot meet his burden for a claim of hostile work environment (Count Four) or harassment (Count Five)

Plaintiff next seeks relief under Title VII for putative hostile work environment, premised on the alleged actions of his fellow patent examiners.   Notably, plaintiff asserts two separate causes of action on this score – one for "hostile work environment" (Count Four), and another for "harassment" (Count Five).   Harassment of the type alleged by Plaintiff is a basis for creating a hostile work environment or more broadly equivalent thereto, but, in any case, not a separate cause of action.   *Cf. Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010).   Count Five of Plaintiff's complaint is thus indistinguishable from Count Four.

"To prevail on a hostile work environment claim, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's protected characteristic; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous*, 828 F.3d at 221 (cleaned up).   "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).   While there can be exceptions (for extremely severe conduct), a hostile work environment claim must often involve a pattern of related conduct to be viable.   *See id.* at 277.

Although Plaintiff can demonstrate that the conduct of his fellow patent examiners was "unwelcome," Plaintiff's claim fails on the remaining elements of the framework.   First, Plaintiff's hostile work environment claim must fail because, even accepting Plaintiff's version

of events, there is no evidence to support the notion that any of the actions by Wall, Prieto, or Chan, were taken based upon Plaintiff's race or gender.   At the outset, *two* of the alleged harassers are themselves male (and notably, the putatively hostile work environment at issue here was no way explicitly-sexual).   And importantly, the only "evidence" that Plaintiff has been able to muster in this regard is his own unsupported supposition that the actions he found hostile were motivated by the different race and/or gender of the individuals involved; *i.e.*, because in Plaintiff's view, Preito had never seen a "polite Black man."   This is singularly insufficient to sustain a claim under Title VII.

Second, the record does not disclose that plaintiff's work environment was "permeated" with the type of "severe or pervasive" hostility that is necessary to establish an actionable hostile work environment claim under Title VII.   *See, e.g.*, *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009).   Put simply, "Title VII does not set forth 'a general civility code for the American workplace.'"   *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).   And as such, "judicial standards for [] harassment must 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"   *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).   But that is the sum total of Plaintiff's environment here—that a number of his co-workers became angry at his behavior during the PTA (whether correctly or not), and expressed that displeasure in extremely occasional instances of public teasing; *i.e.*, the typical type of personality conflicts that are endemic to any workplace.   Moreover, even those allegations that may facially *appear* more problematic are far more benign once examined.   Plaintiff does not allege that Prieto ever threatened him or anyone else with paring knives she used for cutting up fruit or that there was

any other objectively reasonable basis for him to feel threatened by the presence of the knives on Prieto's desk.   And the one instance in which another co-worker tapped Plaintiff on the head happened on a single occasion, and it was extremely difficult for the USPTO to obtain Plaintiff's statement about it.

Third, the actions, even if objectively hostile, cannot be imputed to the Agency. The purported harassment in this case was undertaken by Plaintiff's *co-workers*.   And as such, Plaintiff faces a much more significant hurdle in imputing Title VII liability to the USPTO.   As the Fourth Circuit has held, "where an employee is [] harassed by a co-worker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."   *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011); *see also Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006).   Time after time, after Plaintiff made complaints about his co-workers' conduct, the USPTO "respond[ed] with remedial action reasonably calculated to end the harassment" (to the extent it had occurred in the first instance). *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).

In each case, the Agency investigated Plaintiff's complaints and took appropriate actions in response.   For example, Wall was corrected regarding his inappropriate remarks.   Prieto (and Plaintiff) were also advised to conduct themselves more professionally and Prieto was ultimately moved to a different lab of the PTA, and they were later assigned to different art units.   While the Agency did not believe Prieto's use of a paring knife for cutting fruit to be a violation of Agency policy, she was nevertheless required her to return the knives to her car.   The Agency investigated Plaintiff's report of the incident with Chan but found no witnesses corroborating Plaintiff's description of the severity of the contact.   Thus, even though there is no evidence to suggest that the personality conflicts and arguments reported by Plaintiff were motivated by

Plaintiff's protected characteristics and even though those events did not rise to the level of creating an objectively hostile work environment, the Agency in each case investigated and took corrective action when appropriate.

For these reasons, this Court should grant summary judgment in favor of Defendants on Count Four of Plaintiff's complaint.

### IV.      Plaintiff cannot establish a claim under 42 U.S.C. § 1983 (Counts Six and Seven)

Defendants (originally named and their successors) are federal employees.   Section 1983 claims are only available against persons purporting to act under the law of "any State or Territory or the District of Columbia." 42 U.S.C. § 1983; D*istrict of Columbia v. Carter*, 409 U.S. 418, 424–25 (1973).   Section 1983 claims are thus not available against federal employees acting in their official capacities.

Plaintiff's claims must fail even if reinterpreted as *Bivens*[7] claims.   "[A] *Bivens* action does not lie against either agencies or officials in their official capacity."   *Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002) (citing *FDIC v. Meyer*, 510 U.S. 471, 484–86; *Randall v. United States*, 95 F.3d 339, 345 (4th Cir.1996)).

For these reasons, this Court should dismiss Counts Six and Seven of Plaintiff's complaint.

### CONCLUSION

As there is no legally sufficient basis to maintain any of the counts of Plaintiff's complaint, Defendants respectfully request that this Court grant summary judgment in their favor on Counts One through Five and dismiss Counts Six and Seven.

---

[7] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Dated: November 30, 2018                    Respectfully submitted,


                                            G. ZACHARY TERWILLIGER
                                            UNITED STATES ATTORNEY

                                   By:              /s/
                                            _____
                                            PETER J. SAWERT
                                            Special Assistant U.S. Attorney
                                            DENNIS C. BARGHAAN, JR.
                                            Deputy Chief, Civil Division
                                            Assistant U.S. Attorney
                                            U.S. Attorney's Office
                                            2100 Jamieson Avenue
                                            Alexandria, Virginia 22314
                                            Telephone:      (703) 299-3995
                                            Email: peter.j.sawert@usdoj.gov

                                            ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and will send a true and correct copy of the foregoing to the following non-filing user via first-class mail:

Gregory Allen Royal
8100 N. Mopac Expressway, Apt. 277
Austin, Texas 78759

Date: November 30, 2018                                  _____/s/_____
PETER J. SAWERT
Special Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3995
Fax:        (703) 299-3983
Email:  peter.j.sawert@usdoj.gov

ATTORNEY FOR DEFENDANTS