# Exhibit 2

Part 1

**In the Matter of Gregory Royal**

**Case Number: 14-56-22**
**Agency: United States Patent and Trademark Office**

**STATEMENT OF GREGORY ROYAL**
**COMPLAINANT**

On June 20, 2014, I was interviewed by the designated EEO Investigator, Lisa A. Kleine. Ms. Kleine explained to me that she was investigating allegations made by the Complainant that he was discriminated against in the form of a hostile work environment on the bases of sex (male) and race (African American/Black) since:

> *1. On or about December 13, 2013, Complainant alleges his complaints of hostile work environment were not taken seriously because he is a "six foot, medium built Black man" and the alleged harasser is a White woman;*
> *2. On or about November 07, 2013, he was physically assaulted by a White female co-worker;*
> *3. On or about December 13, 2013 and continuing Complainant alleges that his harasser as been allowed to continue to violate USPTO policies on workplace safety and conduct by bringing several knives to the workplace and threatening Complainant.*

I was advised by Ms. Kleine of my rights as a witness/party in an EEO case, and I was informed that my statement would and may be reviewed by the agency, the Office of Equal Employment Opportunity and Diversity, and other interested parties, in the context of this claim. I have also been advised that there is no assurance of confidentiality as to the testimony given herein. I was also advised that I had the right to have a representative assist me in these proceedings, but I chose not to be represented (at this time). I reserve the right to obtain legal representation at a subsequent time should I deem it necessary to protect my employment and constitutional rights in this matter.

The following represents a true and accurate summary/statement of the information that I provided to Ms. Kleine.

1. Please state your full name and indicate your sex and your race.

Gregory Allen Royal. Sex: Male. Race: African American/Black.

2. Please state your present position, including grade and step, your length of time in your current position and the name of your current supervisor, and the length of time s/he has been your supervisor and the Art Unit and Technology Center which you are associated with.

Probationary Patent Examiner, USPTO. Grade: GS-9. I am not sure of my step. I started at USPTO on September 9, 2013. My supervisor is Lisa Caputo. She has been my supervisor since December 2013. I am in Art Unit 2856 in Technology Center 2800.

1

Initials ___/s/ GAR_____

001284

3. Please state your duties and responsibilities in your current position.

I receive applications for patents from applicants for their inventions; I review the applications, and I understand the applications. I review the claims of an application to assess the scope of the invention, and I search various databases for prior art references, such as patents, patent application publications, or non-patent literature to discern whether an applicant has invented something that is useful, novel, and non-obvious. In performing my job duties, I follow the Manual of Patent Examining and Procedure.

4. You have indicated that you believe you have been subjected to a hostile work environment based on your sex and race. Please describe in detail each instance where you believe you have been subjected to a hostile work environment, including when the harassment began, the form the harassment took, the effect the harassment had on you and your ability to do your job, any witnesses to the harassment, and any preventative or corrective steps available to you by the Agency which you took, including to whom any such incidences of harassment were reported to, and the result of each such report.

As background, I began as a probationary patent examiner on September 9, 2014. I started at the Patent Training Academy (PTA), where all new examiners are trained for 4 months. While in the PTA, as part of the September 9, 2013 orientation for new examiners, Kevin Lewis, the Head of Security spoke and explained that knives were prohibited on federal grounds. *See* **Exhibit D** (a two-page copy of the syllabus from the September 9, 2013 orientation for new patent examiners listing Mr. Lewis as a speaker). At that time, Mr. Lewis stated and explained that even the very small Swiss Army pocket knives, the ones guys keep on their key chains, are not allowed on federal grounds.

After the orientation, new patent examiners were then moved into training labs. I was initially placed in Lab 9, but I was subsequently moved to Lab 11, located in Room 6024. Violeta Prieto and Vincent Wall were also placed in Lab 11. Matthew Such is the SPE/Training supervisor. Mohsen Ahmadi is the Assistant Training Supervisor.

Examination time is a period where new examiners learn patent prosecution procedures and develop their skills as patent examiners. During examination time, new examiners examine either mock patent applications or actual patent applications. During one of the earlier examination times, I requested the assistance of Matthew Such in my search for prior art related to a pending patent application. Mr. Such directed me to enter a search string that contained "ad" and a mathematical operator. As directed by Mr. Such, I entered the stated search string. After Mr. Such had directed me to enter the search string, Mr. Such moved to assist other examiners. Vincent Wall was not present during this time period. Because I was uncertain as to what "ad" meant in the search string, a little time after Mr. Such had assisted me, I asked Nelson Garces for the meaning of "ad." Mr. Garces sat in the cubicle and at the desk directly across from my cubicle and desk. I questioned Mr. Garces as to whether "ad" was an acronym for "after date." Mr. Garces informed me that "ad" stood for "application date."

Despite not having been present during the time when Mr. Such assisted me, Mr. Wall had returned back to his desk from one of his frequent smoke breaks. Mr. Wall overheard Mr.

2

Initials ___/s/ GAR___

Garces and my conversation. Mr. Wall immediately began to mock and harass me about my not knowing the meaning of "ad." Mr. Wall began slandering me by shouting aloud, "Gregory uses post art in reviewing his applications." Art occurring after the U.S. effective filing date would be improper.

Mr. Wall was absolutely aware of the fact that I had attended law school, received Juris Doctor and a LL.M. in Intellectual Property, and that I had worked for six months as a Patent Associate at a local law firm. I had shared this information with Mr. Wall prior to disassociating myself from him because Mr. Wall had demonstrated a lack of respect for others and the environment early on. Mr. Wall would, inter alia, throw his cigarettes on the ground, even in front of the Carlyle building. When I questioned his reasoning for doing so, Mr. Wall replied that there were no garbage cans in front of the building. I did not agree with Mr. Wall's approach; he was a litter bug.

Mr. Wall defamed and slandered me by stating to other examiners, e.g., Nelson Garces and Herve Assouman, "Gregory uses post art, art that is not relevant." Mr. Walls did this for a week. He kept saying that I was using post art. Mr. Wall would continue his harassment of me by making his negative remarks about "post art" daily. Mr. Wall did this solely to place me in a false light before other examiners in Lab 11. Mr. Wall demonstrated an obvious racial animus towards me because I specifically asked Mr. Wall to stop his harassment each time he had made his defamatory statements about my alleged use of "post art." Mr. Wall continued to defame me in my profession as a patent examiner by repeatedly falsely accusing me of using art references that were not proper as related art under the patent laws (35 USC), rules (37 CFR), or procedures (MPEP). On numerous occasions, I first very politely but subsequently used stronger tones of voice in expressing my displeasure with Mr. Wall's defamatory statements to Mr. Wall.

Despite my being polite and courteous to Mr. Wall albeit sometimes stating my desire for him to stop his harassment and slanderous statements in stronger tones of voice, Mr. Wall harassed me daily without hesitation. Mr. Wall would arrive early to work so that he could write defamatory statements about me (and he used my name without my consent) on the White board located in the front of the Lab 11 so that all other examiners could see his defamation. Mr. Wall wrote (something to the effect), "Post Art User of the Month," which he had underlined and then put my name, "Gregory Royal" beneath the statement.

