# Exhibit 2

Part 2

feel as if I am standing inside a bird cage with all these sunflower seeds thrown on my floor." Other examiners got up to look at my floor, and all then looked to Ms. Prieto. Ms. Prieto was continuing her harassment.

Ms. Prieto and Vincent Wall had created a hostile environment where another examiner, Hal Rappaport, had begun to intentionally and obviously be disrespectful and rude. During a lecture, I was conversing with Michael Obinna, STIC/EIC. Mr. Obinna and I were discussing search technique/strategy and an available for Mr. Obinna to assist me.

I am 6'3" and about 210 pounds. Hal Rappaport is maybe 5'5" and about 145 pounds. But because I had sat and allowed Ms. Prieto and Mr. Wall to abuse and violate me for an approximate four-month period, but more so because the PTO officials had failed to do anything to Ms. Prieto or Mr. Wall, Hal Rappaport walked right up to Mr. Obinna and me, and Mr. Rappaport just began stating his concerns. Seeing that Mr. Rappaport was intentionally being rude and disrespectful, I quickly told Mr. Rappaport in a very strong and stern tone of voice, "Hal, you saw me talking to Mike; wait your darn turn; and stop being so darn rude. Wait your turn." Mr. Rappaport stopped talking, and he walked away. I do not remember Mr. Rappaport apologizing for being blatantly rude. It was as if Mr. Rappaport wanted to try his hand at being a bully to me.

Mr. Obinna is a witness to this fact because Mr. Obinna acknowledged that Mr. Rappaport had been very rude. Mr. Obinna, however, was not with knowledge of the stress, trauma, hostility, abuse, and physically assault that I had endured for a four-month period. I would begin to stand up for myself because Ms. Rossi and Mr. Such and Mr. Fields acted with a deliberate indifference to all of my concerns.

I had not done anything to prompt such abuse and violence from Ms. Prieto, Mr. Rappaport, or Mr. Wall. I had only outperformed each and every one of them. Mr. Wall is an attorney who claims to have clerked for a Patent Law Judge, a district court judge. Mr. Wall's quiz scores did not reflect this. He was unable to draft a simple claim during a lab lecture. And Mr. Wall did not know (not even as an alleged former clerk for a patent law judge) that a 35 USC 102 rejection was a "conclusion of fact," or that a 35 USC 103 rejection was a "conclusion of law." Ms. Prieto and Mr. Wall possessed and acted with extreme envy and jealousy against me despite the fact that we are not in competition with each other. Ms. Prieto (and Mr. Wall) could not palate, digest, and stomach the fact that an African American/Black male knew more than she (and he) did about substantive patent law. To be sure that Ms. Prieto (and Mr. Wall) acted with racial animus, I remember that I once reminded Mr. Ahmadi that, specifically, an applicant may file an application claiming benefit to an application, and such a filing would not count against the patent term.

I had specifically omitted the fact the referred to application was a "provisional application" and that the applicant could claim the benefit of priority under 35 USC section 119(e), and that domestic priority would not count toward the 20-year patent term.

Mr. Ahmadi had agreed to Ms. Prieto's blanket statement (an absolute statement) that "any claim of priority would cause the patent term to begin at the earliest application from which priority is

19

Initials ___/s/ GAR_____

claimed." Mr. Ahmadi agreed to Ms. Prieto's statement before all members in Lab 11. Thus, the others examiners were being taught "incorrect information."

I had first raised my hand, and I had waited for Ms. Prieto to finish her incorrect statement. I also waited for Mr. Mohsen to call upon me. I stated the correct law, as stated above. Without allowing me to further explain the patent law supporting my statement, Ms. Prieto turned around, as she had always done, and she intentionally interrupted me. When I politely asked Ms. Prieto to allow me to finish, Ms. Prieto told me to "SHUT UP!"

Ms. Prieto then immediately looked to Mr. Wall nodded her head, and Mr. Wall nodded his head in affirmation. Ms. Prieto then turned to Hal Rappaport's direction on the other side of the class, and she laughed out loud. Mr. Wall also got up from his chair and returned to his desk. Mr. Wall had printed out a part a page out of the MPEP and returned the page to Ms. Prieto, with section circled. That section referred to claims of priority that caused the 20-year patent term to begin at the filing date of the earliest referenced patent document. I clearly understood that patent law. But neither Ms. Prieto nor Mr. Wall—as well as Mr. Mohsen—understood the specific section of the MPEP that I spoke on, i.e. MPEP § 201.04(b). Mr. Mohsen tried to settle down the disruption caused by Ms. Prieto and Mr. Wall. Ms. Prieto had turned around and slammed that MPEP page on the desk that I sat at that time. I picked up the paper, reviewed the encircled section, moved to the pertinent section that I spoke on, circled it and returned the MPEP copy to Ms. Prieto stating, "Now, would you please stop harassing me? Would you just please stop interrupting me because you do not understand what I speak on or ask question about, because it's above your head?"

Mr. Mohsen would likely remember this event because he brought the matter to Mr. Such for and answer and clarification. Mr. Mohsen returned stating, "You both were correct but you spoke about two different things."

I understood Ms. Prieto's statement, but she and Mr. Ahmadi had made a blanket absolute statement that anytime an applicant claims priority the patent term begins 20 years from the earliest filed application that benefit is claimed. This absolute statement is incorrect to any person who correctly understands patent law related to section 119(e).

When I raised my hand, I was called upon by Mr. Mohsen, the point is that Ms. Prieto should have not interrupted me. I sat and listened to her incorrect blanket absolute statement. If she had given me the same respect, I would have also pointed out the specific MPEP rule and statute for the class to take note and review if any so desired. Many in the class, as a matter of fact, the entire September 9, 2013 class would testify that I often support my statements with by stating specific citations from the MPEP, 37 CFR, or 35 USC and that I do so recalling the same from memory. Lyle Alexander, a lecturer, is the latest lecturer to witness to this fact.

Ms. Prieto and Mr. Wall, more likely than not, conspired during the early morning hours when those two were alone in the Lab 11, to intentionally and maliciously interrupt me whenever I spoke and/or asked a question inside of the lab. These two are coconspirators in creating a hostile environment. Mr. Wall aided and abetted Ms. Prieto by encouraging her to bring in additional knives into the workplace. As stated above, Mr. Wall stood up in the middle of the

Initials ___/s/ GAR_____

001303

aisle, and he shouted at the top of his voice, "Violeta, I wouldn't want to mess with you; you got a knife." Ms. Prieto multiplied the number of knives that she kept inside of the PTO and at her cubicle, out in the open, and **on her desktop**.

Ms. Prieto kept multiple illegal knives into the workplace for the sole purpose of causing me fear, intimidation, and emotional, mental, and physical distress. Mr. Wall encouraged Ms. Prieto's knowing and intentional violations of federal law.

Each time Ms. Prieto told me to "SHUT UP!", she made me feel as if she was showing and demonstrating to all the other examiners: "Look you all. This is the way you talk to a 'N-word" (racial epithet ). Do you all see the way I keep telling this "N-word" (racial epithet) to "SHUT UP!" Ha, Ha. Ha."

