# Exhibit 2

Part 3

take mine closed book. I still outscore her and Vincent Wall. Violeta will only report me, but I was only getting up after a quiz to leave the lab room when MD asked me, 'How [I] had done?' I merely said to him, 'Step out,' and motioned and pointed to the door. Yet, bigoted Violeta only reported me, and ask MD, I told him that Violeta was a bigot who would only report me, when he had stopped me." I further stated, "And Violeta disrupts the entire lab whenever she wants too, just like Vince. But she does not tell you that, does she?" When she was allowed to send out her first 'Allowance,' she did not care that I and others were working on our applications when she charged into the lab and shouted out, 'Hey guys, I got my first Allowance.' I did not care what she got. She disturbed my work. And Violeta does not complain to you when Vincent Wall disrupts the lecturer within 20 minutes of a lecture asking, "Can we take a break?" Vince does that all the time for just about every lecture. Violeta does not complain when Vince is interrupting the class lecture talking about some 'elephant-mouse' when there is no such thing as an 'elephant-mouse,' or when he interrupts talking about a 'walking chain' for a 'pet snake,' a patent that should not have issued and is an embarrassment on the PTO. She did not complain about that, did she? And she did not complain about when Mo (assistant lab supervisor Mohsen Ahmandi) specifically told the class on more than three times not to answer a question if you were not called by your name, but Hal Rappaport disobeyed Mo on at least three times, forcing Mo to look at Hal with disgust and exclaim, 'What's wrong with that guy?' To be sure, Violeta did not tell Hal to "Shut Up," not a single time. She was not disrupted by those things. She is only disrupted when a Black male who knows more than she about patent law asks a question too complex for her to comprehend. That's because she is a bigot and likely racist. And you are going to protect that, despite all the witnesses. You won't go and talk to anyone because you do not want to find out the truth. It's within your predilections, like Violeta's, that the Black male be the wrongdoer."

And I continued my rant with this: "Jessica, I am the victim here. I called Security. And I called because Violeta has multiple knives inside the workplace when they told us during the September 9, 2013 orientation that knives were not allowed on PTO grounds. They told us that even the tiny pocket knives, the ones with the little cross, the Swiss Army pocket knives were not allowed on PTO grounds. But Violeta had four knives on her desk to cause me fear and to intimidate while she harassed me, threatened me, and slapped me. You don't care about that. Well, I did call Security, and I called Security because my friend of 20 years, Lindsay Bourda, told me that "I should notify the police because he had witnessed me go from being very happy about my new job with the PTO, to always talking about how this White girl and White guy were harassing me every day, then to talking for the last two weeks (i.e. the first two weeks of December 2013) about how [I would have to defend myself] if that girl comes at me with one of those knives." My friend for stated, "You actually had to bring an old keyboard into the workplace to use a bat if she tries to stab and cut you with her knives. My friend told me that I must address it because the fear is becoming overwhelming, and some security guard and your supervisors aren't going to do anything about those knives, at least. Bro, that's just crazy." I shared with Ms. Rossi, "Jessica, my friend is a witness to the real fear I have because you all won't do anything about Violeta knowingly violating the PTO policies and rules and federal laws."

I stated in a louder and stronger tone of voice, "Jessica, Violeta slapped me; she physically assaulted and battered me; she committed a crime. I should have called the Alexandria police

37

first. Despite what you say Jessica, Violeta committed a crime. But Jessica, I know how this goes. I have been a victim of it. When the higher-ups are White, and the victim is a Black male, and the wrongdoer is White, especially a White female, it is the Black male who gets fired. I know this, so I am being very courageous right now or very foolish, but I am standing up for myself. I told the police officers that it was there fault because the way they mistreat Blacks when Whites are involved, and they stood there and watched Violeta put her fingers in my face and shout at me, 'You're being disrespectful. You're being disrespectful.' They watched her violent nature, but they did not do anything. If I was acting like that, I'm sure that one of them would have sprayed me with mace or hit me with a tazer. And let's be clear, both Violeta and Vince are hiding behind their jobs and their knowledge that they know that you all will favor them and discriminate against me because they are White and I am Black. Neither Violeta or Vincent would talk to me this way or put their hands on me if we were standing over there on that Metro platform. They come into work and carry out their racist and bigoted views because they know that the higher-ups, who are often more likely White than Black, will protect them, the Whites, over the Black person. That's what's happening here. Now, Jessica, you can do whatever you want, you got the power. You can be fair and ethical or you can protect the wrongdoer or wrongdoers because they are White, and no disrespect to you, but you too are White, and that's why you cannot see that I am the victim here, because I am Black. Jessica, you're the boss. You're the boss. And I hope that you and the others will do the right thing. Gary and Deb just sat that, and they did not say a word to me. They know that I am the victim. They know that I called Security. They saw me sitting in the lunch room, but they did not say anything to me. So, I do not know what they are thinking. I see here how you are treating me. You fault me for all of this when Violeta caused this. She had the knives, and she slapped me. Yepper, you have the boss and you have the power. You can do whatever you want to me. But, I will end with this, ya'll do not have to do anything to Violeta. Y'all can protect her, and Vince. But I have rights too. I have a constitutional right of self-defense, and if Violeta should come after me in that lab room with one of her knives, I promise you, only one of us is walking out of that lab alive. I promise that. I should not have to live in fear of my life inside of a workplace, especially a federal government workplace. Title VII affords me a right to be free from a hostile environment, harassment, physical violence, and discrimination even if I am a six-foot medium build Black male. I hope that y'all do the right thing, but I know, America has this stain it carries forth, 'Racism.'"

Ms. Rossi reminded me that she was my superior as Class Manager and that if she got any more complaints, she would recommend strong discipline. Ms. Rossi reminded me that I was a probationary examiner and that I could be fired for any reason. I sat quietly. I did not say anymore, but I thought, "You can fire me for any reason but an unlawful reason. I'm not stupid."

Ms. Rossi asked me whether I understood her. I replied, "Yes, I hear what you have said." Ms. Rossi dismissed me back to my lab room.

Matthew Such was present during all of this. Mr. Such sat and listened to my lengthy rants. I was forced to defend myself because Ms. Rossi, at no time, stated that she would address Ms. Prieto or Mr. Wall. Ms. Rossi's entire stance and approach was a **beat down** on Gregory Royal. Mr. Such, two or days later, called me into his office and ask, "Hey man, are you okay? Are things alright between you and me?" I answered, "Sure Matt, but I have done nothing wrong

38

Initials  /s/ GAR

001321

here." Mr. Such responded, "Let me know if you need any help with anything."
It is important to understand and fully appreciate Ms. Rossi's racial animus towards me. Ms. Rossi was a patent examiner for many years. She is also the Class Manager, thus it is reasonable that she should be familiar with the course materials. Accordingly, I shared an example of one of Ms. Prieto's attacks to show Ms. Prieto's true colors as simply being a racist bigot who sat out and conspired to prohibit and prevent me from learning during the entire four-months of the training academy. I also clarify and correct one of Ms. Prieto's blatant misrepresentations of fact, i.e. one of Ms. Prieto's blatant lies.

