# Exhibit 4

In the Matter of Gregory Royal

Case Number: 14-56-22
Agency: United States Patent and Trademark Office

## JOSEPH THOMAS
## RESPONSIBLE MANAGEMENT OFFICIAL

On October 16, 2014, I was interviewed by the designated EEO Investigator, Lisa A. Kleine. Ms. Kleine explained to me that she was investigating allegations made by the Complainant that he was discriminated against in the form of a hostile work environment on the bases of sex (male) and race (African American/Black) since:

    1.    On or about December 13, 2013, Complainant alleges his complaints of hostile work environment were not taken seriously because he is a "six foot, medium built black man" and the alleged harasser is a white woman;

    2.    On or about November 07, 2013, he was physically assaulted by a white female co-worker;

    3.    On or about December 13, 2013 and continuing Complainant alleges that his harasser has been allowed to continue to violate USPTO policies on workplace safety and conduct by bringing several knives to the workplace and threatening Complainant.

    4.    On or about July 10, 2014, he alleges he was physically assaulted in the workplace by another Agency employee whereby other examiners see him as a "punching bag" to be slapped, and nothing will happen to them for doing so.

    5.    On or about August 14, 2014, during the Patent Examiner Efficiency Exam (Exam), Complainant he was further subjected to a hostile work environment because the Agency failed to take sufficient action2 to prevent him from being subject to a hostile work environment when:

        a. the Alleged Harasser was to be allowed to take the Exam in the same room and the same time as Complainant was, despite the fact that she was moved to a different "Lab" than he was on or about December 13, 2013;

        b. the Alleged Harasser failed to follow the Exam Proctor's instructions to remain silent by approaching the cubicle in front of the one where Complainant was seated and began a "loud conversation" with another employee, and she "did so solely to annoy [sic] Complainant's focus" and "under the cloak of being social," the Alleged Harasser sought to disturb Complainant's focus for the Exam; and

        c. When the Exam Proctor spelled the name of an employee Complainant believes to be "Islamic" due to his name being "Mohammed," another employee was allowed to mock, not for the first time, those of the Islamic faith.

1

Initials J.T.

6. On or about September 4, 2014, Complainant was removed from federal service during his probationary period, including being publicly escorted from the Agency's Alexandria, Virginia headquarters by Agency security guards.

II. Whether Complainant was discriminated against in the on the bases of sex (male) and race (African American/Black), and reprisal (retaliation for engaging in protected EEO activity) when on September 4, 2014, Complainant was removed from federal service during his probationary period.

I was advised by Ms. Kleine of my rights as a witness/party in an EEO case, and was informed that my statement would and may be reviewed by the agency, the Office of Equal Employment Opportunity and Diversity and other interested parties, in the context of this claim. I have also been advised that there is no assurance of confidentiality as to the testimony given herein. I was also advised that I had the right to have a representative assist me in these proceedings, but chose not to.

The following represents a true and accurate summary/statement of the information that I provided to Ms. Kleine.

1. Please state your full name and identify your sex, race and prior EEO activity. If prior EEO activity, please state the nature of such involvement.

Joseph R.F.A. Thomas. Sex: Male. Race: Asian descent, National origin: from India. I have prior EEO activity as the Responsible Management Official (RMO) for a previous discrimination claim.

2. Please indicate your current position, your grade and step, the name of your current supervisor, and the length of time you have been in your current position.

I am a Director of Technology Center (TC) 2800. I am part of the Senior Executive Service (SES) and have been in this position since 2011. My supervisor is Robert Oberleitner.

3. How many Directors are there for Technology Center 2800?

There are four Directors.

4. Please describe your duties and responsibilities in your current position.

I oversee the first line supervisors in my division within TC 2800. I also am the second line authority in my division for reviewing actions such as promotions, within grade increases, and any type of action that a first line supervisor proposes, including disciplinary actions such as removals and discharges from service.

5. Do you know the Complainant in this matter Gregory Royal, and if so, explain how you know him.

Yes. I oversee Complainant's first line supervisor, Lisa Caputo.

6. Had met in him in person prior to his discharge?

Yes, I had met Complainant in person prior to his discharge. I believe the first time that I met Complainant was about a month after he was hired (he had been hired in September 2013). As a Director, I typically go to meet the new class of patent examiners at the Patent Training Academy. There was a formal session called "Directors' Expectations", and I had met him at that session.

7. Do you know the Complainant's race? How do you know his race?

Yes, I believe that Complainant is African American by visual perception.

8. Do you know Complainant's sex, and if so, how do you know his sex?

Yes, Complainant is male. I know this by visual perception.

9. Prior to receiving notice from the investigator, when was the first time you were aware that Complainant had an EEO matter pending, and how did you obtain that information?

