# Exhibit 6

**In the Matter of Gregory Royal**

**Case Number: 14-56-22**
**Agency: United States Patent and Trademark Office**

**STATEMENT OF GARY JONES**
**MANAGEMENT OFFICIAL**

On July 7, 2014, I was interviewed by the designated EEO Investigator, Lisa A. Kleine. Ms.
Kleine explained to me that she was investigating allegations made by the Complainant that he
was discriminated against in the form of a hostile work environment on the bases of sex (male)
and race (African American/Black) since:

*1.      On or about December 13, 2013, Complainant alleges his complaints of hostile
work environment were not taken seriously because he is a "six foot, medium built black
man" and the alleged harasser is a white woman;*

*2.      On or about November 07, 2013, he was physically assaulted by a white female
co-worker;*

*3.      On or about December 13, 2013 and continuing Complainant alleges that his
harasser has been allowed to continue to violate USPTO policies on workplace safety
and conduct by bringing several knives to the workplace and threatening Complainant.*

I was advised by Ms. Kleine of my rights as a witness/party in an EEO case, and was informed
that my statement would and may be reviewed by the agency, the Office of Equal Employment
Opportunity and Diversity and other interested parties, in the context of this claim. I have also
been advised that there is no assurance of confidentiality as to the testimony given herein. I was
also advised that I had the right to have a representative assist me in these proceedings, but chose
not to.

The following represents a true and accurate summary/statement of the information that I
provided to Ms. Kleine.

1.      Please state your full name and identify your sex and race.

William Gary Jones. Race: Caucasian. Sex: Male.

2.      Please indicate your current position, your grade and step, the name of your current
supervisor, the length of time you have been in your current position, your Art Unit and
Technology Center.

Director of the Office of Patent Training. I am part of SES. My supervisor is James Dwyer,
Assistant Deputy Commissioner for Patent Operations. I have been in this position since January
1, 2012.

1

Initials

001807

3. Please describe your duties and responsibilities in your current position.

I am responsible for training of all new patent examiners. Since January 2012, USPTO has hired over 2500 new examiners. All new examiners are assigned to the Patent Training Academy (PTA) for new examiner training. We also do other training for supervisors, refresher training, and legal training. It is a one year program for new examiners. They are assigned to the PTA for the first 4 months, so they are our employees for the first 4 months. Then the examiners are transferred to their home Art Unit. My employees very transient. I could have a few to 500 plus. I am responsible for the oversight of training.

4. Do you know the Complainant in this matter Gregory Royal, and if so, explain how you know him.

Yes, I know him because of the December 13 incident. However, I try to visit the labs. His class started September 9. His class had 12 labs with 14-16 new examiners in each lab, a SPE (supervisory patent examiner) trainer, a PTA trainer and a teaching assistant. They are in lab with the new examiners most of the time. I had about 28 labs at that time.

I tried to walk through the labs once a week. With this group, there were too many to get to know each one. Debbie and I tried to visit once a week. I often come to recognize the examiners and generally knew where he sat Mr. Royal sat.

5. Could you have connected a name with a face before the December incident?

Yes. That was just from walking through the lab. Mr. Royal was an outgoing individual and I had just chatted with him. I had had a slight personal interaction with him prior to the December 13. On the second day of lab I spoke with him and he told me about his previous IP experience so I knew his name pretty early.

6. Do you know the Complainant's race? How do you know his race?

I don't know for sure but I would guess African Africa based on observation.

7. Do you know Complainant's sex, and if so, how do you know his sex?

Male. Based on observation.

8. Complainant has alleged he was discriminated against in the form of a hostile work environment on the bases of his race and his sex when his complaints of co-worker harassment were not taken seriously. When was the first time you became aware that Complainant was having difficulty with a co-worker?

On the 13th of December.

9. How were you informed?

2

Initials _____

I got an email from Jessica Ward, the class manager. Jessica Ward was Mr. Royal's second line supervisor. His first line supervisor was Matthew Such. I received an email saying something about knives on the desk, that Mr. Royal had sent.

As soon as I got that, I walked up to the labs. I went in and neither examiner at his/her desk. I observed a paring knife on Ms. Prieto's desk with fruit, and a plastic knife like you would get in a cafeteria. Mr. Royal was in the pantry. I came back to my office, and I got an email that Federal Protective Service (FPS) was called.

10.     Who was the other examiner?

Violeta Prieto.

11.     What was the rule, if any about knives on USPTO property?

This is something you should get this from our security office. We have signs that say no weapons. I am told from security that means no knife blade longer than 3 inches but that is the purview of the security office.

12.     What did you do next after the email indicating Federal Protective Service had been called?

I am in a different building about three blocks away from Mr. Royal's lab. I have seven different locations with 8-9 labs and lecture halls. I have 8 locations in 7 different buildings.

So I went back over to the lab. The FPS police were talking with one of the two, I cannot recall which. I went with Debbie Reynolds. We told the police we were 3rd and 4th line supervisors. We waited while police interviewed different people and witnesses.

13.     Why did you not do anything when you saw paring knife on MS. Prieto's desk when you went over to the lab after the first email?

