# Exhibit 8

**In the Matter of Gregory Royal**

**Case Number: 14-56-22**
**Agency: United States Patent and Trademark Office**

**STATEMENT OF JESSICA ROSSI**
**RESPONSIBLE MANAGEMENT OFFICIAL**

On June 26, 2014, I was interviewed by the designated EEO Investigator, Lisa A. Kleine. Ms. Kleine explained to me that she was investigating allegations made by the Complainant that he was discriminated against in the form of a hostile work environment on the bases of sex (male) and race (African American/Black) since:

*1.   On or about December 13, 2013, Complainant alleges his complaints of hostile work environment were not taken seriously because he is a "six foot, medium built black man" and the alleged harasser is a white woman;*

*2.   On or about November 07, 2013, he was physically assaulted by a white female co-worker;*

*3.   On or about December 13, 2013 and continuing Complainant alleges that his harasser as been allowed to continue to violate USPTO policies on workplace safety and conduct by bringing several knives to the workplace and threatening Complainant.*

I was advised by Ms. Kleine of my rights as a witness/party in an EEO case, and was informed that my statement would and may be reviewed by the agency, the Office of Equal Employment Opportunity and Diversity and other interested parties, in the context of this claim. I have also been advised that there is no assurance of confidentiality as to the testimony given herein. I was also advised that I had the right to have a representative assist me in these proceedings, but chose not to.

The following represents a true and accurate summary/statement of the information that I provided to Ms. Kleine.

1.   Please state your full name and identify your sex and race.

Jessica Lee Rossi. I was previously known as Jessica Lee Ward. Sex: Female. Race: Caucasian.

2.   Please indicate your current position, your grade and step, the name of your current supervisor, the length of time you have been in your current position, your Art Unit and Technology Center.

I am a Class Manager at the Office of Patent Training. I am a GS-15 Step 5. I have been in my current position since August 2012. My current supervisor is Deborah Reynolds, Deputy Director, Office of Patent Training.

1

Initials _____

3.      Please describe your duties and responsibilities in your current position.

I am the second line supervisor to new examiners. The trainers are assigned as the examiner's supervisors. I assist trainers in dealing with performance and conduct issues for new examiners.

Typically there are multiple class managers on at the same time. Usually I have 2-3 classes at a time.

4.      Do you know the Complainant in this matter Gregory Royal, and if so, explain how you know him.

Yes. I met with him on several occasions due to the issues he raised.

5.      Do you know the Complainant's race and how do you know his race?

Prior to meeting him, I did not know his race.

6.      Do you know Complainant's sex, and if so, how do you know his sex?

Yes, he is male. I know based on observation.

7.      Describe your role as class manager in mediating disputes between co-workers? What is the goal of any intervention you take?

I'm not the person physically present in lab. I rely on information from trainers and examiners. I have to rely on the information I receive. I consult with Deputy Director and the Director as needed. We do everything according to protocol.

8.      What protocol?

It depends on the situation. For example, if the examiner is not complying with the schedule guidelines or the time guidelines we counsel on what the expectations are based on those guidelines. Guidance on PTO work schedules are written and are conveyed to examiners they day they come in.

9.      When was the first time you received notice that Complainant was having problems with his co-workers in the lab?

The first email I received was November 7, 2013, from Mr. Royal himself.

10.     What issues raised did he raise in the email?

Basically he was upset that a co-worker had interrupted him while speaking.

11.     What did you do?

2

Initials $\mathcal{DR}$

This was the first instance I've been made aware of. I talked to trainer. He was aware of situation. He sat down with both examiners, separately and counseled both parties as to appropriate behavior. We want the first line supervisor to handle unless it escalates.

12.    Did you respond to Mr. Royal?

I did not respond to Mr. Royal.

13.    Why did you not respond to Mr. Royal?

I did not respond because it was not my place at that point. The supervisor was already apprised of the situation.

14.    Did Mr. Such indicate he was aware of any previous problems?

He indicated he was not aware of anything previously. That was the first question I asked him.

15.    If an employee is having problems with another employee, what is she/she supposed to do?

He or she is supposed go to the trainer, who is the first line supervisor.

16.    What other resources are available to an employee who is having problems with a co-worker, and what information do they receive regarding handling workplace conflict?

Information is given orally. OHR (Office of Human Rights) comes in to talk about ethics and safe work environment, etc. It is done very early on this the process. I also know they can come to me if they don't want to go to their supervisors. If they wanted to circumvent me and go to the Deputy Director, they are able to do that to as well.

17.    When you got that first email from Mr. Royal, did you know who he was?

No, I had not met him yet. I did not know his race.

18,    Did that fact that Complainant was male and the alleged harasser was female have anything to do with the way you handled the situation?

Not at all. I take all complaints seriously. If someone is unhappy or upset, I want to deal with it immediately and do what I can to alleviate the situation.

19.    Regarding the issues of knives in the workplace, was the protocol for handling the possibility of weapons in the workplace?

3

Initials _____

001767

The only written (not USPTO) rules and regulations are Federal. I received a copy from Mr. Royal. I do not have any particular guidance for USPTO. I also talked with security services. Employees are not prohibited from having any kind of knife – might be a size issue.

Regarding the initial email I got, prior to the knife incident, the trainer spoke to both examiners. I did not hear anything for another month.

