# Exhibit 9

In the Matter of Gregory Royal

Case Number: 14-56-22
Agency: United States Patent and Trademark Office

## STATEMENT OF DEBORAH REYNOLDS
## MANAGEMENT WITNESS

On July 10, 2014, I was interviewed by the designated EEO Investigator, Lisa A. Kleine. Ms. Kleine explained to me that she was investigating allegations made by the Complainant that he was discriminated against in the form of a hostile work environment on the bases of sex (male) and race (African American/Black) since:

1. *On or about December 13, 2013, Complainant alleges his complaints of hostile work environment were not taken seriously because he is a "six foot, medium built black man" and the alleged harasser is a white woman;*

2. *On or about November 07, 2013, he was physically assaulted by a white female co-worker;*

3. *On or about December 13, 2013 and continuing Complainant alleges that his harasser as been allowed to continue to violate USPTO policies on workplace safety and conduct by bringing several knives to the workplace and threatening Complainant.*

I was advised by Ms. Kleine of my rights as a witness/party in an EEO case, and was informed that my statement would and may be reviewed by the agency, the Office of Equal Employment Opportunity and Diversity and other interested parties, in the context of this claim. I have also been advised that there is no assurance of confidentiality as to the testimony given herein. I was also advised that I had the right to have a representative assist me in these proceedings, but chose not to.

The following represents a true and accurate summary/statement of the information that I provided to Ms. Kleine.

1. Please state your full name and identify your sex and race.

Deborah Jean Reynolds. Sex: Female. Race: White.

2. Please indicate your current position, your grade and step, the name of your current supervisor and the length of time you have been in your current position.

I am the Deputy Director of the Office of Patent Training. I am SES and my supervisor is Gary Jones, Director, Office of Patent Training. I have been in this position since May, 2011.

3. Please describe your duties and responsibilities in your current position.

1

Initials DJR

001814

Broadly, I am responsible for the oversight of the Office of Patent Training. Specifically, this office is responsible for training of all examiners in patents.

4. Do you know the Complainant in this matter Gregory Royal, and if so, explain how you know him.

~~Yes, in that Mr. Jones and I meet in general all new employees. We generally walk through our~~ labs. The labs have groups of 16-17 new patent examiners. We visit the labs least every bi-week. Some employees talk a little more than others so we will get to know them a little more than others. We got to know Mr. Royal slightly better because he was involved in the incident with the knives on December 13, 2013.

5. Prior to the December 13 incident involving Mr. Royal, could you have put his name with a face?

Maybe not. They (the new examiners) come in groups of 70-100. Matching names to faces is hard.

6. Do you know the Complainant's race? How do you know his race?

Yes. I know his from his complaint. I did not note his race prior to that.

7. Do you know Complainant's sex, and if so, how do you know his sex?

Yes, I know he is male, based on observation.

8. Complainant has alleged he was discriminated against in the form of a hostile work environment on the bases of his race and his sex when his complaints of co-worker harassment were not taken seriously. When was the first time you became aware that Complainant was having difficulty with a co-worker?

There were a couple of incidences when he met with his managers about difficulties getting along with a co-worker. He talked with managers and then there was the knife incident, which I believe was that after these other issues.

9. How do you know about those conversations?

The managers had briefed us about the difficulties, so I know that they met with him, and I do know that it was more than one occasion. I think it was before the knife incident. I am pretty such the managers documented everything but Jessica Ward would have as well.

Shortly after the knives incident, which involved more than one kitchen utensil, we took action to move the female examiner immediately to another lab. I tend to feel that we took his situation seriously.

10. Who were his managers at the time he was in the lab?

2

Initials DSK

He had a trainer who was his first time supervisor, Matthew Such. The class manager was Jessica Rossi (Ward at the time).

One thing that we did, as soon as we felt Mr. Royal had completed training, we transitioned him to the Technology Center to get him out of that situation as well. Moving her got them apart. ~~Once his training was completed he transitioned so he was out of the environment immediately.~~ I feel like we took it very seriously. The Technology Center was not yet ready to move all examiners. We told them Mr. Royal was ready to be moved, and we moved him.

11. What is your role with the managers regarding the class?

I supervise the class mangers. I give them advice and make sure they are doing the right things. As the senior executive, if there is time when an employee is in a conduct situation and needed to be removed, we would approve that.

When things are going on in the classes and it feels like they need to go to Employee relations (ER), they, the class managers, come and talk to us. This situation did not involve a removal, this was strife between employees. If it had gotten worse, it would have most likely have involved one of the examiners being removed.

12. Do you know how many times prior to the December13, 2104 incident you knew there were problems between these two employees (Mr. Royal and Ms. Prieto)?

I'm not sure. I believe Ms. Ward had met with Mr. Royal twice, but I'm not sure it involved the same other person.

13. What is the protocol that either you or your mangers are suppose to following, when you believe there is co-worker harassment, i.e. if appears a co-worker is creating a hostile work environment for another co-worker?

