# Exhibit 13

## In the Matter of Gregory Royal

Case Number: 14-56-22
Agency: United States Patent and Trademark Office

### ANNE MENDEZ
### RESPONSIBLE MANAGEMENT OFFICIAL

On October 8, 2014, I was interviewed by the designated EEO Investigator, Lisa A. Kleine. Ms. Kleine explained to me that she was investigating allegations made by the Complainant that he was discriminated against in the form of a hostile work environment on the bases of sex (male) and race (African American/Black) since:

1. On or about December 13, 2013, Complainant alleges his complaints of hostile work environment were not taken seriously because he is a "six foot, medium built black man" and the alleged harasser is a white woman;

2. On or about November 07, 2013, he was physically assaulted by a white female co-worker;

3. On or about December 13, 2013 and continuing Complainant alleges that his harasser as been allowed to continue to violate USPTO policies on workplace safety and conduct by bringing several knives to the workplace and threatening Complainant.

4. On or about July 10, 2014, he alleges he was physically assaulted in the workplace by another Agency employee whereby other examiners see him as a "punching bag" to be slapped, and nothing will happen to them for doing so.

5. On or about August 14, 2014, during the Patent Examiner Efficiency Exam (Exam), Complainant he was further subjected to a hostile work environment because the Agency failed to take sufficient action2 to prevent him from being subject to a hostile work environment when:

   a. the Alleged Harasser was to be allowed to take the Exam in the same room and the same time as Complainant was, despite the fact that she was moved to a different "Lab" than he was on or about December 13, 2013;

   b. the Alleged Harasser failed to follow the Exam Proctor's instructions to remain silent by approaching the cubicle in front of the one where Complainant was seated and began a "loud conversation" with another employee, and she "did so solely to annoy [sic] Complainant's focus" and "under the cloak of being social," the Alleged Harasser sought to disturb Complainant's focus for the Exam; and

   c. When the Exam Proctor spelled the name of an employee Complainant believes to be "Islamic" due to his name being "Mohammed," another employee was allowed to mock, not for the first time, those of the Islamic faith.

1

Initials _____

*6. On or about September 4, 2014, Complainant was removed from federal service during his probationary period, including being publicly escorted from the Agency's Alexandria, Virginia headquarters by Agency security guards.*

*II.     Whether Complainant was discriminated against in the on the bases of sex (male) and race (African American/Black), and reprisal (retaliation for engaging in protected EEO activity) when on September 4, 2014, Complainant was removed from federal service during his probationary period.*

I was advised by Ms. Kleine of my rights as a witness/party in an EEO case, and was informed that my statement would and may be reviewed by the agency, the Office of Equal Employment Opportunity and Diversity and other interested parties, in the context of this claim. I have also been advised that there is no assurance of confidentiality as to the testimony given herein. I was also advised that I had the right to have a representative assist me in these proceedings, but chose not to.

The following represents a true and accurate summary/statement of the information that I provided to Ms. Kleine.

1.      Please state your full name and identify your sex, race and prior EEO activity. If prior EEO activity, please state the nature of such involvement.

Anne Mendez. Race: White. Sex: Female. Prior EEO activity: I have been a witness many times. In addition, I was a complainant in my own case approximately 16 years ago.

2.      Please indicate your current position, your grade and step, the name of your current supervisor, and the length of time you have been in your current position.

I am the Chief of the Employee Relations Division. I am a GS-15 Step 4. Karen Karlinchak, Director, Office of Human Resources is my supervisor. I have been in this position since July 2010.

3.      Please describe your duties and responsibilities in your current position.

I supervise a staff of 16 specialists. We give advice and guidance to management on conduct and performance issues.

4.      Do you know the Complainant in this matter Gregory Royal, and if so, explain how you know him.

I met him once when he was getting his discharge letter, on September 4, 2014.

5.      Do you know the Complainant's race? How do you know his race?

He is African American. I know this based on observation from meeting him.

2

Initials _____

6. Do you know Complainant's sex, and if so, how do you know his sex?
He is male. I know this from observation from meeting him as well.

7. Prior to receiving notice from the investigator, when was the first time you were aware that Complainant had an EEO matter pending, and how did you obtain that information.

I have an email dated August 26, 2014 where one of my specialists is letting me know he filed an EEO complaint.

