IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

**GREGORY ALLEN ROYAL,**

**v.**                                                    **Civil Action No. 1:17cv261**

**ANDREI IANCU, et al.**

## ORDER

The *pro per* plaintiff formerly worked at the United States Patent and Trademark Office ("USPTO") as a probationary patent examiner.   On September 4, 2014, plaintiff was terminated by the USPTO at the end of his year-long probationary period.   Plaintiff now sues the USPTO, alleging disparate treatment on the basis of race and gender, retaliation based on protected activity under Title VII, and a hostile work environment based on racial and sex-based animus.  The USPTO has moved for summary judgment, a motion that has been fully briefed and argued, and is now ready for disposition.

## I.

Analysis properly begins by ascertaining the record facts.  In that regard, Federal Rule of Civil Procedure 56, Local Civil Rule 56(B) and the Court's scheduling order set forth specific requirements for the moving party to file a statement of material fact and the non-moving party to respond to that statement of material fact and file their own statement, if desired.

Specifically, Local Civil Rule 56(B) provides that "[e]ach brief in support of a

motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed." The USPTO, as the moving party, complied with this Rule.

The same rule also requires that:

> A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

EDVA Civ. Loc. R. 56(b). Plaintiff, who reports to be an attorney and member of the Bar of the State of Illinois, failed to respond to the USPTO's statement of undisputed material fact, as required by the Rule, despite being warned on previous occasions that he must comply with all Federal and Local rules.  Therefore, pursuant to Local Rule 56(B), the Court may deem the USPTO's statement of undisputed facts as admitted.

Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and based on the undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  Because plaintiff failed to respond to the USPTO's undisputed facts, the following facts will be deemed undisputed:

- Plaintiff is an African-American male.

- Plaintiff attended law school and has a J.D. and an LLM in intellectual property.

- Plaintiff began employment with the Agency as a probationary Patent Examiner,[1] GS-1224-09, on September 9, 2013.

- Once Plaintiff completed his introductory training in the Patent Training Academy ("PTA"), he was assigned to Art Unit 2856 in Technology Center ("TC")2 2800.

- Plaintiff reported to Lisa Cauputo, a Supervisory Patent Examiner ("SPE").

- Plaintiff's second-line supervisor was Joseph Thomas, a Group Director in TC 2800.

- As a probationary Patent Examiner, plaintiff reviewed patent applications from inventors to determine whether the claimed inventions were eligible for patent protection.

- As a new patent examiner, Plaintiff spent his first four months of employment at the PTA, learning the technical aspects of the job, as well as Agency policies and procedures.

- The PTA's starting class had 12 training labs of approximately 14 to 16 new examiners each.

- In the PTA, plaintiff reported to Matthew Such, the Training SPE, and his second-line supervisor was Jessica Rossi (née Ward), the Class Manager.

- In the PTA, from on or around September 9, 2013, through October 17, 2013, plaintiff and another examiner, Vincent Wall, had several confrontations about the meaning of certain acronyms associated with patent examining and researching prior art, which plaintiff found to be "demean[ing] and slander[ous]," and culminated in plaintiff issuing Wall a "Cease and Desist" letter on October 17, 2013.

- Plaintiff and Wall continued to have verbal conflicts about work and other matters.

- On or about October 17, 2013, plaintiff met with Such to discuss his concerns about Wall; however, plaintiff did not raise any issues of harassment based on his sex or race. This was the first time Such became aware of issues involving plaintiff and Wall.

- Such met separately with both Wall and plaintiff and both agreed there was a conflict related to prior art; Such then met with both men together and counseled them that they needed to work together in the PTA and thought the matter was resolved.

3

- On or about October 18, 2013, another examiner, Violeta Prieto told plaintiff to "shut up" during a lecture in the PTA. But Prieto also told another examiner, a non-African-American female to "shut up" during lectures on at least two other occasions.

- Plaintiff asked Such, the Training SPE, to remind everyone to be polite and not to say "shut up." Such and Caputo, plaintiff's direct supervisor, agreed that everyone should be reminded to be polite during lectures.

- On or about November 7, 2013, plaintiff sent Such an email complaining that Prieto was interrupting him and disturbing him during PTA lectures.