Mr. Wall, because he maliciously refused to respect my numerous requests for him to stop harassing me, forced me to issue a written *Cease and Desist* statement to him. *See* **Exhibit J** (a copy of the handwritten *Cease and Desist* letter that I hand-delivered to Mr. Wall on October 17, 2013).

Mr. Wall's intentional and malicious harassment was not only disruptive to my ability to learn my new job duties and skills, his conduct was distracting and caused me headaches and abdominal unrest.

During the period from September 9, 2013 to October 17, 2013, Mr. Wall had engaged in other forms of harassment on numerous occasions. For example, during the lab lectures, new examiners sat at desks/chairs placed at the front of the lab room in front of the White board. A

3

Initials ___/s/ GAR_____

lecturer would stand at the front of the lab room before the White board and new examiners to make presentations and to train the new examiners. Mr. Wall often sat immediately adjacent to me or in close proximity. Mr. Wall would see that I had raised my hand and that I was waiting to be called upon. When the lecturer would turn to me and look in my direction, Mr. Wall would just yell out a question without first raising his hand. Mr. Wall did this intentionally and maliciously.

At first I gave Mr. Wall a simply look of dissatisfaction at his not waiting his turn or raising his hand. Mr. Wall refused to get my hint/message. I, however, noticed that Mr. Wall was in fact waiting for me to raise my hand to commit further harassment. Accordingly, I began verbally informing Mr. Wall that he had seen me raised my hand first but he was not being respectful and courteous. Mr. Wall would simply give a smirk, and he continued his harassment despite my having repeatedly asked him to raise his hand and wait to be called.

Mr. Wall continued his harassment. Mr. Wall more often than not committed his harassment when Mohsen Ahmadi or other visiting lecturers taught the lab. He carried out his harassment before those whom he could see struggled to make it through the lectures. For example, Mr. Ahmadi once called upon Mr. Wall by his first name. Mr. Ahmadi has an accent where he pronounces "Vince" like "Wince." Fully appreciating that Mr. Ahmadi had an accent, Mr. Wall sought to waste class time and mock Mr. Ahmadi by repeating his first name, stressing that the "V" when Mr. Ahmadi had already recognized Mr. Wall but struggled to pronounce "Vince" instead of "Wince." Mr. Wall continued his mockery until a few other examiners began to chuckle.

Mr. Wall continued his harassment incessantly. Once, I first looked at Mr. Wall until he looked back at me, then I put my hand up so that he could see that I had raised my hand. When Mr. Ahmadi moved toward our side of the lab room from the other side, Mr. Wall quickly throw out a question about "whether a mouse trap invention could be used to trap an 'elephant mouse'." Mr. Wall had no materially relevant question because there isn't any animal known as an "elephant mouse." As a result, I quickly and sternly stated aloud, "Vince, you saw that I had my hand raised before you spoke; it's my turn; wait your turn." Mr. Wall had the audacity to reply, "That was not called for." I replied, "Obviously it is because I have been asking your to be respectful and to wait your turn for weeks."

Mr. Ahmadi confirmed that I had my hand raised before Mr. Wall rudely blurted out his question, and Mr. Ahmadi directed Mr. Wall to allow me to ask my question.
But Mr. Wall, without hesitation, continued his harassment. Despite Mr. Wall having received the hand-written *Cease and Desist* letter and despite my having expressed my displeasure with his harassment on numerous occasions with a high degree of frequency, Mr. Wall was obsessed with tormenting and harassing me.

Again, Mr. Wall's harassment caused me to be unable to focus on my job duties after he maliciously harassed me because I could see that he acted with malice. On another day, during the week of October 14, 2013, Mr. Wall observed that I was waiting to speak to Mr. Ahmadi to obtain assistance with my examination of a patent application. I had waited about 4 minutes to obtain help. Hal Rappaport was seated at Mr. Ahmadi's desk. Mr. Rappaport was getting

4

Initials ___/s/ GAR_____

assistance with his application. As Mr. Rappaport began to rise from the chair at Mr. Ahmadi's desk, Mr. Wall rushed in, jumped in front of me, and shouted out his question to Mr. Ahmadi. I turned to Mr. Wall and stated, "Vince, you saw me standing here, and I have waited for 4 minutes." Mr. Wall replied, "Well, I am just going to jump in front of you," and he continued on in asking his questions.

Faced with a decision to just began shouting above and over Mr. Wall, pushing and shoving with Mr. Wall, or acting as a professional, I simply walked away to avoid further confrontation. Mr. Ahmadi had not corrected Mr. Wall this time. Mr. Wall's conduct was extreme and outrageous for an alleged professional and an attorney, and his conduct prevented me from being able to focus and learn the skills I needed to learn. My mind was often preoccupied with his prior abuse. And Mr. Ahmadi not correcting Mr. Wall further sent me into emotional and mental distress, often causing me anger that I would not have endured but for Mr. Wall's malicious abuse. Because I feared that America's stain of incessant racism was rearing its ugly head within the classroom, I did not rush to bring these matters before Mr. Such or any other, at this time. I feared that the Patent Training Officials would only stereotype me and show favoritism to Mr. Wall.

Mr. Wall, however, would continue his harassment by first asking Violeta Prieto to use her knife, a knife that had an approximate six inch blade. Mr. Wall first used Ms. Prieto's knife, and then he stood in the middle of the aisle and shouted aloud (something to the effect), "Violeta, I wouldn't want to mess with you; you got a knife." Mr. Wall shouted this aloud during examination time. Examiners are supposed to work on applications during this period. Thus, Mr. Wall was intentionally distracting all other examiners from performing their job duties. Ms. Prieto was present during this time, but she did not "shush" or tell Mr. Wall to "shut up" or to "be quiet." She, apparently, had no problem with Mr. Wall shouting loud statements during examination times.

Mr. Wall continued his harassment. Mr. Wall saw that Herve Assouman and I were engaged in a conversation. Mr. Assouman was assisting me with posting a completed and examined patent application to Mr. Such via OACS, a tool used to manage and draft Office actions during patent examination. Instead of waiting or first politely excusing himself, Mr. Wall rudely interrupted and began conversing with Mr. Assouman. I later informed Mr. Assouman that I thought his allowance of Mr. Wall's rudeness to be, itself, very rude. Mr. Assouman apologized and stated that he did not think the conversation with Mr. Wall would last as long as it did. Mr. Assouman simply did not realize that Mr. Wall had intended and calculated to interrupt me. Mr. Wall intended to prevent me from obtaining any assistance that I needed. As a result of Mr. Wall's continued harassment, I sent an email to Mr. Such on October 17, 2013. *See* **Exhibit K** (a copy of an email chain wherein I request a meeting to discuss Vincent Wall's harassment of me). One October 17, 2013, I met with Mr. Such alone, as Mr. Wall had requested, and I believe that Mr. Wall had met with Mr. Such alone. *See* **Exhibit K**. However, during the October 17, 2013 meeting involving Mr. Such, Mr. Wall, and me, I shared all of the above relating to Mr. Wall. I showed (and I believe that I provided a copy of) the *Cease and Desist* letter to Mr. Such. I explained to Mr. Such why I was forced to give the letter to Mr. Wall. *See* **Exhibit K**. I made a point to specifically tell Mr. Such, "Matt, it's remarkable how some people believe that because of who they are, they can go about violating others, and then one a person stands up for

5

Initials ___/s/ GAR_____

himself and says, 'I don't like your abuse,' those same abusive persons have the audacity to state that 'the victim's behavior and response is not called for.'" Mr. Wall did not respond to my statements. Mr. Such confirmed that he understood my complaints, and he also stated that if the issues continued, he would have to refer the matter to Class Manager Jessica Rossi (then Jessica Ward).