Ms. Prieto is a racist and a bigot. She is also a liar. Ms. Prieto has misrepresented to Ms. Rossi that all I had to do is ask her to take the knives home. This is not true. Proof that it is not is the fact that I asked Ms. Prieto on numerous times, **a great many times**, to not tell me to "SHUT UP!" Without ever respecting my requests, Ms. Prieto continued to tell me to "SHUT UP!" If I had approached Ms. Prieto and asked her to please remove her knives from the workplace, Ms. Prieto would have exploited that opportunity to stab me in the chest or face with a knife. She would have thereafter told Ms. Rossi that I had confronted her. Ms. Rossi, who also acts with extreme racial animus, discriminates against me and boasts Ms. Prieto's misrepresentations as if she was quoting the "Bible."

The truth about Ms. Prieto's knives is that, on the first day she had out the long knife with the six (6) inch blade, several other examiners, including Mr. Wall, reminded Ms. Prieto that knives were not allowed in the workplace. I believe that, at least one of these other examiners, also joined Mr. Wall's conversation telling Ms. Prieto that knives were not allowed at the PTO. Mr. Wall would likely deny that he told Ms. Prieto that her knife was not allowed on the PTO grounds. But, one of Patricia Reddington, Nichole Nquyen, David Frederiksen, or MD Rahman also told Ms. Prieto that her long knife with the six (6) inch blade was not allowed inside the workplace. Ms. Prieto ignored all and the posted placards at the Security Entrances.

On December 13, 2013, early in the morning, Ms. Prieto once again told me to "SHUT UP!" I was merely asking another examiner if there were any changes to our schedule. Many examiners, Hal Rappaport, were standing and talking about matters unrelated to patent examination. And because the PTO had intentionally and deliberately failed and refused to properly address Ms. Prieto, I had made up my mind that I would begin to stand up for myself against Ms. Prieto. But Ms. Prieto still had the knives, including the knife having a six (6) inch blade, which she kept on her desktop. Despite the fact of the knives, I replied back to Ms. Prieto, "You shut up and quit throwing your sunflower seed shells on my floor. I know it's you doing that."

On multiple occasions, I observed Ms. Prieto doing things that only a mentally disturbed person would do. Once, Ms. Prieto would chew the tips of her fingers until they bled. She would then suck the blood off the tips of her fingers. Once Ms. Prieto chewed her fingers until a tip bled. A drop of blood fell from her finger onto the desktop. This desk was not Ms. Prieto's assigned

21

Initials ___/s/ GAR_____

desk. She posed a recognized health hazard by spreading blood droplets at commonly used desks.  After the blood droplet fell onto the top of the desk, Ms. Prieto took another finger and attempted to wipe up the droplet with her finger. She then licked and sucked her used finger like Winnie-the-Pooh sucking and licking honey out of a honeycomb.

Ms. Prieto forced Muhammad Islam to leave his desk during a lecture to go to the restroom because of Ms. Prieto's disgusting habit. Ms. Prieto was, yet again, disrupting the classroom, and other's ability/opportunity to learn.

On another occasion, I sat focused on the lecture. The seat to my right was empty, which was acceptable to me. Interrupting my focus, MD Rahman had moved into that desk adjacent to me. Mr. Rahman had moved from a front row desk immediately adjacent to and to the left of the desk which Ms. Prieto sat.

Mr. Rahman tapped me on my shoulder, and I replied, "Come on, I'm trying to pay attention." Mr. Rahman pointed at Ms. Prieto. I turned and saw that Ms. Prieto was vigorously running her hands through her hair. She would pull a strand of hair from her head. She actually plucked the strand from her scalp. I could see the force she applied to the strand. Ms. Prieto thereafter held the strand up by its ends for her review. I could see a visible White object attached to the hair strand.

What happened next caused me to seriously fear that Ms. Prieto is actually mentally insane. Mr. Rahman is a witness to Ms. Prieto's behavior. Ms. Prieto would see the White object on the hair strand. She would then put the hair strand into her mouth and suck off the White object as if she was licking and sucking on a string of spaghetti. It was absolutely gross. It was also very distracting during the lecture.

Ms. Prieto then demonstrated why Mr. Rahman had to get up from the desk that he sat in prior to sitting in the seat immediately to my right. After licking and sucking her strands of her, like the nasty, spit-mixed sunflower seeds, Ms. Prieto then piled the sucked and/or licked hair strands on top of the desk that Mr. Rahman had sat. This was insane and more than a bit unusual.
After observing Ms. Prieto's mentally insane actions, I told Mr. Rahman, "Stop watching her. You know she's crazy. Turn this way so you cannot see her and don't look at her." Mr. Rahman agreed, and we both sat at angles in our chairs so that Ms. Prieto could not be seen, at least through the corner of my eyes. Sitting practically sideways in our chairs, things settled for a very brief moment. Mr. Rahman, however, subsequently let out a short muffled scream. Mr. Rahman's scream distracted my attention away from the lecture, and I turned quickly and stated, "Dude, what is wrong with you?" Mr. Rahman responded pointing to his hand and stating, "Look." One of Ms. Prieto's sucked and licked hairs was stuck to Mr. Rahman's hand. Mr. Rahman was grossed out by Ms. Prieto's hair being on his hand. As stated above, Ms. Prieto placed her strands of hair on Mr. Rahman's desk after she licked and/or sucked her hair strands, not her own desk.

On December 13, 2013, because of Ms. Prieto's continued aggressive and violent behavior, I feared that I could not then sit with my back to this crazy person. Thus, I dialed Security to report Ms. Prieto for having multiple illegal knives inside the workplace, because Ms. Prieto had

22

Initials   /s/ GAR

physically threatened, assaulted, and battered me, and because Ms. Prieto was again acting violently and aggressively on the December 13, 2013 morning.

Additionally, as stated above, Lindsay Bourda, a friend of more than twenty years, had also advised me that I needed to get the police involved because of my obvious fears that Ms. Prieto had mental issues and knives inside of the workplace. Mr. Bourda informed me that I had called him every day for the past two weeks only to talk about how I would defend myself if Ms. Prieto came at me with one of her knives.

**SekTek, Inc.'s Response**:
On December 13, 2013, SekTek, Inc. Officer Marquez met me on the first floor of the Carlyle Place lobby. I informed Officer Marquez (as I have stated above) that Ms. Prieto had maliciously harassed me for an approximate four months. I explained to Officer Marquez that Ms. Prieto would allow every other examiner to ask his or her questions without interruption. I informed Officer Marquez that Ms. Prieto, however, would first intentionally and rudely interrupt me when I attempted to ask my questions. I also stated that she would shout out aloud "SHUT UP!" when I politely asked her not to interrupt me. I told Officer Marquez that the other members of the lab were witnesses to Ms. Prieto's constant verbal abuse.
Further, I told Officer Marquez that Ms. Prieto had physically threatened me. I actually demonstrated/acted out how Ms. Prieto had physically threatened me. I demonstrated how close in proximity Ms. Prieto had come to my person and how she had shouted out "You trying to cause trouble. You trying to cause trouble." I also told Officer Marquez that I feared Ms. Prieto was trying to start a fight and that she would stab me with one of her knives. I told Officer Marquez that Didarul Mazumder was a witness to this event.