**On Thursday, November 7, 2013, Hop Dang, an ITRP**, lectured the class on the EAST (EAST Part 2) and WEST search tools. Mr. Dang had explained "how to hide the US Patent Publications behind (or under) the US Patents inside of the "Details"—window. Basically, how an examiner can set up the Details window to only show the latest East reference. Mr. Dang had demonstrated how to set up the above, and Mr. Dang had informed the class that the other documents were still available but hidden under the latest document, which would be a patent if not a patent publication. Mr. Dang had used a laser pointer while operating from the classroom desk that Mohsen Ahmadi generally taught lectures because this desk location had a computer connected to the overhead projector.

Mr. Dang lectured while using the laser pointer to point to specific buttons, fields, or locations on pictorial representations of the actual East or West screen views—i.e. screenshots. Mr. Hop would point to the locate and ask, e.g., "Does everyone see this?" or "Does everyone understand?"

It is very important to understand that this specific material **is not** located at the end of the materials for this lecture (East Part 2). It is important to appreciate that if Ms. Prieto had any question related to this specific material, she would have raised her hand to ask her question at this time. Logically, that is, if Ms. Prieto had a question relating to "how to hide earlier published documents, i.e. patent publications, behind, e.g., later published Letters Patents, Ms. Prieto would have, more likely than not, raised her hand this time and moment of time during the lecture to ask her question. **But Ms. Prieto did not raise her hand for any question at this moment**.

There was more material to cover to complete this lecture, but I did have a question specifically related to the above material. In short, because the lab had been extremely hostile against me, my attention span and focus had been severely damaged by Ms. Prieto (and Mr. Wall). Ms. Prieto constantly interrupted me and then told me to "**SHUT UP!**" Ms. Prieto did this solely to prevent me from asking a question or to prevent me from gaining an answer and/or to prevent me from learning in the classroom.

**I withheld my question because I knew that Ms. Prieto would absolutely interrupt. Ms. Prieto had done so for an approximate four (4) months. I decided that I would wait until the end of the lecture at the last five (5) minutes**.

It is very important to understand what I had done. I needed an answer to information that I had missed instruction from Mr. Dang. But rather than ask my question at that moment, I would

39

Initials ___/s/ GAR___

show and prove to others I the lab that Ms. Prieto would maliciously and intentionally harass me. Withholding my question until the end of the lecture was a way to show and prove that Ms. Prieto would allow anyone and everyone else to speak without interruption. But I would show and prove that Ms. Prieto is a bigot with a lot of racial animus against me by withholding my question until just before the end of the lecture, and Ms. Prieto would still interfere, even though **it was my question**.

Mr. Dang reached the end of his lecture, the complete lecture, and I had not yet asked my question. As lecturers had done so often, Mr. Dang closed off his lecture and stated, "We have quite a bit more time left; you can go back to your desks if you'd like; but I will stick around for a bit if anyone has a question." At this moment, some examiners had begun departing back to their desks. So I seized my moment, I raised my hand. Mr. Dang acknowledged me and stated, "Yes, Greg." I replied, "Hop, can you please go back to the slide where you showed us how to set up the Details window that only the latest document could be seen? I missed those steps." Mr. Dang stated, "Sure."

As Mr. Dang walked back to towards the computer/laptop at the desk where the training supervisor or assistant training supervisor usually sat and/or stood, some of the examiners had returned to their desks. Ms. Prieto, however, had not yet moved back to her desk. Mr. Dang asked me, "Greg, is this the slide you are talking about?" I replied, "Yes, would you please walk me through the steps to get there." Mr. Dang began, "Okay, you would click here." Mr. Dang would pause in speech and point to the field, tab, or hot button. Mr. Dang paused because he was waiting for me to confirm that I understood that particular step. Accordingly, in reply to each of Mr. Dang's pauses (i.e., what I understood to be his implicit question, "Greg, do you see this? Are you following me here?"), I would reply "**Uh-huh**." The pointers, questions, and pauses from Mr. Dang were immediately followed by a reply "**uh-huh**" from me in a pingpong-like fashion.

But during the exchange between Mr. Dang and me, Ms. Prieto blurts out in her loud monstrous tone of voice, "**You shut up and let him talk**. You're being disrespectful." I quickly replied, "What in the hell are you talking about? This is my question. I waited until the end of the lecture to ask my question. Why are you even still here but to cause conflict? Go back to your desk." Matthew Such was not in his office for me to report Ms. Prieto. But I did inform Hop Dang, the lecturer, that I would be reporting Ms. Prieto to Mr. Such and likely Jessica Rossi. Mr. Dang replied, "Okay." *See* **Exhibit W** (a copy of the November 7, 2013 email to Jessica Rossi, formerly known as "Jessica Ward, at 10:02 am and at 11:32 am, which is part of an email chain sent to Mr. Such and Ms. Rossi).

It is more likely than not that Ms. Rossi (nor Mr. Such) actually contacted Hop Dang to discover the truth and veracity of my complaint(s) about Ms. Prieto. Ms. Rossi finds it easier to exploit her tenure, grade, and position to protect Ms. Prieto and to carry out her racial animus against me, i.e. to discriminate against me as a Black male. As stated above, when I approached Ms. Rossi about the November 7, 2013 emails, she gave me this very angry devilish look and said in an abrupt, rude, and curt tone of voice, "Yea, I saw it." Ms. Rossi was visibly angry at me. At no time did Ms. Rossi state that she would get in touch with Hop Dang and then get back to me. This is generally how Ms. Prieto harassed me in the classroom. She interrupted so that she could

Initials ___/s/ GAR_____

cause a commotion and then shout out at me, "SHUT UP!" During the December 13, 2013 meeting with Ms. Rossi, Ms. Rossi completely and intentionally ignored the all of above, but she maliciously accused me of disrupting Ms. Prieto.

Ms. Rossi refuses to appreciate and acknowledge that I have not interrupted Ms. Prieto. Ms. Prieto has always interrupted me, and she has done so without raising her. Ms. Rossi, however, sees no problem with Ms. Prieto intentionally and maliciously interfering with my opportunities to learn at the PTO.

Ms. Rossi had demonstrated that she is absolutely with a very strong "racial animus" towards me. As to my November 7, 2013 request to meet with Ms. Rossi, Ms. Rossi did not meet with me. First, Ms. Rossi did not respond to my email at any time.
As stated above, it was before a lecture in the DKS large lecture hall where I next saw Ms. Rossi. I had arrived quite early to the lecture hall, and Ms. Rossi was seated at a desk at the front on the right side of the lecture all. I approached Ms. Rossi, greeted her, and asked her if she had seen my email in a polite tone of voice. Ms. Rossi had her head downward facing the floor. In response to my question, she lifted her head with a very angered look on her face. She spoke in a very rude and curt tone of voice, "Yea, I saw it." That is all Ms. Rossi said, and she said or did nothing else. I walked away without saying more.
As stated above, about a few to four days later, Ms. Rossi placed a telephone to my telephone in Lab 11. Ms. Rossi asked me if I still needed to meet with her. I responded in the negative because Ms. Rossi had made her interest and concerns about my complaints very clear from her tone of voice and face. As stated above, Ms. Rossi snapped at me as if I was a stranger attempting to take a steak away from a pitbull.