To the best of my knowledge, Complainant transitioned to the TC in December 2013. There was an incident in May or June of 2014, when his supervisor informed me that Complainant indicated that he would file an EEO complaint. I did not know the extent of his EEO complaints until I received the email from the investigator.

10. What role did you have, if any, in the decision to terminate the Complainant during his probationary period?

My role was to make the decision on retaining or discharging probationary employees, including Complainant. I decided on termination based on consultation with Complainant's supervisor and a review of Complainant's performance.

11. What factors did you take into consideration in making your decision?

I looked at Complainant's performance for the entire period he was a probationary patent examiner. Also, I looked at how Complainant had performed since I had a meeting with him and his supervisor in May 2014.

12. What about his performance was problematic?

I personally met with Complainant in May 2014, because of concerns about his low levels of productivity and his low levels of work products that had been generated over the course of his initial eight months. My expectation of probationary employees is that, beyond the first year, they will be successful in all of their performance appraisal plan elements. One of those

3

Initials J.T.

elements is productivity. At the time that I initially met with Complainant in May 2014, his productivity was very low.

13. What do you remember about meeting with him in May?

In my meeting with Complainant and the supervisor in May 2014, I expressed concerns about his low levels of productivity. I asked if he needed any assistance. I let him know that if there were any resources he needed, or any training needed, or access to a primary patent examiner, he needed to let us know. I emphasized that we would be looking at the next three months for his performance to be at a level that would indicate to me that he would be fully successful after a year.

14. How did Mr. Royal respond?

Complainant seemed to indicate that he was fine with the assistance he presently had. He indicated that certain things were taking longer than anticipated. He mentioned some unusual cases he had been working on. Complainant's supervisor, who was also present in this meeting, indicated to Complainant how to address the issues he raised on these cases.

15. Do you have any notes from meeting?

No I do not have any written notes. It was a verbal communication.

16. What happened during that three month period regarding Mr. Royal's productivity?

Complainant's productivity had increased, but the number of work products did not increase. He had also been approved leave from the office for some hours, which decreased his examining time. That may have contributed to a higher productivity number.

17. Explain the difference between productivity and work product.

Work product measures how many cases a patent examiner has reviewed and analyzed. This typically involves assessing patent applications for compliance with legal requirements and completing a technical review of prior art references. Productivity is, when given a set number of examining hours, what is the expected amount of work product a patent examiner is required to do.

During a 2 week period, if a patent examiner has less examining hours, the amount of work needed is generally less, and that is reflected in the bi-weekly productivity measure, which takes into consideration training time and various types of leave.

18. How, if at all, did his conduct factor into his retention decision?

I did consider Complainant's conduct in making my decision. I noticed that it appeared that Complainant was not getting along with others. In the time that he was in the TC, there was an incident in June or July 2014 with another examiner. Complainant's supervisor informed me

4

Initials J.T.

that something happened between Complainant and another employee in TC 2800. From what I had heard of the incident, prior to going to his supervisor, Complainant had been involved in email exchanges with the other employee. Later, when Complainant did report it to his supervisor, he did not want to make a statement to security officers, when offered the opportunity to do so. Later, he changed his mind and did issue a statement to a security officer.

19. Did you know about any prior incidents with other employees?

I was told about an incident in the Training Academy when Complainant directly called the Federal Protective Service (FPS) because another person in the training class had what Complainant thought was an illegal weapon, a knife. To the best of my understanding, when FPS did come and look into the matter, it seemed like the other employee was using a paring knife to cut fruits. A decision was made by the Director of the Patent Training Academy to separate the two individuals and I was contacted to see if the TC would be willing to accommodate an early transition for Complainant. I agreed and Complainant transitioned to TC 2800.

The second incident I was made aware of by Complainant's supervisor was that he had issues with completing a suitability determination investigation. Since he failed to complete it, I was contacted by both Complainant's Supervisor and someone in Human Resources (HR). I was told that if Complainant's suitability determination investigation was not completed, he could not continue his employment with USPTO. I set up a meeting with Complainant in April 2014, and told him that he needed to prioritize the completion of his suitability investigation. Complainant asked me if the suitability investigation was due to his call to the FPS while he was at the Patent Academy. I told him it was totally unrelated and that it was a process for every new employee. He seemed to understand and completed the required investigation.

20. Were these incidence factors in your decision not to retain Mr. Royal?

They were factors, but they were secondary to the overall concerns with his work performance that I observed. When I make such a decision, my routine is to contact HR to let them know of my decision. In this case, HR recommended to me that we follow a particular protocol when informing Complainant that he was no longer being retained, and I agreed.

21. What was the protocol in this instance?

They recommended that a security representative be present and they also recommended that a representative from HR be there to let Complainant know about his options.