It was a paring knife with a small blade. It was on a plate with fruit; it did not seem unreasonable to be cutting fruit with a paring knife. Moreover, neither of the examiners was present and there was no conflict at that time.

14.     Did you speak with Mr. Royal at that time?

I did not. He was in the pantry. I am not sure if he knew I had been there.

15.     What happens next?

The police interview both individuals and some students. They talked to Ms. Reynolds and me. They asked me why people were not on better behavior in their first year. The female examiner was told to put the knives in her car. FPS said the law was kind of fuzzy on kitchen utensils. I estimated the paring knife to be 3 inches long, which is why I did not take it away.   The police talked to both individuals and left.

16.     What did you do next?

3

Initials _____

It seemed like the matter was closed. We decided we needed to separate the two examiners. The female examiner was moved to different lab that same day.

17.    Who was "we"?

Ms. Reynolds and me, and Jessica Ward (Rossi). We moved Ms. Prieto right away, that afternoon. By 1:20 she was being moved. Then I checked with Mr. Royal's home Technology Center (TC) and asked if he could be moved into his new building. We moved him to a new building in his home TC.

18.    Was any other action taken regarding these two examiners as a result of this incident?

No. Well, the class manager did have talk with them, maybe the next day. I am not sure of the substance of that talk. Additionally, I believe it was HR's recommendation to discharge both of them after this incident.

19.    How did this get to HR after the incident?

I do not know. I'm not sure if Ms. Ward called. Usually when we have something involving some discipline, we call HR, so it is not unusual to call HR when discipline is involved. Typically, the class manager would call, but I am not aware of the sequence in this incident.

20.    Did you overrule a recommendation to discharge both?

Yes, I probably did.

21.    Why?

This was the first incident that we had been made aware of involving these two examiners. We separated them. There were no performance issues. We were not aware of any conflicts before this incident.

22.    Did you talk with Mr. Such prior to making that decision?

I do not think I did.

23.    Have there been any other issues with Mr. Royal and Ms. Prieto after the December 13, 2013 incident?

No, there has been nothing else after this incident that I have been aware of. Once Mr. Royal was transferred to his home Tech Center, I am no longer in his chain of command.

24.    Do you know, was there any notation made in his record about the December 13, 2013 incident?

I don't know. Jennifer Ware would know. If no disciplinary action taken, there is no record, usually. I do not maintain these records.

25.    Do you have any reason to believe that Complainant's race impacted how this matter was handled?

4

Initials 

No.

26. Do you have any reason to believe that Complainant's sex played a role in how this matter was handled?

No.

27. Do you have any reason to believe the fact that Complainant is a black man and his alleged harasser is a white woman impacted how this matter was handled?

No. Typically if we have an incident where one person files a complaint, we usually move the person who caused the incident not the one who filed the Complaint. That is why we moved her, the apparent caused of the problem. He emailed and asked to be moved to the TC. We followed protocol in the way this was handled.

28. Do you have any reason to believe that Complainant was subjected to discrimination in the form of a hostile work environment due to the way in which is complaints of co-worker harassment were handled by the Agency and/or by you?

No, we were not aware of any other incidents in his work environment prior to this incident.

29. Why not?

We handled this incident like we would handle any other incident. As soon as there was a problem, we separated them. He indicated in his complaint to police prior incidences. We were not aware of any prior problems. As soon as we knew there was a problem, we moved the person who appeared to be the cause of the problem, not the Complainant, in that same afternoon.

30. Was this type of incident involving a conflict between co-workers unusual?

It does not come up often. There are incidents that happen from time to time. We handle many different kinds of incidents that rarely result in some to any kind of discipline. This was a pretty extreme situation.

31. Is there anything else I should known and the incident we have spoken about that I have not asked you?

I don't know what happened in lab. This is the first time I knew about it. Mr. Mohsen Ahmadi was the trainer. He is not a SPE. He is a patent examiner who is in lab as trainer. Tucker Wright was the teaching assistant. They had probably been in lab most of these first three months full time. At the time, we asked the SPE about harassing behavior. These other two should have been aware of what was going on as well.

32. What are employees told about how to handle co-worker problems or perceived harassment?

I don't know. We have a lot of students. I'm sure each trainer expects them to behave as adults. I know within first few days, the trainers and examiners set expectations for their labs. They usually develop a lot of class rules.

5

Initials

33.    Are the new examiners informed of EEO process or that they should seek out their supervisors to deal with conflict?

Yes.

34.    Did anyone from Human Resources (HR) or the Office of General Counsel (Legal) review your Affidavit or assist you with your responses before you signed and submitted your Affidavit to the Investigator? If the answer is yes, please provide the name, position and title of that individual(s) along with the Agency office to which s/he is assigned.

ANSWER: No.

## OATH

I, Gary Jones, have read the above statement/affidavit and being duly informed, and understanding the penalties of perjury; duly swear under oath that the statements made in this Affidavit are true and correct, and complete, to the best of my knowledge.

Gary Jones, Witness/Affiant

Dated: 7/11/14

Subscribed and sworn to me this 11ᵗʰ day of July, 2014.

Lisa A. Kleine, EEO investigator, or Notary Public

6

Initials

001812