20.     Describe what happened on December 13, 2013 with Complainant and how, if at all, you were involved?

It was a Friday. I received email forwarded from Matt Such from Mr. Royal. It was the excerpt on rules and regulations for conduct on federal property. In the email, Mr. Royal said Ms. Prieto had three knives and stated his opinion about knives in relation to the rules and regulations. He also raised some issues of her conduct that annoyed him and he indicated he was concerned about knives. Mr. Such forwarded it to me and called me.

I forwarded the email to the Deputy Director. We were going to walk to the lab and speak with Mr. Royal. During that time, before I could get in to his building, he had called security.

When I walked over there, security already there. Security responded right away. Security looked at knives. They were paring knives, used to cut up fruit. They searched Ms. Prieto and made her return all three knives to her car in the garage.

They did not cite her.

21.     Who were you with?

Both Deborah Reynolds, the Deputy Director and Gary Jones, the Director. I arrived a little later than the two of them; I was tele-working and had to drive in. I was supposed tele-work that day but drove in to deal with this issue. It is standard for me to do this when there is an issue with one of my examiners.

22.     What happened next after security arrives and the knives were removed?

From a review of my notes, attached as Exhibit "1", security took both examiners separately and together to speak with them. When the two examiners were together there was back and forth with the two of them bickering. They clearly do not get along. The police involved as well – the Federal Officers. Both examiners were reminded by the officers they were both in professional environment.

23.     Did security tell Mr. Royal that he should not have called security?

No, the officers indicated, "By all means call security if you feel threatened, it is ok to call should you really feel threatened." They reiterated that to both parties.

4

Initials _____

In addition, the officers questioned some other examiners in lab to corroborate the badgering and "shut up" in late November by Ms. Prieto. The other examiners indicated it was not uncommon for him to interrupt the speaker in the lab and interject comments or questions. Ms. Prieto got frustrated by the behavior. So she would tell him to be quiet and/or shut up. Both were counseled on the appropriate behavior in work place – that you need to let others speak. If you have a problem, need to go to trainer. I spoke to each examiner privately.

We made the decision to move Ms. Prieto since she had knives not Mr. Royal, so it was appropriate that she be moved. There was only about a week before the completion of training for the examiners. Mr. Royal requested that he be moved early to his home TC. The request was granted.

24.    Did you speak with any other examiners about the situation in the lab?

I did not.

25.    Why not?

I was aware that the police had talked to people, who agreed there were points when the two examiners got into it. I did not feel like I needed to go over that again. I did not want anyone to feel like they needed to take sides.

We felt that moving Ms. Prieto and allowing Mr. Royal to move out of lab was the best course of action.

26.    At any point did Mr. Royal indicated he felt the harassment was race based?

When I spoke with him privately, that Friday, he did. I let him go on for about an hour, which is fine if he needed to say what he had to say. He had something to say about almost everyone in lab. Quotes from Mr. Royal, "Because he is courteous, he is as perceived as submissive black man." "If the roles were reversed and he had knives, they would have searched his underwear and he would have been fired."

He indicated that he did not think he deserved to be dragged into a meeting with me, class manager, and interrupt his work day. I reminded him as class manager that I had the right to speak with any employee, particularly if there is a possible conduct issue involved.

I met with Ms. Prieto, and reiterated the same things, that she needed to go to trainer and let the trainer handle things or come to me. She should not be bringing knives to work. She was told we were moving her to another lab. She was very quiet, she nodded ok.

She (Ms. Prieto) asked for follow up on Monday (she was upset moved to lab). I explained it was appropriate to move her because she had knives. I reminded her again to treat everyone with respect, and informed her that if I heard about problems again, there would probably be a stiffer penalty. She accepted that and moved to TC the following week when appropriate.

5

Initials _JH_

After that, once Mr. Royal was moved to TC, I have not had another word from him.

27.    Do you have any reason to believe that Mr. Royal's allegations of harassment and of being subjected to a hostile work environment were treated any differently due to his race or his sex?

No.

28.    Why not?

We have a very diverse work environment. Everyone is treated equally. The examining position is a non-competitive position, so you are only competing against yourself. I am just concerned that they are able to learn what they need to learn and become successful examiners. I am supposed to make sure extraneous stuff gets taken care of and keep them moving forward smoothly.

29.    Have you ever had an employee have an issue with knives before?

No, I have never had anyone raise the issue of knives. I have never had another employee express concerns about knives to me. Other employees have had knives to eat food; it has never been an issue. The examiner who had the knife, Mr. Royal never said anything to her. She felt a little blindsided. From his perspective, if he was uncomfortable about knives, he was not going to be comfortable talking to the employee in question about them. He could have gone to his trainer, which is what Mr. Royal did.

30.    Have you had any prior discrimination or harassment complaints made against you?

No.

31.    Have you had any subsequent discrimination or harassment complaints made against you?

No.

32.    Did anyone from Human Resources (HR) or the Office of General Counsel (Legal) review your Affidavit or assist you with your responses before you signed and submitted your Affidavit to the Investigator? If the answer is yes, please provide the name, position and title of that individual(s) along with the Agency office to which s/he is assigned.

ANSWER: No.

OATH

6

Initials _____

001770

I, Jessica Rossi, have read the above statement/affidavit and being duly informed, and understanding the penalties of perjury; duly swear under oath that the statements made in this Affidavit are true and correct, and complete, to the best of my knowledge.

Dated: _07/16/14_

Jessica Rossi, Witness/Affiant

Subscribed and sworn to me this _16th_ day of _July_, 2014.

Lisa A. Kleine, EEO investigator, or Notary Public

7

Initials _JAK_