Our first priority is to keep everyone safe and to get the employee out of the harassing situation. First, we normally see what the situation is.

14. Would you normally involve ER and EEO Office?

ER was involved in this case. I don't think we involved EEO.

15. Why not EEO? When do they get involved?

We had been working with ER from the beginning.

16. When was the first time ER was brought in, was it before the knife incident?

ER was contacted by Mr. Such or Ms. Ward.

3

Initials ⎯⎯⎯

17. Did Employee Relations make any recommendations about what to do?

Mr. Jones and I made decision to move Ms. Prieto out of lab.

18. What recommendation did Employee Relations make?

I don't recall. Mr. Royal was not calling a hostile work environment at that time. Everyone was thinking at time that we had two coworkers who were having a problem. There was no sense that problem between co-workers was due to any kind of discrimination. No one had brought that up at that time. There were no allegations in that lab that there were discriminatory actions.

We give diversity training in our labs really early on. The EEO office comes in and gives training really early to our examiners, within the first two weeks. They also get a refresher later in their training. We work hard on diversity and maintaining a diverse work place. There were no red flags on that issue at all while these events were going on with Mr. Royal.

19. What happened on December 13, 2013, describe your knowledge and involvement?

Mr. Jones and I were in a meeting and we were notified someone had knives. Both us thought it was puzzling. Mr. Jones said he would take a look. He came back from the lab and said he did not see anything. Then we were notified Federal Protective Service (FPS) was on the way. We both went down to the building where the lab was.

When we got there, a female student had a couple of paring knives and one slightly larger paring knife, three in total, at her desk, and maybe one in her lunch bag. She had brought them in to cut up fruit in her lunch.

She (the female examiner) was upset Mr. Royal had called FPS. The Officers said the rules regarding knives had to do with a 3 inch blade. The officer generally indicated that referred to pocket knives. The officer indicated the law was very fuzzy on kitchen knives. The female examiner took the knives to her car.

Mr. Jones and I were both appalled at how both examiners spoke to the officers. Both of them were arguing and yelling in front of the officers and back and forth with each other. We were appalled at how they behaved in front of the officers.

The officers interviewed the other students, and the other students said she was the problem. She was argumentative. In talking with the trainers, what it sounded like was that Mr. Royal asked a lot of questions. A lot of people got frustrated with his questions, and she would call him out about it. She really called him on everything he did. At one point I heard there may have been some physical altercation, but this is all third hand.

So we moved her immediately. We took immediate action to get the situation under control. As far as I know, nothing else happened. We did walk through after she was moved, and everything seemed fine.

4

Initials DJR

Moving her seemed to resolve the situation. I don't know what more he wanted us to do. We walked through the lab and checked on them. He was not given any special treatment we didn't give to anyone else. He could have contacted us if there was a problem, and he did not.

20. Prior to the knife incident, should something have been done?

The only thing I know about there was a "tit for tat" kind of thing. He would ask a lot of questions and there would be some kind of arguing that would happen. The manager did talk to them about it a couple of times to try to resolve it and it was not working. I think that is why it escalated.

21. Do you have any reason to believe that Complainant's race impacted how this matter was handled?

No.

22. Do you have any reason to believe that Complainant's sex played a role in how this matter was handled?

No.

23. Do you have any reason to believe the fact that Complainant is a black man and his alleged harasser is a white woman impacted how this matter was handled?

No. I believe that any two people regardless of race or sex, we would have handled the matter the same.

24. Do you have any reason to believe that Complainant was subjected to discrimination in the form of a hostile work environment due to the way in which is complaints of co-worker harassment were handled by the Agency and/or by you?

No.

25. Why not?

It was handled promptly and the way we would have handled the situation for anyone.

26. Were you aware that ER recommended they both be discharged following the December 13 incident?

If they made that recommendation, I do not recall it.

27. Who would have been the deciding official on the discharge?

Mr. Jones or me. Sometimes we take turns, we both have the authority. If Mr. Jones made the decision, it would not have needed to involve me.

28. Is there anything else about the situation involving Mr. Royal that you haven't been asked that you believe is important?

No.

Initials DJR

001818

29. Did anyone from Human Resources (HR) or the Office of General Counsel (Legal) review your Affidavit or assist you with your responses before you signed and submitted your Affidavit to the Investigator? If the answer is yes, please provide the name, position and title of that individual(s) along with the Agency office to which s/he is assigned.

ANSWER: No

## OATH

I, Deborah Reynolds, have read the above statement/affidavit and being duly informed, and understanding the penalties of perjury; duly swear under oath that the statements made in this Affidavit are true and correct, and complete, to the best of my knowledge.

Dated: 7/16/2014

_____
Deborah Reynolds, Witness/Affiant

Subscribed and sworn to me this 16 day of July, 2014.

_____
Lisa A. Kleine, EEO investigator, or Notary Public

Initials DJK

001819