8. Is it routine for you to be informed that someone has filed an EEO complaint?

If EEOD is asking my staff for documents or something, my staff will give me a heads up. I am usually only informed if the EEO matter has some relation to a case we were working on. See attached email. It was sent to my staff. Jessica Hughes was asking the office for information.

9. Prior to being informed of the EEO matter, what issues was your office working on in relation to Mr. Royal?

There had been a few issues. Mr. Royal was new to the office, and in December 2013, we were made aware of an incident where Mr. Royal had a dispute with a co-worker and he had called security and/or FPS (Federal Protective Service). FPS ended up coming to the call. He accused another employer of assaulting him, bullying him and bringing knives to the office. This was the first incident I was aware of concerning Mr. Royal.

10. What was your role in that issue?

One of my team members was on the case. I think it was Jessica Patterson. She is still with the Agency but does not work with me anymore. Jennifer Ware has had some involvement. Karen Dean and Katie Griffith as well. Katie has been more involved in the discharge rather than the earlier issues.

In addition, I was also made aware, around December 20, 2013, by Stacy Hoffman, who was handling the suitability case, that there was a problem with Mr. Royal's suitability paperwork and OPM was taking jurisdiction of his case.

11. It is normal for your staff to inform you that there are issues going on?

Absolutely. We don't make decision, we give advice. My office determined, in the initial incident, that management handled it appropriately. They counseled both employees. They were both probationary. They were given the instructions to behave appropriately and that was the end of it from our perspective.

I believe that he blew that incident out of proportion.

3

Initials _____

12. Was there a recommendation made that they should be both be discharged as a result of the December incident?

We informed management that they had the option of discharging or counseling. Management puts a lot time into bringing people on and training them, so they try to correct problems before having to discharge. In this case, we were fine with management's decision to counseling the two employees.

13. What role did you have, if any, in the decision to terminate the Complainant during his probationary period?

Our office was advising that he should be terminated. I would have reviewed the termination letter and I was there when the termination letter was issued because there were concerns about his behavior.

14. Why was the recommendation made to terminate him?

He was ultimately terminated for performance for not being able to accept instructions and respond to feedback and for issues with consistency in posting work. That is the reason for the discharge, but there were certainly concerns about his behavior.

15. Were there more recent issues with his behavior?

He had an incident with another examiner. The other examiner apparently tapped Mr. Royal on the shoulder or neck to say hi. After the fact Mr. Royal said he was forcibly smacked on the back of neck. He indicated that his neck continued to cause him pain. He sent the other examiner an email regarding his medical bills, etc.

Mr. Royal sort of flip flopped with his story. We tried initially to get him to report it but he said nothing happened. He refused to make a statement when security was sent to talk to him. Then he turned around and said he was assaulted. The other examiner said he was just trying to get his attention. The other examiner said he was afraid of Mr. Royal as a result of this incident. Mr. Royal was just not credible.

16. Other than the EEO investigation that is on-going, has the Agency conducted any other investigations into the allegations Mr. Royal has raised?

Certainly there was an investigation into the incident with the first examiner - security, FPS, and Employee Relations looked into it separately based on incident reports, etc. It was concluded that the other examiner did have knives, but we do not believe she threatened him. Her knives were kitchen knives she was using to eat. She said he was disruptive in class and that she told him to shut up. She was counseled about professional behavior in the workplace.

The second incident involving Mr. Chan, security looked into it. Based on what Mr. Chan said and the flip flopping with Mr. Royal, we believed Mr. Chan to be more credible and did not take any additional action in that incident.

4

Initials _____

17. Was the decision not to take further action against the people Mr. Royal complained about have anything to do with the fact that Mr. Royal was a black man?

No.

18. Why Not?

It would not matter. Race and gender are not used in evaluating an issue of potential workplace violence. Race and gender are not an issue. We take work place violence very seriously. If we think there is a credible threat, we place someone on administrative leave until it is straightened out, and we just did not think it was warranted in this case.

19. What is the usual protocol followed when a probationary employee is terminated from federal service at USPTO, including how much notice of the termination the employee is given, how long the employee is permitted to remain on the premises following the notice of termination, and whether an employee is escorted from the premises?