- That same day, Prieto confronted plaintiff about the email, stating that plaintiff was trying to get her in trouble, and plaintiff told Such.

- Such spoke with Prieto and counseled her that she could not tell plaintiff or others to "shut up," but he also suggested to plaintiff that he should consider whether the complexity of some of his questions was beneficial to the other examiners.

- On November 7, 2013, plaintiff also copied Rossi, his second-line supervisor at the time, on his email complaining about Prieto's behavior. At that time, Rossi did not know plaintiff's race and had not met him in person. Plaintiff chose not to follow up with Rossi, even when she called him, because he perceived her not to be understanding of his situation.

- On or about November 14, 2013, the probationary examiners in Lab 11 took a quiz in the PTA during which there was further verbal conflict between Plaintiff and Prieto.

- Between November 2013, and December 13, 2013, Plaintiff and Prieto had multiple verbal confrontations, each accusing the other of being the problem.

- Plaintiff alleges that at one point during this period Prieto came so close to him waving her hands that a pen was knocked from plaintiff's hands and spilled ink on her; she denied doing so to Such.

- On Friday, December 13, 2013, Such received an email from plaintiff complaining that Prieto had "knives on her desk," was pulling hair out of her head, eating loudly at her desk, and otherwise being contentious.

- Such forwarded the email to Rossi and called her, and he also tried to call plaintiff

to discuss the situation. Rossi contacted Deborah Reynolds, Deputy Director of the PTA, and Gary Jones, the PTA Director, to inform them of the situation.

- As soon as the PTA Director received Rossi's email, he walked over to the labs. When the PTA Director arrived, neither Prieto nor plaintiff was at her/his desk; he observed a paring knife on Prieto's desk, with fruit, and a plastic knife. Given the lack of conflict and the small blade, the PTA Director did not see anything amiss in the situation. When Jones returned to his office, he had an email waiting for him stating that USPTO Security had been called, and Jones returned to his lab, which was a 3-block walk away.

- In actuality, on December 13, 2013, around 10:00 a.m., plaintiff called Security from the PTA, informing them that Prieto had "knives." Plaintiff told Security that Prieto had been verbally abusive and had knives on her desk. Security contacted the Federal Protective Service ("FPS") to respond.

- FPS responded to plaintiff's call and spoke with both plaintiff and Prieto about the situation, who continued to argue, in a way that "appalled" Jones. FPS escorted Prieto to the lobby of the Agency and had her take the "knives" to her car, although it did not appear Prieto had violated any Agency rules or regulations.

- The FPS inspectors concluded it was a non-violent disagreement and called plaintiff and Prieto to the same office and informed them they would have to find a way to get along with each other.

- Prieto was not cited by security, and management concluded that Prieto's knives did not appear to violate Agency policy, as they appeared to be for use as personal eating utensils.

- Jones, Reynolds, and Rossi decided to move Prieto to another lab immediately to separate her from Plaintiff.

- Prieto and Plaintiff were counseled to conduct themselves in a professional manner in the PTA.

- At the time PTA management decided to separate Prieto and Plaintiff, they believed it to be a personality conflict and no one had alleged race and/or sex discrimination.

- On December 13, 2013, after contacting Security, plaintiff contacted Jennifer Ware, an employee relations specialist ("ERS") in the Office of Human Resources ("OHR"), to discuss his complaint about Prieto.

- Plaintiff told Ware that he was being harassed by Prieto and that he believed Preito's actions were because Prieto "was not used to a polite, educated black man."

- On or about December 16, 2013, Plaintiff requested that he be moved early from the PTA and into his Art Unit, which had already been discussed. The Agency agreed and moved Plaintiff to his Art Unit on December 20, 2013.

- On or about December 18, 2013, Prieto came to Ware's office to file a complaint about plaintiff and that she had been moved, not plaintiff.

- Prieto alleged that plaintiff interrupted her, tried to dominate classroom discussions, and that he humiliated her when he called Security about the knives she uses to cut fruit.

- Based on the ongoing issues between Prieto and Plaintiff, and its disruption of the PTA class, Employee Relations recommended to the PTA Director that both employees be discharged.

- But the PTA Director disagreed, and thus did not follow the Employee Relations' recommendation; in short, the PTA Director determined that moving both employees to their separate art units was sufficient action to end the situation.