But in reply to Mr. Such's statement about referring any future matter to Ms. Rossi, I stated, "Matt, please do refer the matter if Vince does not stop harassing me because I have not done anything wrong. I reminded Mr. Such that I had already told Mr. Such that Mr. Wall was not even present in the room when Mr. Such had directed me to enter the search string. I informed Mr. Such that on the *Cease and Desist* letter to Mr. Wall I had stated "Matt Such entered the search" because as new examiners we are required to do whatever our supervisor told us to do as the direction related to patent application prosecution. That is, even if I had disagreed with Mr. Such's search string and direction, I was bound to enter that search string because Mr. Such had directed me to enter the search string. I further shared with Mr. Such that Mr. Wall's abuse was causing me not to be able to focus and learn what I needed in order to become fully successful at my job. I informed Mr. Such that Mr. Wall was intentionally acting out, unprofessional, and harassing me solely to distract me from learning in the labs. Mr. Such confirmed that he understood my concerns. *See* **Exhibit K**.

Mr. Wall, as a result of the October 17, 2013, meeting stopped his direct harassment, but Mr. Wall had apparently recruited and conspired with Violeta Prieto for Ms. Prieto to begin her harassment and to help Mr. Wall to create a hostile environment for me.
Mr. Wall and Ms. Prieto were two of the first lab members to arrive to the lab in the mornings before any other examiners. I know this to be true because I overheard Ms. Prieto and Mr. Wall discuss their running competition to see who would arrive to work first. Ms. Prieto also informed Mr. Wall that she would not be arriving to work so early due to her child, her son.

On October 18, 2013, Ms. Prieto would continue her harassment with Mr. Wall aiding and abetting her. Mr. Wall is an attorney and Ms. Prieto apparently looked to Mr. Wall for legal advice in carrying out her harassment. Mr. Wall operates on a "if he can't prove it, it did not happen philosophy." Mr. Wall had made this statement to me on many occasions, which is why I hand-delivered the *Cease and Desist* letter to him, as proof. But I had not yet realized, at that time, that Ms. Prieto and Mr. Wall were acting in consort. Ms. Prieto, on October 18, 2013, again first waited until I had raised my hand; I had been recognized; I had been called upon by the lecturer; and I had begun to speak and/or ask my question, when she would intentionally interrupt me solely to force me to ask her, and to ask in a polite manner, to allow me to at least finish my question. Ms. Prieto would subsequently and quickly shout out, "SHUT UP!" Ms. Prieto would thereafter turn to look at Mr. Wall, apparently for his approval, and then she would turn about looking to the other side of the classroom to chuckle and laugh.

Ms. Prieto, on at least one occasion, but possibly two other occasions, told Patricia Reddington to "SHUT UP!" During the earlier lab lectures, Ms. Reddington often sat in the desk immediately adjacent to the desk that I sat. Ms. Reddington is a witness to Ms. Prieto intentionally and maliciously being rude. Ms. Prieto would continue her intentional malicious rude statements and conduct on a weekly basis.

6

Initials   /s/ GAR

I won't to make certain that I allege that Ms. Prieto and I were not engaged in some sort of personality conflict or two examiners having a difference of opinion. I hereby state that Ms. Prieto's conduct was far beyond any such interpretation. Ms. Prieto acted with bigotry and racial animus.

To be sure that Ms. Prieto was motivated by racism and bigotry, I informed other examiners of the classroom that Ms. Prieto was acting out as a racist, such as Here Assouman, Didarul Mazumder, Islam Muhammad, MD Rahman, etc. I specifically informed these examiners that to prove that Ms. Prieto was at least a bigot, I would intentionally wait until the end of the lectures to ask my questions.

To prove that Ms. Prieto acted with a racist disposition or at least was a bigot, I waited until the end of lectures before asking my questions. Ms. Prieto would allow all others to ask their questions, or shout out statements, even statements that had no relevance to the subject matter being discussed, without interrupting or telling the others to "shut up" or "be quiet." And the lectures were indeed extremely noisy.

Thomas R. Artman was the supervisor for Lab 12. Lab 12 shared a dividing wall with Lab 11. On multiple occasions, Mr. Artman had to come to and inside of Lab 11 to question whether everything was "okay" because of extremely loud noises, such as "shouts, laughter, booms, or bangs." Lab 11 was so noisy that Lab 11 on multiple occasions disturbed lab 12.
But through of the raucous within Lab 11, Ms. Prieto was never disturbed or bothered, except if I was involved by raising my hand and asking my questions, or even assisting Mr. Ahmadi with getting other examiners set up for WebEx conferences and/or to take quizzes. To be sure, Mr. Wall, as stated above, shouted out of turn, without raising his hand, during a lab lecture, "What about an 'elephant mouse,' can we use the mouse trap to catch an 'elephant mouse?'" Ms. Prieto was not bothered by Mr. Wall's nonsensical line of questioning. In fact, she appreciated his statement and laughed at it. Mr. Wall's statements were not only distracting but disruptive. Mr. Wall had also posted a U.S. patent that was issued to an applicant who claimed a chain to be used for walking a pet snake, similar to a chain used for walking a pet dog. Mr. Wall shouted out statements about the chain for a snake walker in a lab lecture that had nothing to do with his snake walker patent. Mr. Wall had posted the U.S. patent on the Whiteboard. He pointed to the U.S. patent as he shouted out his nonsense. But Ms. Prieto never complained about any of Mr. Wall's intentional disturbances, not even his verbal attacks upon those of the Islamic faith, as will be discussed below.

To be sure that Ms. Prieto is at the very least a bigot, Mr. Ahmadi was giving a lecture on the sections of 35 U.S.C. 102, i.e. (a)-(e). Because some examiners were just yelling out answers to questions in a disorderly fashion, Mr. Wall included, Mr. Ahmadi stopped those from yelling answers, and he said, "Listen guys, if I do not call your name, do not answer the question." Mr. Ahmadi then stated a question number and called upon MD Rahman, saying, e.g., "question number 5, 'MD.'" Despite the prior warning and direction, "Hal Rappaport shouted out the answer." Mr. Ahmadi, as a result, turned towards Mr. Rappaport who sat on the opposite side of the lab and restated and rephrased his prior direction, "Guys, if your name is not called, do not answer the question." Mr. Ahmadi turned back towards Mr. Rahman and called upon him, "Now, question 5, MD." Mr. Rappaport again shouted out the answer to question 5, despite Mr.