Also, I also told Officer Marquez that Ms. Prieto kept four knives out in the open and on top of her desk—two knives each having an approximate four (4) inch blade, a stainless steel standard butter knife, and knife having a blade that was six (6) inches long. I told Officer Marquez that MD Rahman was a witness to the knives.

I told Officer Marquez that I had asked the patrolling officer to remove the knife but that officer did not do anything about the knives. That officer is Officer Andre Fields. I told Officer Marquez that Officer Fields stated that he had to turn the lights off in the copy room when I asked him to go and see Ms. Prieto's knife, the knife with a blade of six (6) inches.
Officer Marquez asked whether Ms. Prieto had attacked me with any of the knives. I responded, "Not with a knife, but she slapped me; she slapped a red ink pen out of my hands and she slapped my hands. That's workplace violence." I actually demonstrated/acted out how Ms. Prieto had slapped me inside the workplace. I told Officer Marquez that if he asked Ms. Prieto if I had written on her hand, she would be so arrogant that, because she is a bigot, she would likely say, "yes." I told Officer Marquez that even if Ms. Prieto tried to deny this, Alam Mohammed was a witness to Ms. Prieto's physical assault.

Lastly, I told Officer Marquez that that morning Ms. Prieto was again engaging in violent and aggressive behavior, and I wanted her knives out of the building because I feared that she'd stab me if I began to stand up for myself.  Officer Marquez directed me to go back to my desk and that someone from Federal Protective Services would call and come to speak with me. I returned

23

Initials ___/s/ GAR_____

001306

to my desk. *See* **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident).

**Federal Protective Services (FPS):**
On December 13, 2013, FPS Inspectors Dearborn and JD Williams (subsequent to Officer Marquez) responded to my Security call. Inspector Dearborn directed me to accompany he and Inspector JD Williams into Matthew Such's office where he asked me the reason for my Security call. Yet again, I offered up the following (same as discussed above):
I informed Inspectors Dearborn and JD Williams that Ms. Prieto had maliciously harassed me for an approximate four months. I explained to Inspectors Dearborn and JD Williams that Ms. Prieto would allow every other examiner to ask his or her questions without interruption. I informed Inspectors Dearborn and JD Williams that Ms. Prieto, however, would first intentionally and rudely interrupt me when I attempted to ask my questions. I also stated that she would shout out aloud "SHUT UP!" when I politely asked her not to interrupt me. I told Inspectors Dearborn and JD Williams that the other members of the lab were witnesses to Ms. Prieto's constant verbal abuse.

Further, I told Inspectors Dearborn and JD Williams that Ms. Prieto had physically threatened me. I actually demonstrated/acted out how Ms. Prieto had physically threatened me. I demonstrated how close in proximity Ms. Prieto had come to my person and how she had shouted out "You trying to cause trouble. You trying to cause trouble." I also told Inspectors Dearborn and JD Williams that I feared Ms. Prieto was trying to start a fight and that she would stab me with one of her knives. I told Inspectors Dearborn and JD Williams that Didarul Mazumder was a witness to this event.

Also, I also told Inspectors Dearborn and JD Williams that Ms. Prieto kept four knives out in the open on top of her desk—two knives having an approximate four (4) inch blade, a stainless steel standard butter knife, and knife having a blade that was six (6) inches long. I told Inspectors Dearborn and JD Williams that MD Rahman was a witness to the knives.
I told Inspectors Dearborn and JD Williams that I had asked the patrolling officer of the Carlyle building to remove the knife but that officer did not do anything about the knives. That officer is Officer Andre Fields. I told Inspectors Dearborn and JD Williams that Officer Fields stated that he had to turn the lights off in the copy room when I asked him to go and see Ms. Prieto's knife, the knife with a blade of six (6) inches.

Inspector Dearborn, like Officer Marquez, also asked whether Ms. Prieto had attacked me with any of the knives. I responded similar to my prior response to Officer Marquez, "Not with a knife, but she slapped me; she slapped a red ink pen out of my hands and she slapped my hands. Again, I stated that Ms. Prieto had engaged in workplace violence." Again, using a wall inside of Mr. Such's office, I demonstrated/acted out how Ms. Prieto had physically assaulted me and who she had slapped me inside the workplace. I also told Inspector Dearborn that if he asked Ms. Prieto if I had written on her hand, she would be so arrogant that, because she is a bigot, she would likely say, "yes." I told Inspector Dearborn that even if Ms. Prieto tried to deny that she had slapped me, Alam Mohammed was a witness to Ms. Prieto's physical assault.

Lastly, I told Inspector Dearborn that that morning Ms. Prieto was again engaging in violent and

24

Initials   /s/ GAR

aggressive behavior, and that was why I wanted her knives out of the building because I feared that she'd stab me if I begun to stand up for myself.

Inspector Dearborn directed me to go back to my desk and Inspector JD Williams to go to Ms. Prieto's desk to look for her knives. I also heard Inspector Dearborn state that they would at least issue a citation. Inspector JD Williams and I walked back to Lab 11, room 6024, at the same time.

As I reached my cubicle and began to take a seat, I heard Inspector JD Williams tell the other Inspectors/Officers that he did not see any knives. I knew that statement to be false. I stood up and stated, "I do not know why you do not see any knives on her desk, there is one right there," pointing to one of the knives having a cutting and stabbing blade of four (4) inches. Inspector JD Williams retrieved the knife, handed the knife to another Inspector/Officer, and stated, "That's one knife." I spoke up again, "I don't know why you do not see that other knife in that clear cup right there; it looks just like that one. It has the same blade and handle." Inspector JD Williams retrieved that knife. It was the other knife having a cutting and stabbing blade of four (4) inches. Inspector JD Williams then proceeded to search Ms. Prieto's desk drawer. However, Inspector JD Williams only pulled out Ms. Prieto's top desk drawer about three to four inches max. Inspector JD Williams did not search any other drawer, part, or area at Ms. Prieto's desk. Ms. Prieto was not at her desk at the time. Ms. Prieto was, as I understood, inside of Mr. Such's office with Inspector Dearborn.

Other examiners were called into Mr. Such's office, such as Patricia Reddington, Didarul Mazumder, and Md Rahman.

Inspector Dearborn called me back into Mr. Such's office. He directed me to take a seat on the opposite side of Mr. Such's desk. It was the chair that Mr. Such sat in daily during training. Ms. Prieto sat in the chair that the new examiners sat in when discussing cases and matters with Mr. Such. Other SekTek, Inc. Officers and/or Inspectors also stood inside of the room and at the office door.

Inspector Dearborn explained to Ms. Prieto and me that violence inside of the workplace would not be tolerated. I nodded my head in agreement and confirmation. Inspector Dearborn further stated that all of the witnesses interviewed confirmed my allegations that Ms. Prieto was harassing me. Inspector Dearborn also stated that all witnesses interviewed confirmed that "**Ms. Prieto has been singling Mr. Royal out and bullying him**" (emphasis added). *See*, e.g., **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident). Immediately, after Inspector Dearborn finished speaking, Ms. Prieto did not hesitate to demonstrate her violent nature and behavior in front of Inspector Dearborn. Ms. Prieto leaned forward, began pointing her fingers at my face, shouting, "You're being disrespectful. You're being disrespectful." Inspector Dearborn, or no other Inspector/Officer, told Ms. Prieto anything about her violent and aggressive behavior.