Ms. Rossi excuses Ms. Prieto's actions before me. Ms. Rossi holds me at fault accusing me of being disruptive during the November 7, 2013 lecture by Hop Dang (ITRP). But Ms. Rossi failed to consult with Mr. Dang before forming her very incorrect perceptions of the November 7, 2013 incident.

Further, Ms. Rossi cannot explain by what or by whose authority did Ms. Prieto have to attempt to chastise or admonish me. Even if Ms. Prieto even had a right to be frustrated to **my question**, and she did not, Ms. Prieto had absolutely no authority to even attempt to chastise or admonish me. **It is important to realize here that I, by withholding my question until the very end of the November 7, 2013 lecture, had given Ms. Prieto every opportunity to ask any questions she needed to ask, and I had given Ms. Prieto every opportunity to interrupt anyone else in the lab**. But Ms. Prieto did not do so in either case.

Moreover, Ms. Prieto should be seen solely as a deceitful and very dishonest person, a person who calculates a cover-up for her intentionally malicious acts of racism and bigotry. If anyone should give any credibility to Ms. Prieto's statement that I was allegedly interrupting Hop Dang, that person would also have to hold and believe that Mr. Dang was totally incapable of instructing or directing me to remain silent and allow him to answer my question without interruption. It is very important to realize that the PTO chose persons who were and are assumedly capable of directing a new examiner to, at least, allow the lecturers to "**answer the examiner's question** without interruption."

41

Initials  /s/ GAR

Neither Ms. Rossi nor Ms. Prieto is capable of comprehending this fact. If it were even true that I was at any time interrupting any lecturer that lecturer would have certainly informed me that I should allow him or her to speak. Mr. Hop Dang did not do this because I was not interrupting him but, instead, responding to him.

Ms. Rossi has never addressed me regarding any lecturer having to tell me anything related to interrupting him or her. But Vincent Wall has had several lecturers direct him "**not to interrupt them**." The entire September 9, 2013 examiner class is witness to the fact that Mr. Wall is known by at least three lecturers to be a "troublemaker." *See*, e.g., **Exhibit 1A** (a copy of the December 18, 2013 email sent out to the September 9, 2013 class having a comment about Vincent Wall, "the heckler"). During the lecture on the new examiner's "Move to the Technology Center" presented by Craig Sokol, Mr. Wall rudely interrupted Mr. Sokol on at least two separate occasions. Mr. Wall also had a habitual habit of waiting until a lecturer was about 20 minutes into his or her lecture, raising his hand, and when acknowledged, asking, "Can we take a break?"

During the December 13, 2013 meeting with Ms. Rossi, I informed Ms. Rossi that Mr. Wall's conduct during lectures was very distracting and disruptive. Ms. Rossi had not concern or interests in my concerns or complaints.

**Enablement and Empowerment by Ms. Rossi**

It is important to appreciate that because Ms. Rossi failed to properly address Ms. Prieto for Ms. Prieto's misconduct during the November 7, 2013 lecture, Ms. Rossi enabled and fostered a further hostile environment and further empowered Ms. Prieto to become more hostile and more violent.

Because of Ms. Rossi's deliberate indifference for my concerns and because of Ms. Rossi's failure to properly address Ms. Prieto, Ms. Prieto would thereafter escalate her hostility and violence to that of physical threats and actually physical assault and battery.
Because of Ms. Rossi's gross and wanton racial animus and blatant discrimination against me, Ms. Prieto was enabled and empowered by Ms. Rossi to physically threaten me on multiple occasions and then physically slap me inside of the workplace.

Ms. Prieto did not hesitate to physically assault and commit battery upon me; Ms. Prieto did not hesitate to slap me because Ms. Prieto knew that Ms. Rossi would absolutely take her side in any conflict.
**Ms. Prieto knew that she could do anything to be inside of the Patent Training Academy, and Ms. Rossi would show favoritism and protectionism for Ms. Prieto. To be sure, in Ms. Rossi's Report of the December 13, 2013 incident, Ms. Rossi deliberately and intentionally commits fraud in the omission upon that investigation by maliciously leaving out the fact that I shared with Ms. Rossi that Ms. Prieto had slapped me inside of the PTO workplace.**

Because of Ms. Rossi's visibly expressed racial animus and overwhelming bias, after Ms. Rossi telephoned me on December 19, 2013 to tell me that I would be moving to my Technology

42

Initials __/s/ GAR__

Center on December 20, 2013, I have not bothered to express any further concerns to Ms. Rossi. For example, even though I requested a conference/meeting with PTA Director Gary Jones and PTA Deputy Director Deborah Reynolds on January 27, 2014 to discuss matters that occurred during the four-month period of the PTA, I did not include Ms. Rossi. Ms. Rossi is a part of the problems, a large part.

In fact, Ms. Rossi was a driving force behind Ms. Prieto's continued and repeated hostility, harassment, and extreme and outrageous violence. Because of Ms. Rossi's prejudice against me, deliberate indifference to my complaints, favoritism towards Ms. Prieto, and gender and racial discrimination, Ms. Prieto was empowered to continue harassing and physically abusing me, even after the December 13, 2013 Incident.

Ms. Prieto needs to be put a witness stand so that her ignorant views can be shown to a trier of fact. Further, Ms. Rossi knowingly and maliciously exploits her tenure, grade, and position with the USPTO to enable and further Ms. Prieto's bigoted views and deception and false statements. Ms. Rossi charges me with being disruptive in the classroom. Ms. Rossi, however, did not list any witness to support her except for Ms. Prieto and Ms. Prieto's coconspirator(s). Ms. Rossi has repeatedly stated that she was told this and that she was told that, but **Ms. Rossi has intentionally and maliciously failed to state any names to support her continued and unsupported false accusations.** The other examiners state that I had raised my hand and that I was courteous and polite. Thus, Ms. Rossi has failed to forward any supporting evidence but for the dishonest Ms. Prieto (or Mr. Wall) for her false accusations and slanderous statements. Ms. Rossi has failed to name a single person. Ms. Rossi, as Class Manager, imputes liability upon the USPTO.

Ms. Rossi's continued accusations that I was disruptive in the lab lecturers is refuted by the investigatory findings of Federal Protective Services Inspectors Dearborn and JD Williams, as recorded in a "business record" of SekTek, Inc. Security. *See*, e.g., **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident).

Instead of appropriately dealing with the actual wrongdoer, a Caucasian/White female, Violeta Prieto, Ms. Rossi acts with racial animus and discriminates against me because of my gender and race. Ms. Rossi rests upon and exploits her tenure with the USPTO, grade, and position as Class Manager to knowingly make statements that she has not properly investigated their truth or veracity. Ms. Rossi maliciously runs about the USPTO slandering me, libeling me, and shedding me in a false light.

Using her tenure, grade, and position with the USPTO, Ms. Rossi continues to knowingly, intentionally, and maliciously slander me, libel me, and shed me in a false light as being the cause of all incidents and the actual wrongdoer. But Ms. Rossi has not listed a single witness to her (and Ms. Prieto's) false accusations.