22. Was this normal protocol?

Having a representative from HR present during a termination of a probationary employee is normal protocol. Having security present is not the typical protocol, but that is not uncommon. It is a practice that has been followed whenever there is a concern that an employee may potentially have a hostile reaction to being notified that they are not being retained.

5

Initials J.T.

23. In this instance, why did you believe security personnel might be warranted?

I believed security personnel might be warranted based on the previous incidences where Complainant had indicated that FPS may be needed, and based on fact that HR had had other interactions with Complainant, which seemed confrontational. Since I had, on several occasions, requested that security be present during employee terminations, I agreed to follow the same practice in this instance.

24. How did the meeting go?

Complainant did not appear at the appointed time. He came 25-30 minutes later than anticipated. He had kept all those present in my office waiting. When he came in, I delivered the letter, told him of the decision, and further told him HR was there to discuss his options. Complainant asked for names of everyone in the room, which was provided. Complainant then told me he was improving, and that this was not the right decision for me to make. He asked for another chance. He also asked whether this decision had been made because of the December 2013 incident.

I told him that while I understood his concerns, my decision was based on his overall performance and based on the reasons set forth in the letter. I referenced that his behavior over the course of his probationary period was not in accordance with someone operating in a professional environment. Due to time constraints, I had to leave for another meeting. He was still talking to me as I was preparing to leave. I reiterated that I had made my decision, and he could discuss his options with HR in the room.

25. What documentation was provided in the file to make determination regarding his retention?

The documentation provided included performance and productivity documents, including evaluations given at regular intervals (4, 6, 8 months), which is customary for all probationary employees.

26. Was there anything about conduct in his file?

There was no specific documentation on conduct. However, I will say that in the employee evaluation form for probationary employees, there are several items which are related to conduct, including the ability to interact with co-workers. Complainant had been given notice this was a problem prior to the termination.

27. Do you have any reason to believe that Complainant was discriminated against on the basis of his race or sex when he was terminated from his employment?

No, I have no reason to believe Complainant was subjected to discrimination based on his race or his sex.

6

Initials J. T.

28. Do you have any reason to believe that he was terminated in retaliation for his EEO activity against the Agency?

No, I have no reason to believe that Complainant was terminated in retaliation for EEO activity against the Agency.

29. Why not?

As stated above, the basis for Complainant's termination was his low level of performance, his low number of work products, and his inability to interact with co-workers effectively. Based on these factors, I did not have much confidence that Complainant would be successful as a patent examiner at the USPTO.

30. Do you have any reason to believe that he was being harassed by his co-workers?

No, I do not have any direct knowledge of Complainant being harassed by co-workers. It was conveyed to me in December 2013 by the Director of the Patent Training Academy that there had been allegations made by Complainant. Since I had not witnessed such incidents, it was my understanding these allegations had been investigated and that there was no conclusive evidence that there was co-worker harassment going on. Regarding the second incident in June/July 2014, Complainant's supervisor told me Complainant felt harassed. However, when given the opportunity to provide a statement to document the harassment, Complainant initially refused, but reconsidered and provided the statement sometime later.

31. Was there any investigation into June/July incident?

I don't know that for a fact. Since Complainant did make a statement, I assume that it was investigated. That would be the protocol. However, I have not received any information with regard to that investigation.

32. Do you know anything about any delays in the payment of his vacation benefits following his termination?

No, I do not know anything about delays in the payment of his vacation benefits following his termination.

33. Are you aware of any other witnesses other than those individuals who have been mentioned already?

I am not aware of anyone else that may have direct knowledge of Complainant's claim other than Complainant's trainer at the Patent Training Academy, Matthew Such, or people from HR, Anne Mendez and Katie Griffith.

34. Is there anything else you believe is relevant that you have not been asked?

No, there is nothing else that I can recall that may be relevant, but was not asked.

7

Initials J. T.

001827

35. Did you discuss the contents of this testimony and/or receive any assistance from anyone in the preparation of your testimony? If yes, who?

Yes, I consulted with an Attorney in the Office of General Counsel (OGC).

36. Did anyone from Human Resources (HR) or the Office of General Counsel (Legal) review your Affidavit or assist you with your responses before you signed and submitted your Affidavit to the Investigator? If the answer is yes, please provide the name, position and title of that individual(s) along with the Agency office to which s/he is assigned.

Yes, I consulted with an Attorney in OGC.

I, Joseph Thomas, have read the above statement/affidavit and being duly informed, and understanding the penalties of perjury; duly swear under oath that the statements made in this Affidavit are true and correct, and complete, to the best of my knowledge.

Joseph Thomas, Witness/Affiant

Dated: November 10, 2014

Subscribed and sworn to me this ___10th___ day of ___October___, 2014.

Lisa A. Kleine, EEO investigator, or Notary Public

8

Initials J.T.

001828