We generally give a days notice at the most. We try to get most of them done the same day. At most we might give them one day with the termination being effective the next day. If we have any concerns about the person's behavior, we would given them administrative leave for the rest of the day and escort them out. Given Mr. Royal's behavior, there were concerns about him that there might be some kind of outburst or he would make some sort of allegation against someone, so we had security present for his discharge.

20. Why was Complainant escorted from the premises on September 4, 2014 following his termination?

Because of the concerns about his previous behavior.

21. Had he ever exhibited any violence or threatening behavior to anyone that caused concern?

Not physically violent, but he has been very difficult over the phone. The incident with Mr. Chan where he alleged told Mr. Chan, "I'm going to –uck you up" were all incidents that were concerning.

22. Who provides instructions to security on what steps to take regarding a terminated employee?

If we need security, one of us from our office will call security and request assistance. We give them very general instructions, asking security to get the employee's badge and keys. Then we let security do their job. We are usually the ones who initiate the discussion about security. In this case, both Employee Relations and management thought it was a good idea to have security personnel present.

5

Initials _am_

23. Who was present at that final meeting?

Katie Griffith, Joe Thomas, me, and a security officer in plain clothes (I cannot remember his name).

24. Why was he in plain clothes?

He was one of the contract security guards and a supervisor. They made the decision on who to send. They were aware of his name from previous incidents.

25. Do you have any reason to believe the decision to escort Complainant from the premises upon his termination on September 4, 2014 was due to discrimination based on his race?

No.

26. Do you have any reason to believe the decision to escort Complainant from the premises upon his termination on September 4, 2014 was due to discrimination based on his sex?

No.

27. Why not?

We requested security assistance because of his previous behavior; it had nothing to do with his race or gender.

28. Did anything in particular happen at the termination meeting?

He was obviously upset and was pleading with Mr. Thomas to give him another chance. He was hostile afterwards when he called from home to me and to a benefits specialist.

29. Has he been barred from the premises?

I don't think so. We took his badge so he can't just come in like an employee, but I do not think he is banned.

30. Do you have any reason to believe that Complainant was discriminated against on the basis of his race or his sex when he was terminated from his employment?

No.

31. Do you have any reason to believe that Complainant's termination was in retaliation for his EEO activity against the Agency?

No.

32. Why not?

6

Initials _____

Because there were valid reasons for the termination. His performance was poor and that is why he was discharged.

33. He has raised the issue that he couldn't perform because he was being constantly subjected to harassment. Do you have any reason to believe that this was true?

No.

34. Why not?

First, I don't think his allegations of harassment were credible. With respect to the incident with Mr. Chan, Mr. Royal had no credibility. Regarding the initial incident in December, I believe that both employees were acting inappropriately. I don't think that had any impact on his ability to perform. They went to different places. She would not still be able to have an impact on him. That claim is not credible.

35. Is there any reason to believe that she continued to harass him in these group settings?

I am not aware that she did anything else to him. If in fact she continued any questionable behavior that was reported, we would of course have recommended her discharge. Nothing has been reported to me.

36. Are you aware of any other investigations going on regarding Complainant's claims and allegations?

No.

37. Did you have any involvement in the issuance of any vacation pay Complainant may have been due following his termination?

No, the compensation staff takes care of it. But there is always a delay in issuing that last check because it gets paid in the next pay cycle, so there is always a two week delay. We cannot cut someone a check as soon as they are terminated.

38. Did you discuss the contents of this testimony and/or receive any assistance from anyone in the preparation of your testimony? If yes, who?

ANSWER: No.

39. Did anyone from Human Resources (HR) or the Office of General Counsel (Legal) review your Affidavit or assist you with your responses before you signed and submitted your Affidavit to the Investigator? If the answer is yes, please provide the name, position and title of that individual(s) along with the Agency office to which s/he is assigned.

ANSWER: No.

7

Initials

## OATH

I, Anne Mendez, have read the above statement/affidavit and being duly informed, and understanding the penalties of perjury; duly swear under oath that the statements made in this Affidavit are true and correct, and complete, to the best of my knowledge.

_____
Anne Mendez, Witness/Affiant

Dated: 10/27/14

Subscribed and sworn to me this __27th__ day of __October__, 2014.

_____
Lisa A. Kleine, EEO investigator, or Notary Public

8

Initials _AM_

001837