- On December 19, 2013, as Plaintiff transitioned to his Art Unit, he received his first interim evaluation.

- Plaintiff received a "1," the lowest score reflecting "needed improvement," in the area of "ability to interact with coworkers," along with the comment "the examiner should be mindful of his interactions with coworkers in order to avoid further instances of contentious interactions from occurring." Plaintiff also received "1s," in productivity consistency and work habits.

- On or around March 2014, plaintiff received his six-month evaluation from Caputo, his SPE, and Thomas, TC 2800 Group Director.

- Plaintiff received a "2" for "meeting expectations" in getting along with others but he received a "1" for "needs improvement" on production.

- On or about April 29, 2014, plaintiff complained to Security about an alleged incident on April 23, 2014, in which Prieto had allegedly waited for plaintiff in a concourse outside one of the lecture halls and attempted to force physical contact. Security reviewed video footage of the alleged incident but concluded that the video did not show anything relevant to support plaintiff's allegations.

6

- In or around May 2014, plaintiff received his eight-month evaluation from his SPE.

- In May 2014, plaintiff received a "1" for ability to work with others as well as a "1" in production.

- Caputo found that plaintiff's work product numbers were not improving, despite weekly meetings.

- Plaintiff's production at eight months was around 44% when management expects it to be around 80% at that time.

- Caputo and Thomas informed plaintiff on multiple occasions that failure to achieve consistent improvement of his production levels would have a negative impact on whether the Agency would retain plaintiff following the probationary period.

- In or around May 2014, Thomas met with plaintiff because he was concerned with plaintiff's low productivity and low level of work product.  Thomas and Caputo asked plaintiff if he needed assistance or resources to help him perform his job.

- On or about July 10, 2014, plaintiff alleged that another examiner, Wei "Victor" Chan, had "smacked [him] on the back of the head"; however, at the time he declined to make any statement and did not do so until August 12, 2014.

- When OHR investigated the incident, it found that while Chan may have touched plaintiff, it was just to get plaintiff's attention and in no way constituted a smack on the head or an assault.  Chan acknowledged touching plaintiff to get his attention but denied it was forceful.  Another examiner who witnessed the incident corroborated Chan's characterization of the amount of force applied.

- Plaintiff's one-year probationary period was set to expire on September 9, 2014; as such, if the USPTO did not wish to retain him, as with other employee, it needed to make that decision by that date.

- On September 4, 2014, Thomas called Plaintiff in for a meeting, along with two OHR employees, an employee from the Security Office and a uniformed security guard.

- On September 4, 2014, Thomas informed Plaintiff he was being discharged during his probationary period because Plaintiff had not demonstrated he could successfully do the job of a patent examiner as required by the PAP.

- In TC 2800, in the three years prior to Plaintiff's discharge, nine other patent examiners were discharged during their probationary period. Seven were male, two were female, and six of them were not African-American.

- Plaintiff filed a formal administrative complaint of discrimination with the USPTO on May 26, 2014.

- The USPTO conducted a significantly-detailed investigation into Plaintiff's Title VII allegations, which generated a more than 2,000 page report of investigation ("ROI").

- Once that ROI issued (and Plaintiff obtained a copy), Plaintiff exercised his right to a hearing before an Administrative Judge ("ALJ") of the Equal Employment Opportunity Commission.

- On October 5, 2016, the presiding ALJ dismissed plaintiff's request for a hearing based upon plaintiff's own misconduct and dilatory tactics. The ALJ noted that plaintiff had "rais[ed] his voice and 'engag[ed] in lengthy rants' during status conferences, repeatedly accusing [USPTO] representatives of malicious and unethical conduct, and sen[t] one [USPTO] representative a photograph of himself with an inappropriate message." The ALJ remanded Plaintiff's administrative complaint to the USPTO for issuance of a final agency decision ("FAD").

- The USPTO issued the FAD—a detailed, seventeen-page decision—on December 2, 2016.

- Plaintiff noticed an appeal of that FAD to the Office of Federal Operations ("OFO") on March 7, 2017, which the OFO dismissed as untimely.

- Plaintiff filed the instant action on March 7, 2017.