7

Initials __/s/ GAR_____

Ahmadi's second instruction/warning. Mr. Ahmadi turned to Mr. Rappaport again, and stated, "If I do not call your name, do not answer the question." Mr. Ahmadi turned back to Mr. Rahman and said, "Question 5 . . . MD." Yet once again, Mr. Rappaport shouted out the answer. Mr. Ahmadi looked about the classroom, as a result, shaking his head, and exclaimed, "What's wrong with that guy."

Ms. Prieto sat through the above back and forth exchange between Mr. Ahmadi, the lecturer and assistant training supervisor, but she did not utter a word of rebuke towards Mr. Rappaport. It was, I believe, Nichole Nguyen and/or David Frederiksen who turned and informed Mr. Rappaport that Mr. Ahmadi wanted Mr. Rahman to answer the question. Absolutely, Mr. Rappaport's conduct was disruptive, but Ms. Prieto did not have any problem with Mr. Rappaport's behavior. Hal Rappaport is also Caucasian/White.

On October 18, 2013, I sent an email to Mr. Such asking him to remind the entire class about being respectful to other examiners. I asked the request in a general sense because I do not want to cause further conflict with Ms. Prieto who sat at my back, my blind spot, and who not only possessed a knife having a six (6) blade in the PTO workplace but who was also acting aggressively and in a threatening behavior. *See* **Exhibit L** (a copy of the October 18, 2013 email sent to Mr. Such about Ms. Prieto's misconduct). My intent was that the October 18, 2013 request reached Ms. Prieto but also that the attempt not to cause further retaliation by Ms. Prieto can be seen in the fact that I specifically state in the email about one examiner telling another examiner to "shut up." *See* **Exhibit L**.

Ms. Prieto's violent behavior and knives caused me to become fearful that she would actually stab me in my back while I sat in front of her during lab room hours. With this fear dwelling in my mind, I was prevented by Ms. Prieto from learning my needed job skills. When Ms. Prieto would knock or bang her desk, I would jump and turn around quickly to make certain that she was not attacking me with her knife.

I am not certain as to whether Mr. Such actually sent out an email to the entire class. Mr. Such may have done so, but I did not keep the email because I did not know that I would be forced to file an EEOD charge against the PTO officials for their deliberate indifference to my concerns. Nevertheless, Ms. Prieto did not stop her harassment and creation of a hostile environment, even if Mr. Such did send out a response email as I had requested.

Ms. Prieto continued her verbal threatening behavior. As a result, after I had sent the email to Mr. Such requesting that he send out a reminder to the class, I was forced to again go to Mr. Such in person to request that he talk to Ms. Prieto, and I also asked Mr. Such to have Ms. Prieto remove the large knife from Lab 11. Mr. Such admitted and agreed that he had seen the "big knife," according to Mr. Such, that Ms. Prieto allegedly used to cut "pomegranates," according to Mr. Such. I had not seen Ms. Prieto cut pomegranates or any kind of foods/fruits with her knife. I had only seen the knife being kept on top of her desk while she verbally abused me on a weekly basis. Mr. Such stated that he would talk to Ms. Prieto but I do not know if he actually did so.

I do not believe that he did at that time because Ms. Prieto still kept the knife on top of her desk.

8

Initials ___/s/ GAR_____

001291

Ms. Prieto also continued her verbal abuse and harassment. As a result, I sought out SekTek, Inc. security guard Andre Fields. Mr. Fields was often at the receptionist desk on the first floor of the Carlyle building fraternizing with the female receptionist. I met Mr. Fields as he was going up the elevators. I informed Mr. Fields that Violeta Prieto had a knife having a six inch blade on top of her desk. Mr. Field's asked me if I knew Ms. Prieto. I told him that Ms. Prieto sat directly behind me in the desk immediately behind me. I told him that because my back was always turned to her, and she and I shared a dividing wall, she could actually stab me through the thin cubicle wall because she kept the knife had a very long blade. Mr. Fields asked me if I knew her name, and I told him yes. I told him that her name was Violeta Prieto and that her name, as well as every examiner's name, was posted at the examiner's desk. Mr. Fields asked me if she had tried to attack me with the knife. I told him no but she had verbally abused me on multiple occasions by shouting out at me to "SHUT UP!" I demonstrated how Ms. Prieto sat in front of me in the lab, but how she would turn around to shout "SHUT UP!" and then look at Mr. Wall and the other side of the classroom. Mr. Fields stated that he would "check it out." But Mr. Fields never got back to me.

Ms. Prieto was also, was very disruptive and inconsiderate to other examiners during examination time. Ms. Prieto was one of the first examiners of Lab 11 to have been allowed to do a first Office action Allowance as a new examiner. Ms. Prieto had departed Lab 11 during an examination period. Ms. Prieto, upon her return into the lab, did not respect any other examiner, including me. It was examination time, but Ms. Prieto stood at the front of the classroom and shouted out in her deep and monstrous voice, "Hey guys, I got my first allowance." Ms. Prieto distracted me from my work, and more so because I sat closest to the front of the room. I did not care and do not care about Ms. Prieto's examinations, therefore, I did not appreciate her disturbing the classroom and me.

Often in the mornings, Ms. Prieto and Mr. Wall would shout across the aisle statements about who arrived first into the lab. This was during examination times. I sat through Ms. Prieto and Mr. Wall's repeated inconsiderate discussions. MD Rahman is a witness that Ms. Prieto and Mr. Wall shouted across and shouted statements aloud inside of the Lab 11.

Ms. Prieto would continue her verbal attacks upon me, and she did this on a weekly basis. Mr. Wall would again stand in the middle of the aisle and shout aloud so that all could hear him, "Violeta, I wouldn't want to mess with you; you got a knife." Mr. Wall only repeated his statements to cause me intimidation and fear. Mr. Wall absolutely knew that knives were not allowed on PTO grounds, and as an attorney, Mr. Wall knew or should have known that Ms. Prieto's knife having a six (6) inch blade was illegal, and illegal even on public streets. Ms. Prieto kept this large knife out in the open so that all could see the knife and on top of her desk. After Mr. Wall's restatement about Ms. Prieto having a knife in the workplace, Ms. Prieto had begun to increase the number of knives that she possessed inside of the workplace. She kept all of the knives on top of her desk. She did not store the knives inside of her desk. At least, MD Rahman is a witness to the fact that Ms. Prieto had multiple knives inside of the workplace, and

Ms. Prieto had at least one knife that had a considerable cutting and stabbing blade of an approximate six (6) inches.

Initials ___/s/ GAR_____

001292

There was no reason for Ms. Prieto to have multiple knives, let alone any knife, inside of the workplace. Ms. Prieto, like many others, could have cut her fruit or foods at her home and brought cut fruit inside her Tupperware bowl, but she intentionally possessed multiple knives and kept the knives on top of her desk to intimidate me while she verbally abused me on a weekly basis. Ms. Prieto, aided and abetted by Mr. Wall, sought to cause me fear so that she could abuse and escalate her violent behavior inside the workplace.