As a result of Ms. Prieto pointing her hands and fingers at my face, I looked up at Inspector Dearborn and the other majority White inspectors/officers, and stated, "You see, this is all of your fault. This is your fault." Inspector Dearborn replied, "How is that our fault?" I responded,

25

001308

"Officer Dearborn, you just stood up there and you stated to both of us that violence in the workplace would not be tolerated. You also stated that all witnesses testified that she was singling me out and bullying me. Despite your statements, she does not hesitate to show you her violent nature and behavior. This is all of your fault because of the way you police treat Black people out in the streets, and apparently inside of the workplace, even when the Black people are the victims and the White people are the wrongdoers. She did not hesitate to point her fingers at my face and shout out that I am being disrespectful, but what did I do here that was disrespectful? I sat here and just listened to you, and she is pointing her fingers in my face and yelling at me. You see, in her racist and bigoted view of life, she believes that she is way up here because she is White (motioning and raising one hand high) and that I am here supposedly here in her view because I am Black (motioning with my other hand and lowering that hand considerably beneath my raised high hand). Because of her bigoted views, she believes that she can verbally assault me, physically threaten me, point her hands and fingers in my face, and also physically slap me. But if I should stand up for myself and say that I do not like it, even call Security against her, I am 'being disrespectful.' This is why she is attacking me. She also cannot handle the fact that a Black man outscores her on the quizzes we take."

Federal Protective Services' obvious prejudice against me and favoritism for Ms. Prieto being a White female made me feel as if I am without value here at the PTO, and other employees, especially White employees, can beat me, and the Federal Protective Service will abuse its discretion while acting under color of law to protect the White violator.

Ms. Prieto still continued her aggressive statements, repeating, "You're being disrespectful." Ms. Prieto also stated, "You waited to do this when Vince was not here." I do not know what she meant by that. Apparently, Ms. Prieto confuses my remaining professional and courteous even in the face of Mr. Wall's and her conspiracy to sabotage my career at the PTO as **cowardice** on my part. The fact that I maintained grace and professionalism, apparently, was misunderstood to be submission on my part by Ms. Prieto.

I did not know Mr. Wall's whereabouts. Mr. Wall could have easily been at his Tech Center discussing cases with his SPE or Primary Examiners. I did not understand Ms. Prieto's assertions; however, it showed and proved that **she and Mr. Wall were acting in concert to create a hostile environment**. Perhaps Ms. Prieto should have waited for Mr. Wall's return before she had verbally attacked me again. Even if she had done so, I would have dialed Security on her and Mr. Wall. Mr. Wall, even being an attorney, is not immune from the liability he created and assumed by harassing me within the workplace, and conspiring to sabotage my career here at the USPTO, at least not if I should decide to file a civil suit against Ms. Prieto and Mr. Wall.

In response my statements to Inspector Dearborn, Inspector Dearborn directed me to go back to my desk. I returned to my desk. Ms. Prieto remained inside of Mr. Such's office for some time thereafter, but when she came back into Lab 11, Ms. Prieto began packing her personal belongings and laptop.

Hal Rappaport went to Ms. Prieto's cubicle area, and Mr. Rappaport asked her if she was okay. Mr. Rappaport had not inquired as to whether I was okay. Mr. Rappaport again demonstrated his obvious bias and prejudice regarding the matter. Ms. Prieto responded to Mr. Rappaport's

26

Initials ___/s/ GAR_____

inquiry, "He stabbed me in the back. He stabbed me in the back."

I overheard Ms. Prieto's statement, yet I remained silent. I thought to myself, "Incredible, she is definitely crazy. We were never friends upon the first time she told me to "SHUT UP!" I later informed Jennifer Ware of Human Resources about Ms. Prieto's conduct. *See* **Exhibit S** (a copy of an email chain to, inter alia, Human Resources Jennifer including my concerns related, inter alia, to Violeta Prieto's continued creation of a hostile environment). I would later see and partially hear Ms. Prieto and Mr. Rappaport discussing the incident on two other occasions the same day. Ms. Prieto was moved to another lab.

**Human Resources Jennifer Ware**:
On December 13, 2013, after I had been investigated by SekTek, Inc. and thereafter the Federal Protective Services, and then sometime afterward that, I received a telephone call from Jennifer Ware. I had not called Ms. Ware or Human Resources. Ms. Ware directed me to report to her office at the Human Resources building. I complied with Ms. Ware's direction.
When I arrived at Ms. Ware's office, Ms. Ware did not tell me how she had learned of the December 13, 2013 incident or my having called Security. Ms. Ware only told me that she was investigating the incident.

As I done with the SekTek, Inc. officers and the Federal Protective Services inspectors, I told Ms. Ware the following:

Ms. Prieto had maliciously harassed me for an approximate four months. I also shared that Vincent Wall had harassed me too and that Mr. Wall was also aiding and abetting Ms. Prieto in her harassment. I explained to Ms. Ware that Ms. Prieto would allow every other examiner to ask his or her questions without interruption. I informed Ms. Ware that Ms. Prieto, however, would first intentionally and rudely interrupt me when I attempted to ask my questions. I also stated that she would shout out aloud "SHUT UP" when I politely asked her not to interrupt me. I told Ms. Ware that the other members of the lab were witnesses to Ms. Prieto's constant verbal abuse.

Especially, I shared with Ms. Ware that **it was not** some mere clash or differences of personalities. I reiterated that Ms. Prieto would intentionally and maliciously wait until I had raised my hand and until I was called upon by a lecturer, then as I was asking my question or answering a question, Ms. Prieto would intentionally interrupt me. I would politely ask Ms. Prieto to please not interrupt me, but Ms. Prieto would always without failing shout, "SHUT UP!" I shared with Ms. Ware that I had not interrupted Ms. Prieto, but that at all times, the lecturer had given me the floor to speak, but Ms. Prieto caused conflict in the class by interrupting me.

Further, I told Ms. Ware that Ms. Prieto had physically threatened me. And just like I had done, I actually demonstrated/acted out how Ms. Prieto had physically threatened me. I demonstrated how close in proximity Ms. Prieto had come to my person and how she had shouted out "You trying to cause trouble. You trying to cause trouble." I also told Ms. Ware that I feared Ms. Prieto was trying to start a fight and that she would stab me with one of her knives. I told Ms. Ware that Didarul Mazumder was a witness to this event.

27

Initials   /s/ GAR

Also, I also told Ms. Ware that Ms. Prieto kept four knives out in the open on top of her desk—two knives having an approximate four (4) inch blade, a stainless steel standard butter knife, and knife having a blade that was six (6) inches long. I told Ms. Ware that MD Rahman was at least one witness to the knives. I shared with Ms. Ware that the police officers had found the two knives having the blades of four (4) blades, but that the officer had not searched Ms. Prieto's desk properly, in my opinion, because he only pulled out Ms. Prieto's top drawer about three to no more than four inches. I told Ms. Ware that I feared stating to the officer that he was not searching Ms. Prieto's desk to find a knife because of the way he performed his search. I told Ms. Ware that I had asked the patrolling officer to remove the knife but that officer did not do anything about the knives. That officer is Officer Andre Fields. I told Ms. Ware that Officer Fields stated that he had to turn the lights off in the copy room when I asked him to go and see Ms. Prieto's knife, the knife with a blade of six (6) inches.