### Matthew Such:

As explained and discussed above and in supporting exhibits, on numerous occasions, I requested that Mr. Such address issues about harassment, a hostile environment, and workplace

43

Initials ___/s/ GAR_____

threats by Violeta Prieto (and Vincent Wall). Albeit Mr. Such stated that he would address and discuss my concerns and complaints with Ms. Prieto (and Mr. Wall), I was not included in the alleged discussions/meetings between Ms. Prieto and Mr. Such. I was included in only one meeting with Mr. Wall and Mr. Such.

I do not know if Mr. Such ever discussed my concerns with Ms. Prieto. I am only aware that Mr. Such warned Mr. Wall and me that if the conflicts continued, he would refer the matter to Ms. Rossi. I agreed that Mr. Such should report the issues to Ms. Rossi; in fact, I welcomed Mr. Such referring the issues to Ms. Rossi because I wanted Mr. Wall to cease and desist his harassment. *See* **Exhibit J** (a copy of the handwritten *Cease and Desist* letter that I hand delivered to Mr. Wall on October 17, 2013). That was before I learned that Ms. Rossi is incapable of being fair to me because she cannot appreciate that a Black/African American male can be victimized by a White person, especially a White female.

Mr. Such, however, **failed to interview any witnesses**, like Ms. Rossi, but charged me with being an active instigator in the conflicts caused by Mr. Wall and Ms. Prieto. At all times this was unfair and discriminatory. To be sure, Mr. Such would have discovered, i.e. had Mr. Such interviewed Nelson Garces, e.g., that Mr. Wall was not present when Mr. Such directed me to enter the subject search string into the East search tool. Mr. Such would have discovered that I subsequently asked Mr. Garces what the search term parameter "AD" meant. Mr. Such would have discovered that it was Mr. Garces who shared the events with Mr. Wall, and not the complainant Gregory Royal. And Mr. Such would have discovered that Mr. Wall took that simple question to an entirely different gross and wanton malicious level of harassment, a repeated harassment.

As stated above, Mr. Wall repeatedly harassed Gregory Royal about a simple question for more than a week despite Mr. Royal repeatedly asking Mr. Wall directly to stop his harassment. Mr. Royal actually told Mr. Wall on numerous occasions, "Vince, please stop it; you are harassing me."

Despite Mr. Royal's repeated requests to Mr. Wall, Mr. Wall continued and escalated his intentional harassment up to writing defamatory and libelous statements about Mr. Royal on a Whiteboard before the class. Mr. Wall used Mr. Royal's name without Mr. Royal's consent to libel and defame Mr. Royal in Mr. Royal's profession as a new patent examiner. Herve Assouman is also a witness to Mr. Wall's harassment. *See* **Exhibit J**.

Further, if Mr. Such had interviewed the numerous witnesses that Gregory Royal had informed Mr. Such about, the witnesses who witnessed Ms. Prieto's incessant harassment, tormenting, physical threats of violence, and physical assault battery against Gregory Royal (as discussed above), Mr. Such would have also discovered that Gregory Royal was not an active instigator of any conflicts.

Mr. Such, like Jessica Rossi, failed to comprehend and appreciate that it is unfair and also against the prohibitions and spirit of Title VII to punish the victim, Gregory Royal. Mr. Such and Ms. Rossi incorrectly and unfairly gave Gregory Royal a poor rating in the December 19, 2013 Evaluation of Gregory Royal.

44

Initials ___/s/ GAR_____

As an Adverse Action against Gregory Royal, Mr. Such and Ms. Rossi rated Mr. Royal as a "1 Needs Improvement" for the "16. Ability to interact with coworkers" category on page 2. And at the "Month 3.5" field on page 3, Mr. Such and Ms. Rossi justified their rating of "1" with: "The examiner should be mindful of his interactions with coworkers in order to avoid further instances of contentious interactions from occurring."

At the time of the rating, I shared with Mr. Such that his rating was unfair. I likened Mr. Such and Ms. Rossi holding me, the victim, as a contributor to be unfairly and unconstitutionally requiring and forcing me to sit in a hostile environment and to allow Mr. Wall and Ms. Prieto to harass me, to torment me, to threaten me, to disrespect me, and to even beat on and to strike me. Mr. Such and Ms. Rossi were partially the creators and enablers of the December 13, 2013 Incident because both were deliberately indifferent to my concerns and complaints. Both Mr. Such and Ms. Rossi willfully turned a blind eye to my complaints allowing Mr. Wall and Ms. Prieto to continue to attack me, harass me, remain hostile towards me, and to physically beat and strike me.

I shared further with Mr. Such that the rating was unfair via analogy: I believe that the conduct Violeta Prieto (and Vincent Wall) is motivated by racial animus. Their behavior is like those White racists during the desegregation of public schools. There is video footage showing that during the period of desegregation of public schools in America, Black students had to be escorted by police into the schools. While entering the school doors, White racist students called the Black students names, threw objects at them, and even spat on them. The Black students did nothing. The video footage shows this clearly. And I can only imagine that inside of the classrooms it was not much different, similar racist attacks occurred inside of the classrooms.

But I believe that at some point, at least one Black student gathered up courage and may have complained about the mistreatment, especially in light of the fact that Black students were not contributing to the hatred and conflict, other than by being there and being Black. And I can imagine also that there was some White teacher and White Principal who protected and favored those White wrongdoers. The White Officials also likely did not interview any witnesses; they simply faulted the Black students. Those White Officials also likely gave the Black students poor and unfavorable ratings. But what did the Black students do but be Black and demonstrate their brightness and intelligence. Possibly, some of those White students filled with their bigotry and racism also hated the Black students who outscored the White students on their quizzes too. Violeta and Vince are like those White students who attacked the Black students for outscoring them. It would have been very unfair to punish/penalize those Black students for the wrongful and harassing conduct of those White students. That's why this rating is unfair to me. To be sure that this rating and the December 19, 2013 Evaluation stinks of the punishment for my complaining, like those Black students might likely have suffered during the desegregation of public schools, the Evaluation was given to me within six (6) days of my dialing Security on Violeta Prieto to stop her continued harassment and verbal threats. And December 14th and 15th were weekend days.

The December 19, 2013 Evaluation is an "adverse action" against me for reporting the continued hostile environment of Ms. Prieto and Mr. Wall, repeated harassment of Ms. Prieto and Mr. Wall, multiple verbal attacks and threats of Ms. Prieto, and physical assault and battery of Ms.

45

Initials __/s/ GAR_____

Prieto.  Like those White students of the days of desegregation, Violeta Prieto sat in class and intentionally harassed me on a weekly basis. So much so, there are witnesses who testified that she singled me out and bullied me. And I endured this harassment because I want my job and because I knew that the Powers-to-be of the Patent Training Academy would likely punish the African American male, not the White wrongdoers, and so, I endured White bigots' torture, harassment, and violence.  Like other new examiners, I was promised an environment free from harassment, abuse, and physical violence, and Title VII, amongst other laws, afforded me the same protections. But the Patent Training Academy officials not only protected the wrongdoers and browbeat me, these officials not deceptively attempt to cover up the facts of the incidents.

**PTA Director Gary Jones and PTA Deputy Director Deborah Reynolds**:

Gary Jones and Deborah "Deb" Reynolds also acted with a deliberate indifference to my concerns and complaints. The PTA Director and the PTA Deputy conspired to sweep my complaints of harassment, hostile environment, and workplace violence under a rug and to just forget about the victim, Gregory Royal.