## II.

### 1.

Plaintiff claims that he was treated differently from other employees because of his race and gender, in violation of Title VII. Plaintiff, however, has failed to produce direct evidence of racial or sex-based animus against him.

Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x. 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*)). In other words, evidence is "direct" if it "proves [the] existence of [discriminatory intent] without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (internal marks and citation omitted); *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018); *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 186 (5th Cir. 2018).

On this summary judgment record, no explicit discriminatory statements or actions were made or taken by the USPTO or its employees against plaintiff. Instead, plaintiff asks that discrimination be inferred based on the way he was treated by the USPTO and his fellow co-workers. Where, as here, plaintiff fails to produce direct evidence that his treatment and/or termination was based on discriminatory animus by the USPTO, he can survive summary judgment only if he establishes *prima facie* cases of race and gender discrimination using the *McDonnell-Douglas* burden shifting framework.[1]

---

[1] "Under the *McDonnell Douglas* burden shifting formula, after the plaintiff establishes a *prima facie* case, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Should the employer articulate such a reason, the plaintiff must then be afforded an opportunity to show that the articulated reason was merely pretext for a racially discriminatory decision." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 283 (4th Cir. 2005) (internal citations and quotations omitted).

**2.**

To state a *prima facie* case for disparate treatment under Title VII, plaintiff must produce record evidence demonstrating: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012). Plaintiff can clearly establish the first element of the *prima facie* case because plaintiff is an African American male. Plaintiff also clearly establishes the adverse employment action element, because he was terminated on September 4, 2014. But plaintiff's case falters on the second and fourth elements of the *prima facie* case.

First, plaintiff has pointed to no record evidence that he performed his job in a manner that satisfied the reasonable expectations of his employer. To the contrary, the USPTO has pointed to overwhelming evidence, including three performance reviews and a host of individual meetings between plaintiff and his supervisors, where the USPTO informed plaintiff that he was underperforming and would need to improve his performance to retain his position. The record evidence shows that plaintiff did not improve and was therefore terminated by the USPTO before his probationary period expired. Because the record evidence demonstrates that plaintiff was not meeting the legitimate expectations of his employer, he cannot establish a *prima facie* case of discrimination.

Second, plaintiff's raced and sex-based disparate treatment claims also fail because he cannot prove the fourth element of the *prima facie* case, namely that he was treated less

favorably than similarly situated employees outside the protected classes.   In this regard, plaintiff has produced no evidence that comparable non-black and/or female employees were treated more favorably than he was.[2] *See Hurst v. D.C.*, 681 F. App'x 186, 189 (4th Cir. 2017) (noting that proof of similarly situated comparators satisfies the fourth element of a disparate treatment claim); *see also Haywood v. Locke*, 387 F. App'x. 355, 359 (4th Cir. 2010).   Moreover, plaintiff has produced no evidence showing he was discharged "under circumstances giving rise to an inference of unlawful discrimination." *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (holding that comparator evidence may not be required to prove the fourth element of the *prima facie* case if plaintiff produces other evidence that shows the adverse employment action was rooted in discriminatory animus).   Thus, plaintiff has not produced sufficient evidence to establish the fourth element of the *prima facie* case for Title VII race or gender discrimination.

For these reasons, plaintiff has failed to establish a *prima facie* case for Title VII race or gender discrimination.   Even assuming, however, that plaintiff had produced admissible summary judgment evidence establishing a *prima facie* case, the USPTO has met its burden of articulating a "legitimate, nondiscriminatory reason for its actions" and plaintiff has failed to adduce record evidence that there is a triable issue of fact as to whether "the legitimate reasons offered by the [USPTO] were not its true reasons, but were

---

[2] At oral argument, plaintiff identified Victoria Prieto as a white female who was treated better than he was.  But the record evidence belies this baseless assertion.  After plaintiff and Prieto engaged in months-long interpersonal warfare, the USPTO fixed the problem by moving Prieto out of the art-unit she shared with plaintiff.  In other words, Prieto was punished by moving her to a different art-unit.  Plaintiff stayed in his art-unit where he continued to under-perform.