Ms. Prieto had a total of four (4) knives inside of the workplace: two knives having four (4) inch blades, a stainless steel standard butter knife, and a knife having a six (6) inch cutting and stabbing blade. The excessive number of knives caused me serious fear and emotional, mental, and physical distress and anguish. The constant worry and fear had caused my stomach to begin to pain me daily. MD Rahman is a witnessed that I began to complain about stomach pains when I had not done so earlier in the training program.

Despite the fact that I had previously asked Mr. Such to address Ms. Prieto for her knives and for her behavior, Ms. Prieto continued her intentional and malicious harassment. She was obsessed with attacking me because of her racial animus and bigotry. Ms. Prieto forced me to again send an email to Mr. Such on November 7, 2013 having the subject "Violeta Prieto constant badgering during classroom lectures." *See* **Exhibit M** (a copy of the November 7, 2013 email sent to Mr. Such about Ms. Prieto's misconduct).

Ms. Prieto, therein the email, misrepresents that I did not let Hop answer my question. Hop Dang is listed as a witness in this matter. On November 7, 2013, I informed Hop Dang that I would be reporting Ms. Prieto also to Class Manager Jessica Rossi. I included Jessica Rossi in the emails sent on November 7, 2013. *See* **Exhibit N** (a copy of the email chain documenting Violeta Prieto's ongoing incessant harassment and maliciously violent behavior wherein Ms. Ward is included in the email chain).

On November 7, 2013, after I had sent the email and during the break allowed by Mr. Dang, Ms. Prieto leaped from her desk and followed me to my cubicle area. Ms. Prieto approached me and stood within inches of me poking out her chest in a violently confrontational manner as if she wanted to fight, shouting, "You trying to cause trouble. You trying to cause trouble." Ms. Prieto had assaulted me. I replied, "Violeta get away from me, leave me alone." Ms. Prieto replied, "No, you trying to cause trouble. You trying to cause trouble." She continued her assault. She was within inches of me. I yelled out, "Violeta, get away from me, quit harassing me, leave me alone." To that, Ms. Prieto walked away. Didarul Mazumder witnessed this confrontation, in part, but Mr. Mazumder stated that he could not hear all that had been said. Mr. Mazumder, however, did notice a commotion and he saw Ms. Prieto at my desk. *See* **Exhibit N**.

Ms. Prieto's attack caused me to be fearful for my life. Unbeknownst to anyone, I had brought an old broken Memorex terminal keyboard into the office. I kept this keyboard at my desk. I would use this keyboard as a defensive weapon when Ms. Prieto attempted to stab and cut me with one of her knives.

On November 7, 2013, I informed Mr. Such about Ms. Prieto's attack, as well as told Mr. Such that I had informed Hop Dang that he may be contacted and that Mr. Mazumder had witnessed

10

Initials __/s/ GAR__

Ms. Prieto's violence. Jessica Rossi was made aware of this incident. Ms. Rossi would make a presentation or introduce a lecturer some days later in the DKS large lecture room. I arrived at the DKS lecture room much earlier than a majority of other examiners. There were only a few other examiners present, and Ms. Rossi had her head facing downward towards the floor. I approached Ms. Rossi, and I questioned her as to whether she had seen my November 7, 2013 email sent to her at 11:32 am. *See* **Exhibit N**.

In response to my questioning, Ms. Rossi lifted her head showing her face. She was visibly angry, or very much annoyed at least, and stated in a rude and curt manner, "Yea, I saw it." That's all she stated. Because her tone of voice and clearly angry face, I moved along not saying anything further. Ms. Rossi had made it perfectly clear that she was already acting with a bias against and with racial animus against me. Ms. Rossi did not meet with me after the lecture to entertain my concerns.

After a few days had passed, Ms. Rossi placed a telephone call to me, and she asked me "if I still needed to talk to her." I quickly told her no because I feared that Ms. Rossi would fire me for complaining. Ms. Rossi's tone of voice and angry face made it clear of her intent and demand that I "do not bother her with my concerns and that I remain silent." I told Ms. Rossi that I did no longer wanted to discuss the matter with her because I feared that she would fire me because of her rude, curt, and very unprofessional prior response. Ms. Rossi snapped at me in a manner that an angry pitbull would snap at a stranger attempting to take a steak from his mouth. Instead of discussing my concerns with Ms. Rossi, I remained quiet because Ms. Rossi did not appreciate my concern or fear for my life and safety. Her response in the DKS lecture room made this perfectly clear. It left me without any doubt whose side Ms. Rossi had jumped, despite not having any supporting evidence to support Ms. Prieto.

At a subsequent day and during the evening after 5:00 pm, MD Rahman had come up behind me and he stuck his index finger in my back, and he stated, "She's going to get you; she going to get you with that knife." I jumped from the poke, and I turned and said, "MD, man it's not funny because that girl is a bigot and she is crazy." MD replied that he was just joking but he told me to look at the big knife on Ms. Prieto's desk. It was the knife, not including its handle, having a cutting and stabbing blade of six (6) inches. I got up from my desk and looked at the knife. Ms. Prieto had left the knife on her desk, clearly out in the open and on her desktop. I took a mechanical pencil that was given to each examiner by the PTO training academy and I put it alongside of the blade of the knife. I then took that same mechanical pencil home and measured the pencil. Thus, I am absolutely certain of the size of the blade on Ms. Prieto's knife.

On that same night, when MD poked me in my back, I went to search for security guard Fields because he had not gotten back to me about the knife being prohibited on PTO grounds. I found Mr. Fields at the door of the copier room on the sixth floor of the Carlyle building, room 6031. I told Mr. Fields that the knife with the six inch blade had been left out on Ms. Prieto's desk and that he could see it and remove it. Mr. Fields replied that "he had to make certain that the lights were turned off in the copier room." I did not argue with Mr. Fields but the problem with his excuse for not going remove the knife was that it was about 6:30 pm to 7:30 pm, i.e. well before 9:00 pm, and examiners were allowed to remain inside of the CPL building until 9:00 pm. Thus, even if Mr. Fields turned off the lights in the copier room, any remaining examiner could have

11

Initials ___/s/ GAR___

gone into the copier room and turned the lights on.

Mr. Fields' lack of concern for workplace safety and my concern for my life and safety caused me to become extremely concerned for my safety. Mr. Fields appeared to be more concerned with gaining favoritism amongst females than doing his job. As a result of this obvious lack of concern for his job duties, as well as federal law. Ms. Prieto kept the big knife and brought additional knives into the workplace. *See* **Exhibit A** (a copy of 18 U.S.C.A. section 930 defining a dangerous weapon as and prohibiting a knife having a blade greater than 2.5 inches in length); *see* also **Exhibit F** (a copy of the Rules and Regulations Governing Conduct on Federal Property, which is displayed at the security entrances of the USPTO buildings).

Ms. Prieto, seemingly, had ceased her misconduct for a period of about a week. But I believe that her seeming cease may have been because as the lectures began to focus more on substantive patent law issues, I may have ceased asking as many questions and/also had begun to slip into a state of depression as far as the lab room setting had become extremely hostile for me as a direct and proximate result of not only Ms. Prieto's violent behavior and misconduct (as well as Mr. Wall's harassment) but because of Ms. Rossi's angry and stifling attitude towards me, as well as security guard Fields' inactivity.