Further, I told Ms. Ware that that morning Ms. Prieto was again engaging in violent and aggressive behavior, and I wanted her knives out of the building because I feared that she'd stab me if I begun to stand up for myself.
I told Ms. Ware that Officer Dearborn had explained to Ms. Prieto and me that violence inside of the workplace would not be tolerated. I shared that I nodded my head in agreement and confirmation. I shared that Officer Dearborn further stated that all of the witnesses interviewed confirmed my allegations that Ms. Prieto was harassing me. I shared that Officer Dearborn also stated that all witnesses interviewed confirmed that "**Ms. Prieto has been singling Mr. Royal out and bullying him**" (emphasis added). *See*, e.g., **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident).

Further, I shared that immediately after Officer Dearborn had finished speaking, Ms. Prieto did not hesitate to demonstrate her violent nature and behavior in front of Officer Dearborn. I shared that Ms. Prieto leaned forward, began pointing her fingers at my face, shouting, "You're being disrespectful. You're being disrespectful." And I shared that Officer Dearborn, or no other Officer, told Ms. Prieto anything about her violent and aggressive behavior.
I shared that as a result of Ms. Prieto pointing her hands and fingers at my face, I looked up at Officer Dearborn and the other majority White officers, and stated, "You see, this is all of your fault. This is your fault." Officer Dearborn replied, "How is that our fault?" And I responded, "Officer Dearborn, you just stood up there and you stated to both of us that violence in the workplace would not be tolerated. You also stated that all witnesses testified that she was singling me out and bullying me. Despite your statements, she does not hesitate to show you her violent nature and behavior. This is all of your fault because of the you police treat Black people out in the streets, and apparently inside of the workplace, even when the Black people are the victims and the White people are the wrongdoers. She did not hesitate to point her fingers at my face and shout out that I am being disrespectful, but what did I do here that was disrespectful? I sat here and just listened to you, and she is pointing her fingers in my face and yelling at me. You see, in her racist and bigoted view of life, she believes that she is way up here because she is White (motioning and raising one hand high) and that I am here supposedly here in her view because I am Black (motioning with my other hand and lowering that hand considerably beneath my raised high hand). Because of her bigoted views, she believes that she can verbally assault me, physically threaten me, point her hands and fingers in my face, and also physically slap me.

28

Initials ___/s/ GAR___

But if I should stand up for myself and say that I do not like it, even call Security against her, I am 'being disrespectful.' This is why she is attacking me. She also cannot handle the fact that a Black man outscores her on the quizzes we take."

I shared that after I had stated my reasoning for my statements against the investigating police officers, Ms. Prieto still continued her aggressive statements, repeating, "You're being disrespectful." Ms. Prieto also stated, "You waited to do this when Vince was not here." I shared that I do not know what she meant by that. I shared that apparently, Ms. Prieto confuses my remaining professional and courteous even in the face of Mr. Wall's and her conspiracy to sabotage my career at the PTO as **cowardice** on my part. The fact that I maintained grace and professionalism, apparently, was misunderstood to be submission on my part by Ms. Prieto. I shared that I did not know Mr. Wall's whereabouts. Mr. Wall could have easily been at his Tech Center discussing cases with his SPE or Primary Examiners. I did not understand Ms. Prieto's assertions; however, it showed and proved that **she and Mr. Wall were acting in concert to create a hostile environment**. I shared that perhaps Ms. Prieto should have waited for Mr. Wall's return before she had verbally attacked me again. I shared that even if she had done so, I would have dialed Security on Ms. Prieto and Mr. Wall. I shared that Mr. Wall, even being an attorney, is not immune from the liability he created and assumed by harassing me within the workplace, and conspiring to sabotage my career here at the USPTO, at least not I should decide to file a civil suit against Ms. Prieto and Mr. Wall.

I shared that in response to my statements to Inspector Dearborn, Inspector Dearborn directed me to go back to my desk, and I had returned to my desk. I further shared Ms. Prieto remained inside Mr. Such's office for some time thereafter, but when she had come back into Lab 11, Ms. Prieto began packing her personal belongings and laptop.

I shared that Hal Rappaport went to Ms. Prieto's cubicle area, and Mr. Rappaport asked her if she was okay. I shared that Mr. Rappaport had not inquired as to whether I was okay. I shared that Mr. Rappaport demonstrated his obvious bias and prejudice regarding the matter. I shared that Ms. Prieto responded to Mr. Rappaport's inquiry, "He stabbed me in the back. He stabbed me in the back."

I shared that I overheard Ms. Prieto's statement, yet I remained silent. I thought to myself, "Incredible, she is definitely crazy. We were never friends upon the first time she told me to "SHUT UP!" I later informed Jennifer Ware of Human Resources about Ms. Prieto's conduct. *See* **Exhibit S** (a copy of an email chain to, inter alia, Human Resources Jennifer including my concerns related, inter alia, to Violeta Prieto's continued creation of a hostile environment). I would later see and partially hear Ms. Prieto and Mr. Rappaport discussing the incident on two other occasions the same day. Ms. Prieto was moved to another lab.

Additionally, I stated to Ms. Ware how I had sent Jessica Rossi an email on November 7, 2013 prior to the December 13, 2013 incident about Ms. Prieto's repeated harassment and violent behavior. I also shared that Ms. Rossi had responded to me in a very rude, curt, and angry manner when I merely asked Ms. Rossi if she had received my email. I further shared that Ms. Rossi had frightened me from expressing my concerns. I also shared that because of Ms. Rossi's visibly angry facial expressions and rude and curt tone of voice, I had informed Ms. Rossi that I

29

Initials   /s/ GAR

no longer needed to talk to her when Ms. Rossi contacted me a few days after Ms. Rossi had been intentionally rude and impolite. *See* **Exhibit U** (a copy of an email chain to Jessica Rossi on November 7, 2013).

Ms. Rossi **has never met** with me regarding this November 7, 2013 email request because Ms. Rossi first sought to be extremely rude and angry to frighten me away.
If Jessica Rossi had not been so intentionally and discriminatorily prejudiced against me, and if she because of her racial animus had not been so rude and angry frightening me away from expressing my concerns to her, Ms. Rossi addressed my email and concerns prior to the December 13, 2013 incident. Ms. Rossi could have prevented my need to call Security if she had applied the same behavior to her statements and representations as a Class Manager that she applied to me against Ms. Prieto. Apparently, there was "No Open Door Policy" with Ms. Rossi. Ms. Rossi, apparently, had received complaints from Ms. Prieto, and or Mr. Wall, but rather than do a fair and actual investigation into the unknown's allegations, Ms. Rossi stereotyped me and made conclusions based upon mere speculations and unfounded conclusions because of her predilection s and racial animus. In instances of conflict between a Black male and a White female, Ms. Rossi's prejudices and predilections are prevalent.