Mr. Jones and Ms. Reynolds made rounds to the lab rooms on a weekly basis. Both would walk pass the new examiners' desks and ask "How was everything?" or "How it going?" The two presented the face that they were genuinely interested.

On December 13, 2013, however, Mr. Jones and Ms. Reynolds were both made aware that I had called Security on Violeta Prieto. It is also reasonable for one to believe that the PTO Security Officers and the Federal Protective Service Investigators had informed both that I had complained of harassment in the workplace, workplace threats, and workplace violence, and dangerous weapons being inside of the workplace, knives. One would believe that the PTO security and FPS investigators would have stated that Gregory Royal had expressed a fear and concern about Ms. Prieto having multiple knives inside the workplace and that Ms. Prieto had singled out Gregory Royal and was "**bullying him**." *See* **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident).

Mr. Jones and Ms. Reynolds sat immediately outside of Matthew Such's office during the time period that the FPS Investigators Dearborn and JD Williams interviewed Gregory Royal on December 13, 2013. To be sure, Gregory Royal had to walk directly in frontal view of Mr. Jones and Ms. Reynolds to enter and exit Mr. Such's office (as discussed above).

But having presented the appearance of being genuinely interested in the well-being of new examiners previously, neither Mr. Jones nor Ms. Reynolds subsequent to the investigation and before Mr. Royal moved to his new Technology Center had a concern for Mr. Royal's wellbeing. To be sure that neither had such a concern, on the day of the December 13, 2013 investigation, Mr. Jones and Deborah Reynolds saw Gregory Royal sitting alone in the kitchen area, but neither approach Gregory Royal to ask "How was everything?" or "How it going?"

On January 27, 2014, Gregory Royal sent emails to Mr. Jones and Ms. Reynolds not only requesting to conference and meet with them but also informing both that workplace violence had occurred within the Patent Training Academy. But as the PTA Director and PTA Deputy

46

Initials   /s/ GAR

Director, Mr. Jones and Ms. Reynolds intentionally failed to even respond to Gregory Royal's request. Neither was concerned about workplace violence at the PTO.

Mr. Jones and Ms. Reynolds subsequently stopped speaking to Gregory Royal after the December 13, 2013 incident. On two separate occasions, Gregory Royal walked passed Mr. Jones and Ms. Reynolds in very close proximity. Mr. Royal greeted each by first name in a voice sufficient each to hear Mr. Royal's greeting. Both ignored Mr. Royal, instead both put their heads downward facing the ground. One may likely state that Mr. Jones and Ms. Reynolds did not hear Mr. Royal's greeting. However, Gregory Royal's voice is strong enough to get a person's attention without the use of any microphone.

I consider Mr. Jones and Ms. Reynolds' subsequent refusal to greet me to be an adverse action. When superiors in high positions take a position of casting out a low-level employee, even if the superior is not expressly defaming the low-level employee, when other superiors to the low-level employee but at lower levels to the PTA Director and PTA Deputy Director observe the casting out and casting aside of that low-level employee, those superiors to the low-level employee but subordinates to the PTA Director and PTA Deputy Director will more likely than not also cast aside the low-level employee as a "Scarlet Letter."

**Kevin E. Lewis**:

On April 29, 2013, I was forced to send Head of PTO Security Kevin Lewis an email because Violeta Prieto had continued to harass me and to attempt to cause conflict. *See* **Exhibit B** (a copy of an email chain wherein I request that Mr. Lewis review a video possibly recording Ms. Prieto's continued harassment). On or about April 23, 2014, Ms. Prieto had waited for me to exit the Randolph 00A10 large lecture room located on its concourse. Ms. Prieto had stalked me down the hallway, and she attempted to force physical contact. I was forced to adjust my person to avoid Ms. Prieto's attempted second battery. Via email, I requested that Mr. Lewis review video surveillance to observe Ms. Prieto's continued harassment within the workplace. Michael Sally of the EEOD was *Cc*'ed in the emails. On April 25, 2014, I had sent Jennifer Ware, Human Resources, a similar and original email. *See* **Exhibit B**.
Both Kevin Lewis and Jennifer Ware failed to respond to and failed to send any summary of any investigation related to my April 29, 2013 and April 25, 2013 request and complaint. Mr. Lewis and Ms. Ware were simply going to continue with a just ignore him and he'll get the message and go away approach to all of my complaints of discrimination, harassment, hostile environment, workplace threats , dangerous weapons, and workplace violence by Violeta Prieto. *See* **Exhibit B**.

**December 13, 2013 Incident Report Summaries**:

As part of my Informal Interview with Michael Salley of the EEOD, I was provided with the December 13, 2013 Incident Report Summaries of SekTek, Inc., Class Manager Jessica Rossi, and Human Resources Jennifer Ware. I do not yet have a copy of the Report Summary from the Federal Protective Services.
All of the Reports are **fraudulent in the intentional deliberate and/or malicious omission** of the fact that I told each of the above that I had been physically assaulted and battered inside of

47

Initials   /s/ GAR

the PTO. At all times material, I told each of the SekTek, Inc. Security, Federal Protective Services, Human Resources Jennifer Ware, and Class Manager Jessica Rossi that **Violeta Prieto had slapped me in the workplace and Ms. Prieto had engaged in workplace violence on multiple occasions**. I named witnesses to the events.

All of the reports intentionally fail to state that actual size of the knives, and one or more fail to state the location that Ms. Prieto kept her four knives, as I alleged to each of the named PTO officials or entities. At all times material, I told each of the above named that Ms. Prieto kept a total of four (4) knives—i.e. two knives each having a blade of four (4) inches, a stainless steel standard butter knife, and a knife having a blades of six (6) blade inches.
Further, at all times material, I informed each of the above named individuals/entities that Ms. Prieto kept her knives out in the open, for all to see, on top of her desktop. I shared that MD Rahman (as well as other examiners) witnessed the knives.

All of the above-named individuals or entity has intentionally and deliberately omitted my allegations and statements from their reports to favor Ms. Prieto, a White woman, over me, a Black/African American male, each discriminates against me.

### SekTek, Inc. Incident Report

To avoid expressly stating that actual size of the cutting and stabbing blades of Ms. Prieto's knives, the SekTek, Inc. Officer intentionally omitted the actual sizes of the cutting and stabbing blades alleged by me when I stated that the cutting and stabbing blades of two knives each having blades of four (4) inches and a cutting and stabbing blade of six (6) inches. *See* **Exhibit C** (a copy of the SekTek, Inc. Incident Report of the December 13, 2013 incident).

At all times material, the SekTek, Inc. Officer knew of, or should have be aware of, the 18 USCA § 930 prohibition against knives of having a blade of greater than 2.5 inches. At the time the SekTek, Inc. Officer, who reported first to the Carlyle building and met me in its lobby, interviewed me, I told that Officer that I had measured the cutting and stabbing blades. More so, on the intentional cover-up, I specifically and expressly told this Officer that during two previous occasions, with the latter incident occurring during the prior week, **Ms. Prieto had not only physically and violently threatened me on multiple occasions but that she had actually physically slapped me**. I demonstrated how Ms. Prieto had threatened me and how she had slapped me. I told this Officer that there were witnesses to each incident, i.e. Didarul Mazumder and Alam R. Mohammed.