11

a pretext for discrimination." *Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Specifically, the USPTO has identified multiple performance evaluations which demonstrate that plaintiff was not meeting the USPTO's reasonable expectations. Despite months of employment counseling and training, plaintiff continued to underperform and the USPTO decided to terminate him before his probationary period expired. Thus, the USPTO has articulated a legitimate, non-discriminatory reason for plaintiff's discharge, and plaintiff has pointed to no admissible evidence demonstrating that the USPTO's decision to fire him was mere pretext for discrimination.

For all these reasons, summary judgment must be entered on behalf of the USPTO on plaintiff's disparate treatment claims.

## III.

For his Title VII hostile work environment claims to survive summary judgment,[3] plaintiff must show that a reasonable jury could find that the alleged conduct by the USPTO and plaintiff's fellow employees: (1) was unwelcome; (2) was based on his race and/or gender; (3) was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment; and (4) was imputable to his employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015); *Baqir v. Principi*, 434 F.3d 733, 745 (4th Cir. 2006)).

---

[3] As correctly noted by the USPTO, a harassment claim under these facts is the same as a hostile work environment claim.

Plaintiff identifies several incidents that he believes created a hostile work environment. Many of these incidents involved a single fellow employee, Violeta Prieto, who allegedly told plaintiff to "shut up" during lectures, annoyed plaintiff by chewing loudly and pulling her hair while sitting at her desk,[4] intimidated plaintiff by having knives on her desk, and verbally and physically confronted plaintiff outside a lecture hall. Plaintiff also identified another incident where an Asian male coworker, Wei "Victor" Chan, "slapped" plaintiff on the back of his head. And finally, plaintiff had several verbal conflicts with another employee named Vincent Wall. The issue then is whether these incidents gave rise to a hostile work environment as contemplated by Title VII.

The law is abundantly clear that Title VII does not establish a "general civility code for the American workplace." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). It is an unescapable reality that the "workplace[] [is[ not always [a] harmonious locale"; therefore, "even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy [Title VII's] severe or pervasive standard." As the Fourth Circuit has recognized, "some rolling with the punches is a fact of workplace life." Accordingly, complaints premised on nothing more than "rude treatment by [coworkers]," *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir.2006), "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir.2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins*

---

[4] Ms. Prieto's desk was located next to plaintiff's desk.

13

*v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir.2000), are not actionable under Title VII. *Id.*;
*see also Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 161–62 (4th Cir. 2018).

It is readily apparent from the undisputed facts that plaintiff's relationship with his co-workers was mired by mutual dislike and antagonism. But there is no evidence on this summary judgment record that any of the incidents identified by the plaintiff were motivated by racial or sex-based animus. It is equally clear that plaintiff did not roll with punches. If plaintiff had spent more time doing his work and less time arguing with his coworkers, calling security and filing complaints, he may have kept is job at the USPTO. But plaintiff let a childish spat with a co-worker dominate his time at the USPTO and undermine his professional credibility. Plaintiff cannot seek the protection of Title VII simply because he is an African American male when there is no evidence that he suffered any racial or sex-based discrimination. To seek the protections of this important legislation, under these facts, demeans Title VII's prophylactic purpose.

In sum, the conduct of Prieto, Chan and Wall may well have been unwelcome to plaintiff; but nothing on this record shows (i) that Prieto, Chan or Wall's conduct was based on plaintiff's race or gender, (ii) that their conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment or (iii) that their behavior was imputable to the USPTO. At worst, plaintiff suffered rude and unpleasant behavior from his co-workers, none of which, the record shows, was motivated by race or gender. Therefore, plaintiff's Title VII hostile work environment claim fails as a matter of law and judgment must be entered on behalf of the USPTO.

14

## IV.

Plaintiff's final claim is for Title VII retaliation, which requires proof of three elements to establish a *prima facie* case: "(1) that [plaintiff] engaged in protected activity; (2) that his employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)).   At the *prima facie* stage, plaintiff must demonstrate a causal link between the adverse employment action(s) and the protected activity.[5] *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).  To establish a causal link, plaintiff must show that the defendant knew of his protected activity. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).