On November 14, 2013, Lab 11 was to take the fourth and last quiz for examiners while inside of the Patent Training Academy. Mohsen Ahmadi would administer this quiz. Mr. Ahmadi directed everyone to access their PTA online account and take the quiz. Despite having already taken three quizzes, some of the examiners, such as MD Rahman and Didarul Mazumder, had forgotten how to access the quiz. There were about five examiners who had forgotten how to access the quizzes from the Assessment column. As a result, Mr. Ahmadi asked the class in a loud tone of voice so that all could hear him, "Guys, how many of you do not have the quiz because they told me you should have it?" Multiple examiners began responding in loud tones of voice to inform Mr. Ahmadi that they did not have the quiz. I, however, was already on question 4. Mr. Ahmadi noticed that I was not attentive to his requests and focused. Mr. Ahmadi asked me, "Greg, do you have the quiz?" I replied, "Yes Mo, I am already on question 4. Tell them to click on the Assessment column." Mr. Ahmadi asked me to help out and tell the others how to access the quiz because there was a limited time period to take the quiz. I replied, "Mo, I am not saying anything because that girl is going to act out, and I am tired of her crazy mess."

This was not the first time, that Ms. Prieto acted violently and rudely when I was attempting to help Mr. Ahmadi move the entire class forward in a lecture, exercise, or quiz. Mr. Ahmadi and MD Rahman are witnesses to the fact that Ms. Prieto would act out, telling me to "SHUT UP," even when Mr. Ahmadi, the assistant lab supervisor, had specifically requested my help. Thus, Ms. Prieto is simply a liar who misrepresents the truth because she knows that Ms. Rossi will cover up her bigotry and racist views with her own additional discriminatory acts, exploiting her position as Class Manager, and discriminating based upon gender and race. Ms. Rossi had been told about Ms. Prieto's behavior. Ms. Rossi, however, did not consider Ms. Prieto's misconduct to be disruptive, at least Ms. Rossi has never expressed anything of that sort to me.
As Mr. Ahmadi asked me to help him get the others up and running to take the quiz, Ms. Prieto

12

Initials   /s/ GAR

again "shushed me" and "told me to 'SHUT UP.'" Mr. Mohsen did not address her. The biggest issue with Ms. Prieto is that she had purchased **headphone silencers**. Ms. Prieto had the silencers on her ears; therefore, she could not actually hear Mr. Mohsen and I discussing how the other examiners were to access the quiz. Ms. Prieto could only see that my mouth was moving and she absolutely saw that I was conversing with Mr. Ahmadi. Ms. Prieto took it upon herself to take another shot at being rude.

I finished my quiz, and after sitting quietly for a moment, I decided to get up to visit the restroom. As I got up from my desk and moved out of my cubicle, MD Rahman thanked me for helping him access his quiz, and he asked me how I had done on the quiz. All I did was to motion and quietly tell Mr. Rahman to let's discuss outside of the classroom. But Ms. Prieto shushed us both, and as a result, Mr. Rahman shushed her back and stated, "You talk when you finished your quizzes and others are still taking their quiz."

Mr. Rahman was indeed correct. Ms. Prieto on two separate occasions had finished her quiz and turned to talk to Mr. Wall while others were still taking their quizzes. Ms. Prieto and Mr. Wall had done this during the very first exam while I was still taking my quiz. I had arrived late due to traffic. Mr. Such had to have the quiz pulled for me. I was taken my quiz, rushing to complete the quiz, and Ms. Prieto and Mr. Wall held a conversation right by my cubicle and desk while I took my quiz. Neither Ms. Prieto nor Mr. Wall bothered to move the discussion out of the lab room, or at least away from my desk while I took my quiz.
Albeit Mr. Rahman was correct about Ms. Prieto's frequent disrespect for others inside of the lab room (e.g., Ms. Prieto shouting aloud at the top of her deep, monstrous voice, "Hey guys, I got my first allowance"), I informed Mr. Rahman that he had gotten me in trouble. Mr. Rahman quickly disagreed stating, "She cannot tell on you when she always talks in class even during quizzes." I responded, "MD, listen, Violeta is a racist. I bet you that she will sneak and tell Matt and Jessica Ward that I was talking during the quiz, but she won't even mention your name, and you are the one who 'shushed' her back." Mr. Rahman tried to assure me that Ms. Prieto would not do so, i.e. "report me and only me." However, the facts are, based upon Jessica Rossi's December 13, 2013 Report, that Ms. Prieto only reported me, and not specifically, Mr. Rahman. Moreover, Mr. Wall had also completed his quiz prior to Ms. Prieto. Or, at least, Mr. Wall began talking aloud during the time Ms. Prieto appeared to still work on her quiz. Ms. Prieto, however, did not "shush" Mr. Wall. She did not say a word. Ms. Prieto, however, got up from her desk and stormed out of the Lab 11 after she completed her quiz.

The fact is that Ms. Prieto had performed poorly on her quizzes because she did not know what she thought she knew, and the color of her skin gave her no entitlement to outperform me solely because she is White. Ms. Prieto's racist views and bigoted ideologies simply do not allow her to understand and appreciate that fact. Ms. Prieto did not report Mr. Rahman and she did not report Mr. Wall. Ms. Prieto apparently only reported me, the African American/Black male. But her statements were untrue, or at least deceptively disingenuous.

And Ms. Rossi, instead of questioning me about the matter and being fair, simply accepted Ms. Prieto's account of the event without question, and Ms. Rossi began using her grade, tenure, and position as Class Manager to go about slandering and defaming me to place me in a false light.

13

Initials __/s/ GAR____

001296

On December 4, 2013, with Mr. Ahmadi as the lecturer, Ms. Prieto would continue to intentionally and maliciously interrupt me so that she could subsequently tell me to "SHUT UP!" *See* **Exhibit O** (a copy of the December 4, 2013 email from Matthew Such to Lab 11 examiners about that day's lab events).

Upon the return of Matthew Such return to the Lab 11, I informed Mr. Such about Ms. Prieto's conduct during the quiz, as well as her other misconduct.
Mr. Such stated that he would talk to Ms. Prieto, perhaps he did, I do not know. Even if Mr. Such did address my concerns with Ms. Prieto, Ms. Prieto did not refrain from her misconduct for long, only about a week. Mr. Wall had begun harassing those of the Islamic faith and mocked their religion and culture. Ms. Prieto sat and listened to Mr. Wall's anti-Islamic statements each time, but did not complain or tell Mr. Wall to "shut up." *See* **Exhibit E** (a copy of emails sent to Bismark Myrick of EEOD and Jennifer Ware of Human Resources).

Ms. Prieto would deny that she sat in the lab room when Mr. Wall made his anti-Islamic statements. I, however, took great interest in her response and actions because Mr. Wall was disturbing the lab during examination hours. Mr. Wall would stand in the aisle in close proximity to Ms. Prieto and shout out his anti-Islamic statements; such as:

> (1) A day or two after Matt Such addressed Mr. Wall and me on October 17, 2013, Mr. Wall, no longer having me to bully and harass, shifted his abusive and disrespectful nature towards those of the Islamic faith. Mr. Wall would wait until those of the Islamic faith would return from their daily prayers. A room was provided to persons of the Islamic faith to pray in private, which was a reasonable accommodation because the room was empty. But during examination time, Mr. Wall would intentionally and maliciously stop Mr. Rahman and say, "Hey MD, I want to join your religion. I want to join your religion so that I can get the same days that you guys had off." Mr. Rahman responded (something to the effect), "We did not get any days of free; we have to make the days up." Mr. Wall repeated his prior statement. Mr. Rahman walked away.