If Ms. Rossi had actually spoken to the other examiners in Lab 11 or me, she would have discovered that Ms. Prieto was in fact misrepresenting the truth. Ms. Rossi would have discovered that Ms. Prieto is a liar. *See*, e.g., **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident).

Ms. Prieto consistently without failure deceitfully states that I interrupted a lecturer or her. Ms. Prieto, however, is simply incapable of perceiving what is actually taking place or what has actually taken place because Ms. Prieto is filled with bigotry. To be sure, no lecturer has ever told me or reported that I interrupted the lecturer. Additionally, if I sit and allow Ms. Prieto to ask whatever question she desires, and I allow her to receive an answer without interruption, it cannot be said that I interrupted her because I thereafter raise my hand, receive acknowledgement and the floor to speak, and then ask my question or state my disagreement to Ms. Prieto's statement/answer. Ms. Prieto is absolutely incapable of understanding this fact because of her racist and bigoted views. Thus, Ms. Prieto continues to slander, defame, and libel me, my character, and reputation.

I also shared with Ms. Ware that **it had been my personal experience** that when a African American/Black had filed a complaint of harassment, hostile environment, and discrimination against a Caucasian/White person, and the administration, *i.e.* the higher-ups, were White, they fired the **Black victim**, cutting of his livelihood, and not caring at all that the **Black person** was **the complainant and victim**. I shared that I hoped the USPTO was different, and that the PTO would not fire me when **I am the victim**, and there are witnesses to the fact that **I am the victim**. To be sure that I did in fact make such above statements to Ms. Ware, *i.e.* about the White higher-ups not having been fair in my experiences, even when I was the victim, I sent Ms. Ware an email on Monday, December 16, 2013 at 12:15 pm wherein I stated to Ms. Ware, "**Just an fyi. I shall now allow the authority to do its job. I, however, state that it would be unfair to punish the victim.**" *See* **Exhibit S** (a copy of an email chain to, inter alia, Human Resources Jennifer including my concerns related, inter alia, to Violeta Prieto's continued creation of a

30

Initials ___/s/ GAR___

hostile environment).

I shared with Ms. Ware that, thus far, in the investigation of the December 13, 2013 incident, all officials of the PTO and Security had made me feel as though I was a second class citizen, not to be protected equally under the same laws. I explained my basis for the fact that the FPS and PTO security had failed to arrest, issue a citation, or even order Ms. Prieto to stop her violence while inside Mr. Such's office, as well as conduct a proper search of Ms.Prieto's desk area. I shared that I was being treated differently because Ms. Prieto is a White female and I am a Black male.

Further, I shared with Ms. Ware the above statements about how Vincent Wall had harassed me for several weeks forcing me to have to bring the harassment of Vincent Wall to Matthew Such, as stated above. I shared that Mr. Wall after one or two days shifted his bullying and harassment to those of the Islamic faith, as explained above.
I shared that one or two days later, Mr. Wall started harassing another student, MD Rahman, who is of the Islamic faith. I shared that Mr. Wall would stand in the middle of the aisle and shout out in a loud voice so that all could hear, "Hey MD, I want to join your religion because I want to have all those days off." Mr. Rahman indicated to Mr. Wall that he and the others of the Islamic faith did not get anything free and that he and the others had to make up the days he and the others had taken off.

I shared that the very next day and on multiple subsequent days, Mr. Wall continued to mock and harass Mr. Rahman before others of the Islamic faith (as explained above). Mr. Wall asked questions of Mr. Rahman, such as: "Who is your leader because I want to join your religion?" "How do I join your religion because I want to get the same days off as you did?" Or, in response to Mr. Rahman asking for Mr. Wall's reasoning for demanding to be allowed into the room set aside for prayer during the Islamic prayer time, "Is your God the same as my God?"
I shared that Islam Muhammad had admitted that he found Mr. Wall's statements to be disrespectful and mocking those of the Islamic faith. I shared that MD Rahman also found Mr. Wall's statements to be disrespectful, but Mr. Rahman feared for his job because of the "Fire for any reason" statement put upon all new examiners, and because of the stereotypes put upon those of the Islamic or Muslim faith.

I shared that instead of continuing to harass me, Mr. Wall had started to harass Mr. Rahman and that Violeta Prieto had elevated the level of harassment upon me. I shared that Mr. Wall and Ms. Prieto were acting together to create a hostile environment (as discussed above).
Lastly, I provided Ms. Ware with written documentation of the events that I have complained of above, including, having documented Mr. Wall's mockery of those of the Islamic faith, a Cease and Desist letter hand-delivered to Mr. Wall, emails, my written notes, etc. Ms. Ware made copies of these documents for alleged investigation.
Ms. Ware also stated that she would draft of a summary of my complaint and she would send me her summary for my review. *See* **Exhibit V** (a copy of an email exchange between Jennifer Ware and Gregory Royal on December 20, 2013 and December 23, 2013 documenting that Ms. Ware had agreed to forward her summary of Mr. Royal's Statement to Mr. Royal for his review).
On or about December 15, 2013, I remembered that I had not shared with Ms. Ware (Human Resources) that Violeta Prieto had physically assaulted and battered me inside of the USPTO

31

Initials ___/s/ GAR_____

workplace. On December 16, 2013, at 8:21 am, I sent Ms. Ware an email that contained explicit statements that Ms. Prieto had physically assaulted and battered me, i.e. Ms. Prieto slapped me, inside of the workplace. *See* **Exhibit E** at the email of December 16, 2013 at 8:21 am on page numbered 3 and at the first full paragraph.

On or about a few or four days later, I placed a call to Ms. Ware to request "Other Time" for the events of December 13, 2013 because "it was not my fault that I had to call the police on Ms. Prieto." I further stated to Ms. Ware that I am the victim and was also a victim of a hostile work environment and workplace violence because Ms. Prieto had slapped me. I told Ms. Ware that there was a witness to Ms. Prieto slapping me, Alam Mohammed.

Ms. Ware stated that I had not told her that Ms. Prieto had slapped me. I responded that I had forgotten to state so during our meeting on December 13, 2013 because a lot had happened prior to our meeting. I further stated that "I did send you," meaning Ms. Ware, and email regarding Ms. Prieto's workplace violence. Ms. Ware stated, "I did not see any email containing that." In reply, while on the telephone with Ms. Ware, I specifically pointed and walked Ms. Ware to the specific email and paragraph. I read the explicit statement:

And during a lecture break, instead of going on her break, she leaped from her desk in front of me, and began chastising me and swinging and pointing her hands and fingers at invading my personal space. She stood over me doing this. I was sitting and holding an ink pen which I used to take notes. She put her hands so close to my person and face that her hand stuck my hands and the ink pen. She had to gall and nerve to say, "You wrote on me." I replied (something to the effect), "You hit me and the pen and knocked it out of my hand; you wrote on yourself. Quit putting your hands in my face, get away from me, and go back to your desk.["] I believe strongly that it was Alam Mohammed sitting adjacent to me and when I looked at him, he smiled and nodded in agreement to my statements.