Moreover, I specifically and expressly informed the Officer that the attacks by Ms. Prieto were not just mere conflicts or clashes of different personalities. I shared with that Officer my belief that Ms. Prieto was at least a bigot, and likely a racist, because she could not digest and palate the fact that I scored higher on the quizzes.

SekTek, Inc. has intentionally and deliberately omitted my allegations from its report. Under the spirit of Title VII, it is fair that my allegations of workplace violence and the severity of the knives be included accurately in any report, **at least include my allegations**.
SekTek, Inc.'s failure to, at the very least, include my allegations has caused me to fear for my

48

Initials __/s/ GAR____

safety within the PTO. Its omission also prevents me from filing subsequent reports because I have experienced that the Officer could abuse his or her discretion and report my statements as he or she desires and not as I alleged. The Security Officer abuse his discretion.

**SekTek, Inc., on December 13, 2013, failed to offer me the opportunity to make a written statement under oath. At no time did SekTek, Inc. offer up any opportunity to submit a written statement related to Violeta Prieto slapping me.**

To be certain that SekTek, Inc. has discriminated against me because of my gender and race, as it relates to the December 13, 2013 incident and my complaints of workplace violence, any related federal or state law statute of limitations has not yet lapsed. Thus, there is absolutely nothing preventing SekTek, Inc. from accepting a written statement under oath from me that Ms. Prieto threatened and slapped me in the workplace.

The City of Alexandria police evade the same by stating that the Alexandria police lack authority to act because Ms. Prieto slapped me on federal grounds.

SekTek, Inc. failed to treat me fairly under Title VII and under 42 U.S.C.A. § 1983 when acting under color of law, it failed to extend equal protection to a me, a Black male, in order to cover up the criminal acts of and protect Ms. Prieto, a White female.

The discrimination has caused me mental, emotional, and physical distress including but not limited to inability to focus on my job duties, headaches, depression, sleepless nights, etc.

**Jessica Rossi Incident Report**
**Friday, 12/13/13**
**Jessica Rossi was not present at the time of the investigations.**

As I have stated above, Jessica Rossi exploits her tenure, grade, and position within the PTO to maliciously and intentionally slander, libel, and shed me in a false light.
First and foremost, Ms. Rossi's entire summary of the events on December 13, 2013 is hearsay, hearsay without an exception under Federal Rules of Evidence (FRE). Ms. Rossi was not present at the time of the investigation. Moreover, Ms. Rossi is allegedly repeating what someone else told her. Thus, her account of the events are not only "double hearsay" but grossly inaccurate.

Ms. Rossi intentionally, deliberately, and maliciously omitted my allegations and statements made to her on December 16, 2013 that **Ms. Prieto had not only physically and violently threatened me on multiple occasions, but that Ms. Prieto had actually physically slapped me**.

First, Ms. Rossi is incorrect in her hearsay statement about why I actually called security. Contrary to Ms. Rossi's incorrect statement, I called security because on November 7, 2013, Ms. Prieto had physically threatened violence against me (as partially witnessed by Didarul Mazumder); and about one week prior to December 13, 2013, Ms. Prieto had violently and aggressively **slapped me** (as witnessed by Alam R. Mohammed, who sat immediately adjacent

Initials ___/s/ GAR_____

001332

to me while Ms. Prieto attacked and slapped me); and on early morning December 13, 2013, Ms. Prieto was continuing her verbal attacks and overly aggressive and violently behavior while she had two knives each having a cutting and stabbing blade of four (4) inches. **Because Ms. Prieto was clearly escalating the intensity, severity, and frequency of her violent attacks, I called Security**.

Ms. Rossi's ignorance to the facts of the December 13, 2013 incident can be seen in Ms. Rossi being in error as to the number of knives, "which Ms. Rossi refers to only as 'pairing knives' [sic] instead of "paring" knives, i.e. knives having cutting and stabbing blades of four (4) inches. The FPS Investigators removed **only two (2) paring knives** having four (4) inch blades from Ms. Prieto's desktop—*emphasis added*—kept on the actual top of Ms. Prieto's desk. However, I have at all times stated that Ms. Prieto kept a total of four (4) knives on top of desk. I informed Ms. Rossi that MD Rahman was, at least, one witness who saw Ms. Prieto's knife having a blade of six (6) inches.

Matthew Such also saw the long knife of Ms. Prieto. I complained early on to Mr. Such about Ms. Prieto having such a long knife inside the workplace while at the same time repeatedly acting out her hostility and violence on a weekly basis. Mr. Such acknowledge that he had seen the long knife. Mr. Such also questioned why Ms. Prieto needed such a "big knife" to cut a pomegranate.

Ms. Rossi discriminates against me by downplaying the size of Ms. Prieto knives, denying and omitting my actual statements, and downplaying my fears of Ms. Prieto not only having multiple knives inside the workplace but also acting violently and having slapped me.
Racial and gender discrimination: Accordingly, my complaint is brought exactly because, inter alia, the PTO/PTA officials, the Federal Protective Services and SekTek, Inc. Officers and Investigators discriminated against me based upon my gender and race.
One of the possible problems with giving police officers "discretion" is that some "**abuse their discretion**." E.g., neither SekTek, Inc. nor FPS took pictures of the blades of the knives, at least. Foolishly, I did not take pictures of the knives because I mistakenly believed that, at the USPTO, I would be treated fairly and not discriminated against despite being a Black/African American male.

**Federal Law, i.e. 18 USC § 930, prohibits knives having blades over 2.5 inches, thus, Ms. Rossi's thoughts and perceptions about Ms. Prieto's knives are without value and meaningless**.

**Friday, 12/16/13**
**Second paragraph**: Ms. Rossi's characterization of my fears is incorrect as discussed above and throughout my affidavit.
Ms. Rossi has also intentionally, deliberately, and maliciously omitted my allegations of the **actual sizes** of the cutting and stabbing blades Ms. Prieto kept out in the open on top of her desktop. I specifically and expressly informed Ms. Rossi that Ms. Prieto had kept a total of four (4) knives out in the open and on her desktop's top—two knives each having blades of four (4) inches and a cutting and stabbing blade of six (6) inches.
On December 13, 2013, the FPS only found two of the knives that I had complained about. As I

50

001333

have stated in various communications, I later saw in a Tupperware bowl I knew to be Ms.
Prieto's the knife having the blade of six (6) inches.

I have exhausted myself and become very sickened and ill informing all officials that MD
Rahman saw the long knife as well as Matthew Such (and other examiners). But no one wants to
seek out the truth because all are protecting a White female and discriminating against the Black
male.

This discrimination has caused me mental, emotional, and physical distress including but not
limited to inability to focus on my job duties, headaches, depression, sleepless nights, etc.