Plaintiff only has one plausible allegation that he engaged in protected activity, as envisioned by the statute.  Specifically, plaintiff claims that on December 13, 2013, he contacted Jennifer Ware, an employee relations specialist at the USPTO, to discuss his complaint about Prieto. On December 13th, plaintiff told Ware that he was being harassed by Prieto and that he believed Preito's actions were because Prieto was not used "to a polite, educated black man."  Even assuming, *arguendo*, that plaintiff's December 13th meeting constituted protected activity under Title VII, plaintiff has nonetheless failed to establish a

---

[5] The Fourth Circuit has stated that the "but-for" causation standard governing Title VII retaliation cases does not apply at the *prima facie* stage of the summary judgment analysis; but instead applies later when assessing whether the legitimate, non-discriminatory reason offered by the employer is pretextual. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

*prima facie* case of retaliation because there is no evidence connecting the protected activity to the adverse action and no reasonable inference can be drawn in plaintiff's favor.

Because there is no other evidence supporting a causal link between plaintiff's termination and his "protected activity," plaintiff can rely on temporal proximity to create an inference of retaliatory motive. In other words, plaintiff's causation argument rises and falls on the fact that he was terminated approximately nine (9) months after engaging in "protected activity." But as the Fourth Circuit has recognized, a nine-month lapse between plaintiff's protected activity and his termination is insufficient to create an inference of causation.[6] Therefore, plaintiff has failed to establish a *prima facie* case of Title VII retaliation.

Moreover, even if plaintiff had stated a *prima facie* case for retaliation, the USPTO has met its burden of establishing a "legitimate, nonretaliatory reason for taking the employment action at issue." *Hannah P. v. Coats*, No. 17-1943, __F.3d__ (4th Cir. Feb. 19, 2019) (holding employee failed to establish that employer's legitimate, nonretaliatory reason for not hiring her for a new position, namely the employee's prior attendance issues, was pretext and that the employer's true motivation for not hiring her was retaliation for

---

[6] *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 99 (4th Cir. 2016) (holding a ten-month lapse between Hall's protected activity of filing a HUD complaint and GMS's adverse action was insufficient to create an inference of causation); *Hooven–Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir.2001) ("A six month lag is sufficient to negate any inference of causation."); *Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 337 (4th Cir.2013) (finding ten-month lapse insufficient to establish causation) (unpublished); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (7th Cir.1992) (four-month period insufficient).

16

engaging in protected activity). Specifically, the USPTO has pointed to a mountain of evidence that plaintiff did not perform his job in a satisfactory manner, including failing to interact with his co-workers in a professional way and failing to meet the USPTO's reasonable production expectations. Plaintiff has offered no admissible record evidence to suggest that these legitimate, nonretaliatory reasons are pretextual. Accordingly, summary judgment must be granted to the USPTO on plaintiff's retaliation claim.

## V.

In sum, this case reveals a shocking lack of professionalism exhibited by the plaintiff and other USPTO employees. These individuals routinely behaved like children fighting over toys in the sandbox; not like adults doing the important work of examining patents for the United States government. And although it is apparent that plaintiff was not well-liked by several of his colleagues and that various unpleasant incidents did occur between plaintiff and his co-workers, all of this unpleasantry is attributable to personality conflicts amongst co-workers. Nothing on this record reveals that plaintiff suffered any race or gender-based discrimination, and there is no federal legislation protecting plaintiff from rudeness or unkindness.[7]

Accordingly,

It is hereby **ORDERED** that the USPTO's second motion for summary judgment (Doc. 42) is **GRANTED**.

---

[7] If plaintiff wishes to succeed as an attorney or an employee in a modern office setting, he will need to develop thicker skin.

17

It is further **ORDERED** that judgment shall be entered in favor on defendant and against plaintiff on all counts in the plaintiff's complaint.

It is further **ORDERED** that all other motions are **DENIED AS MOOT** and all hearings and deadlines are cancelled.

To appeal this decision, or any other decision of this Court, plaintiff must file a written Notice of Appeal with the Clerk of this court within thirty (30) days of receiving an order that aggrieves him. Failure to file a timely Notice of Appeal waives the right to appeal.

The Clerk is directed to provide a copy of this Order to plaintiff at his last known address and to all counsel of record, and to enter Rule 58 Judgment in favor of the USPTO and against plaintiff.

Alexandria, Virginia
February 28, 2019

/s/

T. S. Ellis, III
United States District Judge