I was not only distracted from doing my examination, I was very angry at Mr. Wall's anti-Islamic statements. My ex-girlfriend and still very close friend is a follower of the Islamic faith who wears hijab. I immediately texted her, Susila Rindu Kamari, about Mr. Wall's statements, and I shared Mr. Wall's statements. Ms. Kamari also thought Mr. Wall's statements to be very disrespectful, and she asked why the Islamic males remained silent about the matter. I shared via text that everyone is afraid of being "terminated for no reason, even an unlawful reason," which is why I too had remained silent.

> (2) Again, during the same week, on the next day, Mr. Wall again stopped Mr. Rahman and reiterated his previous statement but added to it, "Hey MD, seriously, I want to join your religion. I want to have those days off too. Who is your leader?" Mr. Wall continued by involving Patricia Reddington. Mr. Wall asked Ms. Reddington, "Patricia don't you want to have those days off too?" Ms. Reddington joined in the mockery and replied, "Yea." Mr. Rahman again replied, "We did not get any free. We did not get anything that others did not get." I began taking notes on Mr. Wall's attacks, and I have submitted my notes to the EEOD. But *see* **Exhibit N** (a copies of Gregory Royal's notes documenting

14

Initials ___/s/ GAR_____

Ms. Prieto and Mr. Wall's violations of PTO rules and policies, i.e. harassment and hostile environment, etc.).

Since Ms. Reddington's joining Mr. Wall in his malicious verbal attacks against members of the Islamic faith, I have not stated any word(s) to her. It was inappropriate for her to join in on Mr. Wall's obvious disrespect for those of the Islamic faith. Ms. Reddington and I formerly engaged in frequent conversations. We sat next to one another during the lab lectures. I, however, distanced myself from her because she nurtured the hostile environment of Mr. Wall.

(3) Mr. Wall would continue his harassment against those of the Islamic faith. Mr. Wall subsequently charged Mr. Rahman with Mr. Wall's demand to be allowed into the room where those of the Islamic faith were allowed to pray. Mr. Wall again stopped Mr. Rahman and stated, "Hey MD, I want to go in that room when you guys pray; I want to see what's going on in there." Mr. Rahman responded, "Why, you do not believe in my God?" Mr. Wall responded, "Well, isn't your God the same as my God?" Mohammed A. Bashar, passing by this conversation, overheard the conversation and stated to Mr. Rahman, "He does not have to believe to be allowed into the room." Mr. Rahman let the matter alone. I do not know whether Mr. Wall ever went to the prayer room.

(4) Mr. Wall on another day, again stopped Mr. Rahman and asked, "Hey MD, how come all you guys' name is Mohammed." Mr. Rahman responded in an annoyed matter (something to the effect), "Muhammad is considered to be a very important person in our culture and faith, so people name their children after him. What does Vince mean to you?" Mr. Wall continued his attacks and mockery stating, "What are the females named, 'Muhammette'?" Mr. Wall (and possibly Ms. Reddington) will likely allege that he (and possibly she) was only interested in learning more about the Islamic faith. If this was Mr. Wall's intent, and the manner in which he pursued any information was absurd and rude, Mr. Wall should have pursued his interests outside of the lab room and outside of examination time.

Moreover, Mr. Wall did not need to stand up in the middle of the aisle on multiple times to shout out aloud any alleged requests for information. Mr. Wall was absolutely aware that he was disturbing others inside of lab. Further, if Mr. Wall remotely believed that his god was the same as Mr. Rahman's God, Mr. Wall **did not need** to ask Mr. Rahman, "Who is your leader?" Most importantly, Mr. Wall, on numerous occasions, disturbed others in the lab **including Violeta Prieto**. Ms. Prieto has not stated anything about Mr. Wall's misconduct, and she has never told Mr. Wall to "shut up" or to "be quiet." Ms. Prieto only has racial animus and a bigoted attitude towards me. MD Rahman, as well as any other inside of Lab 11, is a witness to Mr. Wall's attacks.

Muhammad Islam sat immediately behind Mr. Wall. Mr. Islam told me that he found Mr. Wall's statements to be disrespectful. Mr. Islam also stated that he understood Mr. Wall to be mocking his religious faith. Mr. Islam as well as Mr. Rahman stated that they did not say anything because they feared being fired because of the "[can] be fired for any reason" statement that is threatened at each new examiner. Because of the statement, "A probationary patent examiner can be fired for any reason," new examiners remain silent even in the face of racism, harassment,

15

Initials    /s/ GAR

discrimination, and physical violence within the USPTO; thus, the statement/warning cuts down the force of Title VII.

Mr. Wall would return to being rude to me by intentionally interrupting my conversations with Herve Assouman. On December 17, 2017, I verbally told Vincent Wall not to interrupt me, and he stuck his index finger up in the air to represent sticking his middle finger up at me. *See* **Exhibit R** (a copy of my email sent to myself documenting Mr. Wall's behavior on December 17, 2013).

Ms. Prieto also continued her harassment. Again, I have never rudely interrupted Ms. Prieto. I have also never interrupted any lecturer. No lecturer has had to tell me to allow him or her to finish. I have only been told that my questions were far ahead of the class, or that "I should be teaching the class because I knew the material well." Regarding, the former, Mr. Such had asked me to refrain from asking questions that were "too complex" for the class. I now understand and believe that it was simply Ms. Prieto carrying out her racist attitude and bigotry.

If Ms. Prieto had remained quiet without intentionally and maliciously interrupting me during every lecture, she may have learned something. Instead she was jealous and envious and she could not tolerate, digest, or palate that an African American/Black male knew more than she did about substantive patent laws. Ms. Prieto, as a result of her inability to control her racism and bigotry, decided that she would intentionally interrupt me each and every time, tell me to "SHUT UP!", and physically slap me inside of the USPTO.

Regarding the latter statements, they were always complimentary. Dave Okonsky (and as of late Lyle Alexander) are witnesses to the level of my understanding of substantive patent laws. During the first week of last week of November or first week December, Ms. Prieto engaged in intentional and malicious workplace violence. I had not interrupted Ms. Prieto, she simply misrepresents the truth when she states that. She is a person who has repeatedly acted in deceit and dishonesty throughout this process. Ms. Prieto has produced no witnesses to my knowledge who can support her accusations. The only possible witnesses she could, even remotely have, are Vincent Wall, her accomplice, and possibly Hal Rappaport, who attempted to join in on Ms. Prieto and Mr. Wall's intentional harassment and hostile environment (as will be explained below).