Ms. Ware, therefore, was at all times material, absolutely aware that I had complained about Ms. Prieto's harassment, violent threats inside the workplace, and commission of physical assault and battery, i.e. workplace violence by slapping me. *See* **Exhibit E** at the email of December 16, 2013 at 8:21 am on page numbered 3 and at the first full paragraph. On December 23, 2013, Ms. Ware would tell me that she would not forward my Statement to me for my review and that she (and Human Resources) had completed the investigation and had closed the file. *See* **Exhibit V**.

After hearing Ms. Ware's decision to close the file on my complaints about a hostile environment, harassment in the workplace, violent threats in the workplace, and workplace violence, etc., I was very upset and hurt. I could not perform my job duties because it is unfair to just close my file containing my complaint that Violeta Prieto slapped me at the PTO. This is painful and hurtful.

If I went and slapped Ms. Prieto, Human Resources would not just close Ms. Prieto's file because we are no longer in the same lab room. And this fact is why the PTO and Human Resources' decision and handling of this matter are discriminatory. I am made to feel that I am without value here at the USPTO. I am made to feel by Ms. Ware and Human Resources that because I am an African American/Black male, any person could disrespect me and physically

32

Initials ___/s/ GAR_____

threaten me and physically abuse and beat on me, and the USPTO would not care or do anything about it.

As a result of Human Resources and Ms. Ware closing my case, I am hurting internally and emotionally, and I have become mentally and emotionally distracted. Ms. Ware, Jessica Rossi, Gary Jones and Deborah Reynolds (through their deliberate indifference), and the PTO Security and Federal Protective Services have caused me to change from being happy to being unhappy and somewhat angry, and depressed, especially unable to sleep or focus. It is extremely difficult for me to focus on my job duties because I have been physically violated inside the PTO, and the PTO officials are covering up the workplace violence. I keep seeing Ms. Prieto violating me and slapping me, and I keep hurting because the PTO is maliciously and actively covering up Ms. Prieto's workplace violence.

All PTO officials involved have treated me as if I am **something less** (emphasis on the "something," not someone, added) than Ms. Prieto and Mr. Wall. Feeling hopeless and depressed, I sit daily and dwell, and I sit daily and dwell upon the thought that if I had acted like Vincent Wall or, especially, acted like Violeta Prieto, i.e. if I had slapped Ms. Prieto, being a Black male, those involved PTO officials would have quickly fired me, i.e. quick, fast, and in a hurry—in a New York second.

I sit and dwell fearing that the PTO will soon fire me because those PTO officials, especially Jessica Rossi, are calculating to fire me and to protect Ms. Prieto because she is a White female. Ms. Prieto is the wrongdoer, and she is a repeat violator, but the PTO officials protect her. After asking to be moved to my Tech Center, I was allowed to move on December 20, 2013. I, however, viewed the move as those PTO officials simply realizing that Ms. Prieto could not control herself, she could not control her violent nature.

On January 28, 2014, I contacted Jennifer Ware to complain about how Human Resources had just swept me aside ignoring my complaints about workplace threats and workplace violence. Ms. Ware replied, "Didn't the security guard tell you that the knives were not illegal?" *See* **Exhibit T** (a copy of my notation on January 28, 2014 recording that Jennifer Ware alleges that an unknown security guard had told me that Violeta's knife having a six (6) inch blade was not illegal). I answered, "No security guard or officer ever told me that Violeta's knives were not illegal. In fact, the CPL security guard told me that he would look into it, but he never got back to me. But I went back to that CPL security guard and requested that he come and see Violeta's knife, the one with the six (6) inch blade. It was out on top of her desk. That security guard told me that he had to make certain that the lights were off in the copier room, that's room 6031. And I heard the federal police officers say that they would at least issue a citation to Ms. Prieto." See Exhibit

**Jessica Rossi (formerly Jessica Ward):**
On December 16, 2013, Jessica Rossi arrived to the Carlyle building, a business day after FPS and SekTek, Inc. had finished interviewing me and Ms. Prieto had been moved out of Lab 11. Ms. Rossi directed me to meet her in Matthew Such's office. Mr. Such was present during this meeting.

33

Initials   /s/ GAR

001316

Ms. Rossi began by stating that she wanted to talk to me about the incident, and she began by telling me, "Gregory, the Federal Police Officers risk their lives every day protecting persons [. . .]" Immediately, being utterly annoyed by what I perceived Ms. Rossi to be saying was that I should not have dialed Security, I interrupted, saying, "Excuse me, excuse, respectfully, Jessica, I know that you are not trying to tell me that I should not have dialed Security because I feared for my life and safety when Violeta had four knives in the lab room; she has been acting crazy and doing crazy and insane things; and she has threatened me and she slapped me. I know you are not telling me that I should not have dialed Security to protect my life. Are you saying that I am not a person?"

Ms. Rossi shifted her body and position and asserted in a stronger tone of voice, "Gregory, I am saying that if you felt you had to dial Security then you had a right too; but as your Class Manager, if I get anymore reports that you are being disruptive in the lab, we are going to have to take stronger actions including termination." I responded saying, "Well Jessica, I am not the disruptive one and there are witnesses to this fact. One thing that I am not, and you and whoever can say whatever you want about me, but the one thing that I am not is either a liar or a thief. I am not the one being disruptive. I raise my hand, I am called upon and given the floor by a lecturer, and when I begin to speak, answer, or ask a question, Violeta intentionally and maliciously interrupts me. When I ask her, even in polite tones of voice, to please not interrupt me, she turns around and yells, 'SHUT UP!' She then turns to Vince who gives her a head nod, and then she turns to the other side of the class and chuckles and laughs, 'Ha, ha, ha.' That's being disruptive. She has done this since the beginning weeks of training, especially after we took the first quiz, and I believe she scored a 40 (or 60 at best) on her quiz. She has threatened me physically, getting up in my face and shouting, 'You trying to cause trouble. You trying to cause trouble.' Didarul is a witness to this. She has slapped me. Because I first raised my hand and was acknowledged by the lecturer, when I disagreed with her, during a break, she jumped from her chair, charged to the back of the lecture area, pointed her fingers in my face, and while pointing her fingers in my face, close to my face, and flailing her hands at me, she slapped a red ink pen out of my hands. She slapped my hands too. Then, she got red ink on the back of he hand because she had backhand slapped me. She had the gall and audacity to say that I wrote on her. I had to tell her that she wrote on herself because she slapped me. I told her to keep her fingers and hands out of my face and to go sit down and get away from me. I told her that she was harassing me. I then turned to Alam Mohammed and asked, 'Didn't she slap me?' "Didn't she write on herself?' And Alam Mohammed nodded in agreement laughing. I said to Alam, 'She's crazy.' And Alam again nodded in agreement."

I further stated, "You call me in here and you accuse me of being disruptive when you have never talked to me or any witnesses but Violeta, and likely her coconspirator Vincent Wall. Vince is enabling Violeta. Vince is aiding and abetting her. She looks to Vince every time she rudely interrupts me, and neither she nor Vince understand what I am actually asking the lecturer, so they both need to allow me to ask my questions. Yeah, I had to complain on Vince too (I am looking at Mr. Such at that time). And Vince does not know what I am talking about. He claims to be a lawyer who clerked for a Patent Law judge, but I do not know how he did that because he did not do better than me on his quizzes and he did not even know that a 102 rejection was a conclusion of fact and that a 103 rejection was a conclusion of law. So maybe he lied on his resume and application. Check that out."