**Third paragraph**: Ms. Rossi shows her true colors here, and she is merely trying to cover her
discrimination and racial animus. The fact is that I called police, therefore there was no reason
for Ms. Rossi to seem to be given me allowance to dial Security.
Ms. Rossi only made the statement because she believes that I should not have called Security.
In a passive-aggressive, disingenuous manner, Ms. Rossi expresses her predilections and
prejudices and her disappointment that I called Security. Ms. Rossi discriminates by acting with
such a racial animus that she thinks that she knows what goes on inside my head and thoughts.
Ms. Rossi has judged herself whether I should have had any fear about Ms. Prieto sitting directly
behind me, having acted violently on multiple occasions, and having as Ms. Rossi describes the
knives "pairing knives." The mere fact that Ms. Rossi made such a statement when I had called
Security demonstrates her racial animus against me.

Ms. Rossi's statement, in fact, defeats her excuse and pretext. Ms. Rossi stated that "security
puts their life on the line every time they respond to a call." Understandably if FPS was acting in
"hot pursuit" roaring and rushing through traffic there was risk. However, when I called
Security and PTO security spoke to me, I informed PTO security that I would wait for them
downstairs in the lobby, five floors between Ms. Prieto and me. Reasonably, PTO security
relayed such information to FPS. To be sure, when FPS arrived, they were not roaring/rushing
into the building like fireman attempting to save a newborn baby from a blazing fire.
Ms. Rossi's statement defeats her pretext because if Ms. Prieto was not dangerous with her
knives as Ms. Rossi wants to portray, the FPS Investigators' lives were not on the line, as Ms.
Rossi charged.

Absolutely not, Ms. Rossi sat there in Matthew Such's office in her position of authority and
discriminated and stereotyped me as a Black male, a six-foot, medium build Black male.
My basis, in part, for my complaint of discrimination is based upon my gender as a male and my
race as an African American/Black man. In Ms. Rossi's view, because I am a Black male and
Ms. Prieto is a White female. Even with Ms. Prieto having slapped me and having insane habits
and possessing multiple knives, Ms. Rossi believes that I had no right to call security.

**Ms. Rossi made her statement because Ms. Rossi believe that I had no right to call security.
That is, Ms. Rossi is filled with such racial prejudice that she believes that it is only up to
her to decide when I should ever call Security.**

To note, I clearly and explicitly explained to the dispatchers and officers and investigators that
Ms. Prieto had physically and violently threatened me two weeks prior, physically slapped me

51

Initials    /s/ GAR

one week prior, and continuing in her violent behavior that very moment with knives on her desk. Security and FPS were aware before departing the nature of the call.

**Having browbeaten me during the December 16, 2013 meeting, Ms. Rossi intentionally and deliberately omits that fact that I defended against her charge that I should not have called security by stating, "What Jessica . . . do I have come staggering into your office bloody and bleeding to death with one knife stuck in the side of my neck, another knife stuck in the back of my head, and a third knife stuck in my back for you to understand my reasoning and fear for calling the police?"**
**Ms. Rossi omits the fact that the discussion was so intense and contentious between us that**

**I ended my defense stating, "Jessica, you can mistreat me and discriminate against me if you want to, but if Violeta comes at me inside that lab with one of her knives, only one of us is walking out of that lab. I promise you that**."

Ms. Rossi has omitted this important fact from her summary. Ms. Rossi has deceptively and intentionally omitted that the fact that I was very upset by Ms. Rossi even suggesting when I should or should not call Security when Ms. Prieto has multiple, a total of four (4) knives inside of the workplace, and Ms. Prieto had continued numerous attacks upon me without any hesitation or fear from discipline.

Accordingly to Ms. Rossi's passive-aggressiveness, the U.S. Constitution stops at the doors of the USPTO, and I have no constitutional right of self-defense, which would include first calling Security.

I had also told Ms. Rossi that Violeta had forced me to bring an old keyboard into the lab and put on my desk that I would use to defend myself against Violeta by keeping distance between us using the keyboard. I cannot remember exactly but MD Rahman or Didarul Mazumder had seen the keyboard sitting on top of my desk and questioned me about it. I simply replied, "Oh, I must bring that home someday."

Being a professional, instead of allowing Ms. Prieto (and Mr. Wall) to cause me to drop to their level of unprofessionalism and even violence, I remembered my familial upbringing, and I stayed my hurt and pain. I decided to just call security as soon as Ms. Prieto engaged in any violent behavior again. She did so early December 13, 2013 morning.

FACT: Gary Jones and Deborah Reynolds saw me sitting in the pantry kitchen because I was staying away from Violeta Prieto because she had again acted with hostility and violence. I had moved out of the lab because I could not focus on my work.
After stewing over the fact that Jessica Rossi and Matthew Such or the PTA administration were not going to properly address Ms. Prieto or Mr. Wall, I called security so that I could sit at my desk and not have to worry and be fearful and paranoid that every time I hear that crazy Violeta Prieto move abruptly that she may be moving to stab me in my back.

**Having to sit here and type this affidavit after all the hurt and pain I have been through in that Patent Training Academy which not only prevented me from being able to focus and**

52

Initials __/s/ GAR__

do my job as a patent examiner, but it has scarred me with serious hurts and pains. The PTA administration and Human Resources refusal and failure to deal with Ms. Prieto (and Mr. Wall) fairly and appropriately has damaged me, and stolen my happiness, etc. I have been at work for three days straight without going home or going to sleep because the hostile environment has caused me to suffer bouts of insomnia. I am now in Employee Assistance Program because of the hurt and pains cause to me.

And I am now burdened with clearing my name and reputation because the PTO officials choose to cover-up Ms. Prieto's violence by slandering, libeling, and shedding me in a false light as a troublemaker and the wrongdoer.

Jessica Rossi, Jennifer Ware, Gary Jones, Deborah Reynolds, and Matthew Such, I am not some animal to be beaten and mistreated, I too have feelings, even if I am, for Jessica Rossi, a Black/African Americna male. All have and are discriminating against me.

**Fourth paragraph**: As stated above related to Matthew Such's approach. Ms. Rossi's approach is also similar to a White racist teacher or principal punishing a Black student entered into a White public school during desegregation because racist and/bigoted White students harassed, tormented, and hit and beat the Black student, who outscored her and reported her violence. In Ms. Rossi's view, I am supposed to sit and allow Ms. Prieto and Mr. Wall to not only abuse me on a daily basis but also beat and physically slap me without complaint. Well, the U.S. Constitution does not stop at the USPTO doors, the federal law affords me a right of selfdefense, and protected right to report Violeta Prieto's violence.

Ms. Rossi has yet to produce any witness except Ms. Prieto and her coconspirators as a witness, if that. (Lisa Kleine, the investigator, in my complaint has forbidden me from conducting my own investigation, i.e. going about asking lab members for statements. I bear the burden of proven that I have been discriminated against, but Ms. Kleine gets to pick and choose the witnesses she wants to interview and at the same time shy away from asking questions that cut to the heart of my complaint to the PTA officials.)

**Fifth paragraph:** Ms. Rossi failed to properly address Ms. Prieto. Ms. Rossi failed to do her job, along with Matthew Such. Ms. Prieto, therefore, was enabled and empowered to continue her harassment and intentional torture. The Lab 11 class witnessed Ms. Prieto's harassment during each lecture. *See* **Exhibit C** (a copy of the SekTek, Inc., Incident Report of the December 13, 2013 incident), e.g. Ms. Rossi deceitfully misrepresents my statement to cover up her failure to correct Ms. Prieto. A review of the submitted emails and documents submitted by me to Human Resources and EEOD show and prove that I stated **Ms. Prieto seemed to have stopped her harassment and torture for about a week**, not for a few weeks.