Ms. Prieto had raised her hand and she had made an incorrect statement about patent prosecution procedure. The lecturer was not certain of the correct answer. I first raised my hand, and I was thereafter acknowledged and called upon by the lecturer. I stated the correct procedure for the patent prosecution issue at hand. The lecturer then remembered the correct answer confirmed that I was correct. This obviously infuriated Ms. Prieto, and it inflamed her racist attitude and bigotry.

After the lecturer gave the entire class a break, Ms. Prieto leaped from her desk located on the front row. She charged to the back row of desks where I sat next to Mohammed R. Alam. I was seated and I remained seated. Ms. Prieto began shouting, pointing her fingers in my face, swinging and flailing her hands about my face, and she slapped me hands knocking a red ink pen out of my hand. **Ms. Prieto had engaged in extreme physical violence, assault and battery.**

16

Initials ___/s/ GAR___

Ms. Prieto showed her ultimate contempt and disrespect for me by **backhand slapping me**. In doing so, Ms. Prieto got red ink on the backside of her hand. Incredible is the fact that Ms. Prieto had the gall and audacity to remark, "You wrote on me." I replied, "I did not write on you. Get your hands out of my face. Stop pointing your fingers in my face. You slapped me and you got ink on yourself. Get away from me. Leave me alone." I looked at Mr. Alam and I asked, "Didn't she get ink on herself by slapping that pen out of my hand?" I further remarked, "She's crazy." Mr. Alam nodded his in confirmation that Ms. Prieto got ink on her hand from her violent behavior. Mr. Alam chuckled and laughed a little as he nodded his head in confirmation.

Not surprising, Ms. Prieto did not go and run and tell Mr. Such or Ms. Rossi that she had slapped me. I sat feeling disrespected and physically abused by Ms. Prieto. But more so, I felt disrespected, abused, and discriminated against by Class Manager Jessica Rossi, Training Supervisor Matthew Such, and SekTek, Inc. security guard Andre Fields because each had not appropriately addressed and put an end to Ms. Prieto's workplace violence. The official here made me feel less than human, something not to be respected, not even as a government employee. Thus, I remained silent because I knew that the USPTO would discriminate against me based upon my gender and race. I, especially, knew that Ms. Rossi would show a discriminatory racial animus against me based upon her former dealings.

Ms. Rossi had acted overly rude and discourteous on each occurrence. Ms. Rossi had not met with me at all prior to this incident. As stated above, Ms. Rossi was very rude and discourteous, her conduct and temperament were actually threatening. Fearing for loss of my job, I had previously told Ms. Rossi that I did no longer wanted to meet with her. My perception about Ms. Rossi turned out to be right on point (as discussed below related to the December 13, 2013 incident). I had already seen that Ms. Rossi will exploit her grade and tenure within to USPTO to carry out racially charged actions, which are unfair.

Ms. Rossi has failed to list a single piece of evidence and/or a witness to support her allegations. Ms. Rossi, however, has continued to knowingly and intentionally slander me and to shed me into a false light. She does this without any dignity or respect or concern for my wellbeing and/or livelihood because Ms. Rossi understands that her time at the PTO and her position will cause others to listen to her and ignore my words, facts, witnesses to the truth, and even my evidence. Ms. Rossi cannot refute my evidence, but she knowingly, intentionally, and maliciously continues to libel, slander, and shed me in false light of being the wrongdoer and troublemaker. Ms. Rossi, however, has protected Ms. Prieto absolutely knowing that Ms. Prieto has engaged in workplace violence.

**Because of the Patent Training Academy's refusal to properly address Ms. Prieto for her workplace threats of violence, and because of the Patent Training Academy's discrimination against me based upon my gender and race, I have suffered bouts of insomnia, likely depression, headaches, abdominal, back and neck pains, as well as nausea.** Lindsay Bourda, a friend of mine for more than twenty (20) years, noted that he had observed that I had morphed from being totally happy about my new job, into complaining about how Ms. Prieto and another (i.e. Mr. Wall) harassed me at work, and finally into calling him each day after work to complain and talk about how I would defend myself in the classroom if Violeta

17

Initials ___/s/ GAR___

Prieto tried to come at me and stab me with one of her knives. Mr. Bourda has authorized me to provide his contact telephone numbers to be contacted for verifying the veracity of these statements—(309)287-5665 or (309)829-1695.

Again, because of my intense fear that Ms. Prieto was going to stab me with one of her knives, I had brought an old broken keyboard into the lab room just in case I had to defend myself against Ms. Prieto using her knife, especially her long knife with a six (6) blade. Ms. Prieto had made me paranoid. I was always looking over my back. As a result, I began to jump and quickly turn around every time Ms. Prieto knocked or bumped the desk, basically every time that she made sounds of movement.

I was now in a fourth month of a hostile environment. I had complained about Ms. Prieto's repeated verbal abuse and physical violent threats on multiple occasions. I had complained about the long knife with a blade of six inches. Albeit I had not yet complained about Ms. Prieto's physical assault, I had complained to Matthew Such about Ms. Prieto's physical threats. As an example of Ms. Prieto's insane habits: Ms. Prieto had a nasty and ugly habit of chewing, sucking and spitting sunflower seed shells on top of her desktop. The shells contained her saliva and spit mixed in the empty shells. Instead of tossing those shells into her trash can, Ms. Prieto would often leave them sitting on top of her desk. To be sure, Ms. Prieto was assigned to a group including Patricia Reddington, Nichole Nquyen, David Frederiksen, MD Rahman, and me.

Being assigned to the same group, the group assembled around my desk. I had not noticed the pile of nasty, spit-filled, sunflower seed shells on top of Ms. Prieto's desktop. During our lab exercise, I typed out the group Office action, a practice assignment. Ms. Prieto continued to speak to me in a very rude and curt manner. Because I was very uncomfortable with the manner that Ms. Prieto spoke to me, and I could not focus, I got up from my desk chair, and I informed Ms. Prieto that she had better type the Office action because I was not going to tolerate her continued disrespectful tones of voice. Nichole Nquyen, Patricia Reddington, and David Frederiksen are witnesses to this. Ms. Prieto sat in my chair and typed the practice Office action, but she did not apologize for her rude and curt behavior.

More so, because Ms. Prieto fought with me the entire time, e.g., where the Drawing section was to be placed in an Office action, we did not finish our Office Action. Ms. Prieto had no prior experience with patent prosecution. All members knew that I had prior experience. Ms. Prieto would argue and be rude despite this fact. Rather than have the entire lab exercise prohibited because of Ms. Prieto's bigotry, I relinquished my desk chair.

As Ms. Prieto typed whatever, she wanted to type, which turned out to be incorrect, a member of the group, I believe that it was Nichole Nquyen pointed to the nasty pile of spit-mixed sunflower seed shells piled on top of Ms. Prieto's desk. Ms. Prieto had a garbage beneath her desk, but she had piled the sunflower seed shells on top her desk—a health hazard.

One morning during the first week in December, before December 13, 2013, I arrived at work only to find that someone had thrown nasty sunflower seed shells all over the floor inside of my cubicle. I suspected it to have been Ms. Prieto, who was sitting at her desk and eating sunflower seeds. Rather than confront Ms. Prieto, I stood up and asked the entire class, "Guys, why do I

18

Initials   /s/ GAR