34

Initials ___/s/ GAR_____

Ms. Rossi interrupted my rant, saying, "Gregory, we are not talking about what Vincent knows or put on his application, we are talking about the disruptions in the classroom."
I replied, "Okay, let's talk more about Violeta being disruptive and not me. Violeta sits up in class all day, all day long, chewing, clucking, chucking on sunflower seeds like a 'chipmonk on steroids,' that's very distracting and disruptive. I ignore it to try to keep peace but I can't focus. And she stacks those empty sunflower seed shells on top of her desk with spit mixed in them. That's a health violation. And she throws those nasty, spitty shells on my cubicle floor. Why don't you go and ask the class that? I came into work the other day and there were sunflower shells all over my floor. I know that they vacuum and clean every night because I stay to 9:00 pm every night. Tom (Artman, the lab 12 supervisor) can attest that I stayed very late. Only Violeta and Vince arrive earlier than me, so either one of them threw those shells on my cubicle floor. There are witnesses to the shells being on my floor because I stood up and loudly asked the class, 'Guys, why are there sunflower shells all over my floor; why do I feel like I am standing up in a bird case?' And other examiners looked and came to look at my cubicle floor, and all of them then turned and gave Violeta a quick look. It was obvious she had taken her pile and reach around the divider wall to toss her shells on my floor instead putting her shells in her trash can. And why Jessica, can you tell me, 'why does Violeta need four knives inside of the lab room?' She has a knife having a cutting and stabbing blade of six (6) inches, that's a sword. And I measured that knife. She has two knives that have a cutting and stabbing blade of (4) inches. And she has a stainless steel butter knife, it's the standard kind, but I can tell you four ways to kill someone with a butter knife Jessica, 'Do you want me to tell you?'" Ms. Rossi responded, "No, that's not necessary."

I quickly continued, "Then, how many knives does she need to cut fruit, as you say Jessica? As you make excuses for Violeta and accuse only me of being the disruptive one, please enlighten me and tell me how many knives does she need to have? And she keeps all the knives on top of her desk out in the open for easy access. And Vincent Wall stands in the aisle and shout out loud so all can hear and he does this during examination times disrupting me, and he yells out, 'Violeta, I wouldn't mess with you, you got a knife.' And after Vince had shouted that out a few times Jessica, Violeta increased the number of knives that she kept on her desk, and she also increased and intensified her harassment and violence against me until she slapped me. Violeta slapped me in the workplace, but you are not concerned at all about that. You are only concerned about trying to paint me, the six-foot medium build Black male, as the wrongdoer here. What about her slapping me? Alam Mohammed saw her do it. What about her threatening me? Didarul Mazumder saw her do that? But you do not consider those things disruptive, it's just me. You are hell bent on making me the bad guy while Violeta and Vince go free. And she is doing crazy things in the class that are disruptive. She is disrupting me, and I cannot focus. I cannot learn what I need to learn to do my job. Violeta is harassing me to distract me, intentionally and maliciously so. She sits in the front of the lectures, and she chews on her fingers like a starved cannibal until her finger tips bleed drops of blood on the desk top. That's not her assigned desk. Someone else may sit at that desk at a later time, so that's a health hazard. But Violeta takes another finger and swipes up the blood droplet and licks and sucks her finger. That's disruptive! She caused Islam Muhammad to have to get up and go to the restroom because he was disturbed by Violeta. When he returns to the lab, he takes a sit in the back of the room where I was seated so that's disruptive to me. Violeta is the one disrupting the class by always telling me to "shut up" and doing crazy things that disturbs others and me. But Jessica,

35

Initials __/s/ GAR_____

you continue to accuse me for allegedly being disruptive. In your view, like Violeta's view, you cannot see Violeta as being disruptive, not at all. But I am not the one who put hair strands on MD's desk. The other week, Violeta plucked her hair strands from her head like this (I demonstrated Violeta's insane conduct). She then examined the hair strand, and I could see something White stuck to the hair stand. I do not know what that White things was, but it was clearly visible. After examining the hair strand, holding it at the ends, Violeta licked and sucked the strand of her from end to end like someone sucking up a string of spaghetti (I demonstrated how Ms. Prieto licked and sucked the hair strands). Then, Violeta sat the hair strands not on her desk but on MD's desk. She forced him to get up from that desk and to then come and sit in a desk adjacent to the one where I sat thereby disturbing me during lecture time. So, that's disruptive. Jessica, you act as if I am the only one not supposed to be free from distraction to learn what I need to learn here. I am not the 'disruptive one' your Violeta is the disruptive one. She forced MD to move from his desk iat the front of the classroom to come and sit in the only empty desk next to me. He disturbed me when he touched my shoulder. I told him, "Dude, what's your deal? It's not like that here. MD said, 'No, look,' and he pointed to Violeta pulling out her hair and sucking and licking the strands. There was a two-inch pile of licked and sucked hair not her desk but on MD's desk. I told MD, whispering, just don't look at her; she is nasty and crazy. Turn sideways like this so you can't see her. MD turned as I had been turned, i.e. at an angle seated in the desk. There was a moment of silence. But then I heard MD let out a muffled scream. I turned quickly and said, 'Come on dude, what's wrong now?' In a still-like shock, MD pointed to his hand. Violeta had placed one of her nasty, licked hair strands also on MD's hand." I looked directly into Ms. Rossi's eyes with a look of "**you stop being prejudiced here, stop discriminating against me**," and said, "One person, Violeta, is doing all of this, and yet to protect her, the White female, over the six-foot medium build Black male, me, you continue to threaten me with stronger discipline including termination. That's unfair."
Ms. Rossi responded saying, "Don't do that with your tongue." I replied, "Do what?" She answered, "Don't do that you did with your tongue." I responded to her demand, "Wait a minute . . . wait just one minute here . . . you mean to tell me that you cannot sit there and observe my demonstration of what Violeta is doing inside the classroom because it's too disruptive to you just to see it one time, but I am supposed to sit in the classroom while she is not only that just one time but doing that for the entire lecture time, Violeta is passive-aggressively attacking MD by putting her hairs on his desk and then causing him to disturb me. Violeta prevented me from learning the lecture that day. Violeta attacked me each week has caused me not to be able to focus and do my job."

Ms. Rossi, despite all that had been said, continued her defense of Ms. Prieto. Ms. Rossi stated, "Gregory, I do quirky things with my hair," and she put her hand in hair and twisted her hair as if she is such the "prettiest girl." I responded very quickly, "Yeah, but you do not do this," and I again imitated Violeta, emphasizing Violeta's licking and sucking her hair strands. I continued my defense stating, "Respectfully Jessica, your may superior, you're the Class Manager, so you can choose to see things whatever and whichever way you want despite there being witnesses to everything that I have stated. You intentionally and deliberately sit there and ignore the fact that I have informed you of witnesses for everything that I complained out. Violeta is a bigot and likely a racist. She complains about me because I know more about the substantive patent law than she knows. That's her problem, her mommy and daddy taught her that Black people are not smarter than she. So, I outscore her on every quiz, and she takes her quizzes open book, but I

36

Initials __/s/ GAR__