Ms. Rossi's deceitful statement is solely an attempt to shed liability, it's a pretext. *See*, *e.g.*, **Exhibit E** (a copy of emails sent to Bismark Myrick of EEOD and Jennifer Ware of Human Resources)(stating: I did not find another email for the chain as I had believed. Thus, it appears that things actually got better for a period of time because I brought the matter before Matt Such, Supervisor PE. Obviously, it did not get better because of Violeta being aware that I had escalated the matter to Jessica Ward. Nonetheless, the issue is still that I had to resort to bringing in a supervisor to get the same courtesies that I have extended to Violeta. She ceased to interrupt and harass me for a short period of time before beginning again. As I stated, if you talk

Initials   /s/ GAR

to enough lab members, I believe strongly that the facts would allow one to conclude that Violeta continues to harass me via the lectures. She is intentionally malicious. I have expressed my disapproval on numerous times by first simply informing her "not to interrupt me and not to tell me to 'shut up'" and in strong enough tones of voice for her to unequivocally get the message that I did not appreciate her conduct. Despite each attempt to communicate my absolute disapproval of the harassment, she continued her attacks even laughing after telling me to "shut up" and subsequently turning to look at Vince Wall for approval. Even if she is aware that she can annoy and harass me, her doing so only proves that her acts have been intentional and calculating.).

Ms. Rossi attempts to misconstrue and exploit my conception of what a "short period of time" means in a training period lasting only four months. On October 18, 2013, I write to Mr. Such asking him address the class in a general sense because of someone telling me to "shut up." That someone is Violeta Prieto. I tried to keep Ms. Prieto's violence at a minimum because she had multiple knives inside of the workplace. *See* **Exhibit L** (a copy of my October 18, 2013 email asking Matthew Such to remind class of lab rules and courtesies within the lab room)(stating:

I would like for you to please take a moment and remind the entire class of the
rule regarding respect (e.g., telling another to "shut up" is rude) for lab members
and the "one at a time" requirement. I believe that a reminder is likely necessary
just to facilitate an environment more conducive towards each PE learning. Would you please
take a moment to do this whenever you deem appropriate? Thanks very much.).

And on November 7, 2013, and I write again to not only Matthew Such but I escalate the attention to Ms. Prieto's violence in the workplace desired to Ms. Rossi. *See* **Exhibit W** (a copy of the November 7, 2013 email to Jessica Rossi, formerly known as "Jessica Ward," at 10:02 am and at 11:32 am, which is part of an email chain sent to Mr. Such and Ms. Rossi) (stating: Good day Jessica, May I please have a conference with you? Violeta continues to interrupt me during classroom discussions. She has repeatedly told me to "shut up," which is very rude. She chuckles in doing this. I have expressed my concerns to Matt on several occasions but it has not ceased. I have asked her in very strong tones of voice to cease but she has continued to do so. I do not interrupt her during her questions. It is not her position to chastise me, even if I was not letting Hop (classroom instructor) speak, which I was not. Sincerely, Gregory").

And on December 13, 2013, I called Security for Ms. Prieto because attempts to get fair treatment and equal protection and to get Ms. Prieto to stop her constant hostility, intentional harassment, and violence have failed through contacts with Mr. Such and Ms. Rossi. And during this time that Ms. Rossi intentionally and deceitfully misrepresents to have stopped for a few weeks: from November 7, 2013, when Ms. Prieto violently threatened me physical harm (as witnessed, in part, by Didarul Mazumder) to about a week before December13, 2013 when Ms. Prieto physically slapped me (as witnessed by Alam R. Mohammed) and in between the time Ms. Prieto slapped me to the actual December 13, 2013 Security call, except for about a one week period, maybe, Ms. Prieto continued her verbal attacks, and did so with impunity. To emphasize the seriousness of Ms. Prieto's violence, I am not certain as to whether Ms. Prieto even stopped her harassment at all; or whether, there was about **one week hiatus because I simply did not ask questions or make any statements**. There was about a one week period

Initials ___/s/ GAR_____

001337

where I cannot remember Ms. Prieto acting like a thug inside of the workplace. But, having been berated, cast aside by Ms. Rossi and Mr. Such, and discriminated against by Ms. Rossi in her protection of Ms. Prieto, I am not certain whether I suffered no violence because I had become disengaged from the hostile environment and just went through motions, or whether I was actually free to ask my questions or present answers without Ms. Prieto's attacks. Either way, I was only free for about a week from Ms. Prieto's thuggery.

The fact is that there are witnesses that Ms. Prieto continued in her violent ways. It's incredible that Ms. Prieto is still permitted to work at the USPTO. Without, any doubt or uncertainty, I believe very strongly that if I had acted like Ms. Prieto, I would have been fired. Ms. Rossi would have been the first to suggest that I be fired. Ms. Rossi would have made her suggestion in a New York second.

**Sixth paragraph**: Even if Matthew Such spoke to Ms. Prieto, Ms. Prieto then knowingly, purposefully, and maliciously continued her violence (as discussed above and throughout my affidavit).

**Seventh paragraph**: As discussed above, Ms. Prieto appeared to have stopped her violence for a "short period of time," which for my meaning is about a week. And I am not sure whether Ms. Prieto stopped her violence or I had become disengaged from the entire training program because of the hostile environment. That is, if I sat and did not answer any questions, did not ask any questions even if I need clarification for my job duties, Ms. Prieto could not tell me to "SHUT UP!"

Ms. Rossi would likely find such docility and/or complacency on my part to be an acceptable form for a Black/African American male, similar to that of a slave. Ms. Rossi stood before the September 9, 2013 class and stated that there was no "dumb question." Ms. Rossi, however, as well as Mr. Such, found problematic my asking complex questions. Mr. Such called me into his office and asked me not to ask questions that were above the class level of understanding. Apparently, no dumb question was problematic, but my asking question focused upon substantive patent law that Ms. Prieto perceived to be too complex was problematic.

If Ms. Prieto had stopped her violent attacks, perhaps, she could have and would have learned something from my questions. But Ms. Prieto's bigotry prevented her from being able to even sit and listen, or at the very least remain courteous.

**Eighth paragraph**: Ms. Rossi deceptively lumps multiple instances together to protect Ms. Prieto. First, it's simple. Compare my quiz scores with Ms. Prieto's score while inside of the training academy. Second, as discussed above, I have stated and explicitly so that Vincent Wall and Ms. Prieto are coconspirators in the hostile environment. Ms. Prieto believes that because Mr. Wall is an attorney, Mr. Wall telling her and motivating her to continue her harassment and attacks puts her in the right.

On multiple occasions, as stated above, Mr. Wall stood in the middle of the aisle within the lab room and shouted very loudly so every could hear him, specifically me, "Violeta, I wouldn't want to mess with you; you got a knife." Ms. Prieto, as a result, increased the number of knives

55

Initials ___/s/ GAR_____

001338